# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

SIERRA CLUB and PUBLIC CITIZEN          )
                 *Petitioners*,          )
                                      )
     v.          )          No. 24-1199
                                        )
FEDERAL ENERGY REGULATORY          )
COMMISSION          )
                 *Respondent*.          )
_____)

## PETITION FOR REVIEW

Pursuant to Section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b), Federal Rule of Appellate Procedure 15, and Circuit Rule 15, Sierra Club and Public Citizen hereby petition the United States Court of Appeals for the District of Columbia Circuit for review of the following order of the Federal Energy Regulatory Commission ("Commission"):

- Order Issuing Presidential Permit and Granting Authorization Under Section 3 of the Natural Gas Act, *Saguaro Connector Pipeline, LLC*, FERC Docket No. CP23-29 (February 15, 2024), 186 FERC ¶ 61,114 and attached as Exhibit A.

All petitioners were intervenors in the Commission proceedings below.

Petitioners timely filed a request for rehearing of the Order Issuing Presidential Permit and Granting Authorization on March 18, 2024, which FERC

failed to respond to within 30 days. As such, petitioners' request for rehearing was

deemed denied by operation of law, as FERC acknowledged in its Notice of Denial

of Rehearing by Operation of Law and Providing for Further Consideration re

Saguaro Connector Pipeline, LLC under CP23-29 (Apr. 18, 2024), 187 FERC

¶ 62,050 and attached as Exhibit B. Accordingly, this Court has jurisdiction to

review the Order Granting Authorization Under Section 3 of the Natural Gas Act,

pursuant to 15 U.S.C. § 717r(b).

This petition for review is timely filed, because FERC has not yet issued an

order on the merits of the request for rehearing. *Env't Def. Fund v. FERC*, 2 F.4th

953, 972 (D.C. Cir. 2021), *cert. denied sub nom. Spire Missouri Inc. v. Env't Def.

Fund*, 142 S. Ct. 1668 (2022). Moreover, this petition was filed within 60 days of

the date the request for rehearing was deemed denied. 15 U.S.C. § 717r(b).

Dated June 13, 2024.

Respectfully submitted,

*/s/ Doug Hayes*
Doug Hayes
Sierra Club
1650 38th Street, Suite 103W
Boulder, CO 80301
(305) 449-5595
doug.hayes@sierraclub.org

Rebecca McCreary
Sierra Club
1650 38th Street, Suite 103W

Boulder, CO 80301
(305) 449-5595
rebecca.mccreary@sierraclub.org

*Attorneys for Sierra Club and Public Citizen*

**/s/ *Nandan M. Joshi***
Nandan M. Joshi
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
njoshi@citizen.org

*Attorney for Public Citizen*

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT


SIERRA CLUB and PUBLIC CITIZEN          )
        *Petitioners*,          )
                  )
    v.          )          No. 24-1199
                  )
FEDERAL ENERGY REGULATORY          )
COMMISSION          )
        *Respondent*.          )
_____)

### PETITIONERS' RULE 26.1 STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1,

Petitioners make the following disclosures:

**Sierra Club:** Sierra Club has no parent companies, and there are no publicly

held companies that have a 10 percent or greater ownership interest in Sierra Club.

Sierra Club, a corporation organized and existing under the laws of the State of

California, is a nonprofit organization dedicated to the protection and enjoyment of

the environment.

**Public Citizen:** Public Citizen is a nonprofit organization that has no parent

companies, and no publicly held company has any form of ownership interest in it.

Public Citizen advocates for consumers, citizens, and the public to promote the

adoption and implementation of governmental policies and actions that protect

against corporate actions and behaviors that threaten to harm public health and

safety and the environment.

Respectfully submitted,

*/s/ Doug Hayes*
Doug Hayes
Sierra Club
1650 38th Street, Suite 103W
Boulder, CO 80301
(305) 449-5595
doug.hayes@sierraclub.org

Rebecca McCreary
Sierra Club
1650 38th Street, Suite 103W
Boulder, CO 80301
(305) 449-5595
rebecca.mccreary@sierraclub.org

*Attorneys for Sierra Club and Public Citizen*

*/s/ Nandan M. Joshi*
Nandan M. Joshi
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
njoshi@citizen.org

*Attorney for Public Citizen*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on June 13, 2024, I served a copy of the foregoing Petition for Review and Corporate Disclosure Statement by email on the following parties, including all members of the service list in FERC Docket No. CP23-29.

These documents were also filed in the official FERC docket, publicly accessible through FERC's eLibrary system.

Juan Mancias
1250 Roemer Ln
Floresville, Texas 78114
onebigjuan@gmail.com

NGSA NGSA
Natural Gas Supply Association
900 17th Street NW, Suite 500
Washington, DC 20002
intervenor@ngsa.org

Dan Nickel
Continental Resources, Inc.
dan.nickel@clr.com

John Floom
Floom Energy Law PLLC
3100 Clarendon Blvd.
P.O. Box 50606
Arlington, Virginia 22201
jpf@floomenergylaw.com

Kaci W Poor
Associate Attorney
Floom Energy Law PLLC
3100 Clarendon Blvd.

Arlington, Virginia 22201
kwp@floomenergylaw.com

Deborah Pendleton
Rancho Danita
200 Wagon Train Rd, 113
Sierra Blanca, Texas 79851
ranchodanita@gmail.com

James Bowe
Partner
King & Spalding LLP
1700 Pennsylvania Ave., NW, Suite 200
Washington, DC 20006-4707
jbowe@kslaw.com

Dawn McGuire
Assistant General Counsel
Energy Transfer LP
1300 Main Street
Houston, Texas 77002
dawn.mcguire@energytransfer.com

Tyler Brown
King & Spalding LLP
1180 Peachtree St. NE, Ste 1600
Atlanta, Georgia 30309
trbrown@kslaw.com

Krysta De Lima
General Counsel
Mexico Pacific Limited LLC
700 Louisiana St., Ste 2410
Houston, Texas 77002
kdelima@mexicopacific.com

Denise Adams
Director - Regulatory Affairs
ONEOK, INC.
100 W 5TH ST

TULSA, OKLAHOMA 74103
denise.adams@oneok.com

FERC Filings at ONEOK, INC.
ONEOK
100 W 5th St.
Tulsa, Oklahoma 74103
regulatoryaffairs@oneok.com

Lisa Parsons
Regulatory Analyst
ONEOK INC.
100 W 5th St.
Tulsa, Oklahoma 74103
lisa.parsons@oneok.com

Respectfully submitted,

**_/s/ Doug Hayes_**
Doug Hayes
Sierra Club
1650 38th Street, Suite 103W
Boulder, CO 80301
(305) 449-5595
doug.hayes@sierraclub.org

Rebecca McCreary
Sierra Club
1650 38th Street, Suite 103W
Boulder, CO 80301
(305) 449-5595
rebecca.mccreary@sierraclub.org

*Attorneys for Sierra Club and Public Citizen*

# EXHIBIT A

186 FERC ¶ 61,114
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Jr., Chairman;
Allison Clements and Mark C. Christie.

Saguaro Connector Pipeline, LLC                    Docket No. CP23-29-000

ORDER ISSUING PRESIDENTIAL PERMIT AND GRANTING AUTHORIZATION
UNDER SECTION 3 OF THE NATURAL GAS ACT

(Issued February 15, 2024)

1.     On December 20, 2022, Saguaro Connector Pipeline, L.L.C. (Saguaro) filed an
application seeking a Presidential Permit and authorization pursuant to section 3 of the
Natural Gas Act (NGA),[1] Part 153 of the Commission's regulations,[2] and Executive
Order Nos. 10485 and 12038[3] to site, construct, and operate a natural gas pipeline and
related facilities for the export of natural gas at the International Boundary between the
United States and Mexico.  For the reasons discussed below, the Commission will grant
the requested authorizations, subject to certain conditions.

## I.     Background and Proposal

2.     Saguaro, a limited liability company organized under the laws of Delaware, is
wholly owned by ONEOK, Inc. through its various subsidiaries.[4]

---

[1] 15 U.S.C. § 717b.

[2] 18 C.F.R. pt. 153 (2022).

[3] Authorization under section 3 of the NGA is necessary for the siting,
construction, expansion, or operation of facilities to import or export natural gas.
15 U.S.C. § 717b(a).  Pursuant to Executive Order No. 10485, dated September 3, 1953
18 Fed. Reg. 5397, as amended by Executive Order No. 12038, dated February 3, 1978
43 Fed. Reg. 4957, a Presidential Permit also must be obtained for the portion of an
import or export facility crossing one of the United States' international borders.

[4] ONEOK, Inc. owns and operates approximately 1,500 miles of interstate natural
gas pipelines and 5,100 miles of state-regulated intrastate pipelines in Texas, Oklahoma,
and Kansas.

Docket No. CP23-29-000                                                          - 2 -

3.      Saguaro proposes to construct and operate an approximately 1,000 foot-long,
48-inch-diameter pipeline from the United States-Mexico border at the center of the
Rio Grande River to a point approximately 1,000 feet inland from the river, about
18 miles southwest of Sierra Blanca in Hudspeth County, Texas (Border Facility).[5]  The
Border Facility will have a design capacity of approximately 2.834 billion standard cubic
feet per day (Bcf/day) and a maximum allowable operating pressure of 1,480 pounds per
square inch gauge (psig).  Saguaro states that, on the Mexican side of the border, the
proposed pipeline will connect with another pipeline[6] that will extend to a liquified
natural gas (LNG) export facility under development on the West Coast of Mexico.
Saguaro estimates the cost of the Border Facility to be $9,500,000.

4.      Saguaro states that it also plans to construct and operate a new intrastate pipeline
(Connector Pipeline)[7] located wholly within the State of Texas that will interconnect with
the Border Facility.  The proposed non-jurisdictional pipeline will consist of
approximately 155 miles of 48-inch-diameter pipeline and transport natural gas to the
Border Facility from a tie-in with WesTex's existing intrastate natural gas pipeline at the
Waha Hub in Pecos County, Texas.  The proposed Connector Pipeline will also include
two new compressor stations and other related appurtenances.

## II.   **Procedural Issues**

### A.      **Public Notice, Interventions, and Comments**

5.      Notice of Saguaro's application was published in the *Federal Register* on
January 11, 2023,[8] establishing January 26, 2023, as the deadline for filing protests,
motions to intervene, and comments.  The Center for LNG, Mexico Pacific Limited LLC
(MPL), the Natural Gas Supply Association, Public Citizen, and Sierra Club filed timely,
unopposed motions to intervene.[9]  Juan Benito Mancias, Continental Resources, Inc.

---

[5] ONEOK WesTex Transmission, LLC (WesTex), a Saguaro affiliate, will
construct and operate the border crossing facilities pursuant to an operating agreement
between WesTex and Saguaro.  Saguaro Application at 1 n.1.

[6] Because the name of the interconnecting pipeline in Mexico had not been
finalized, Saguaro used "NewCo Mexico Pipeline" in its application.  *Id.* at 4 n.5.

[7] The Connector Pipeline will be subject to the jurisdiction of the Railroad
Commission of Texas.

[8] 88 Fed. Reg. 1575 (Jan. 11, 2023).

[9] Timely, unopposed motions to intervene are granted by operation of Rule 214 of
the Commission's Rules of Practice and Procedures.  *See* 18 C.F.R. § 385.214 (2023).

(Continental Resources), and Energy Transfer LP filed unopposed motions to intervene out of time that were granted.[10] Sierra Club, Public Citizen, and Steve Chima also filed protests, to which Saguaro and Continental Resources filed answers.[11] In addition, several commenters opposed the project, raising concerns about safety, damage to cultural resources, lowered local property values, and the environmental effects of the project. The protests and comments are addressed in the Environmental Assessment (EA) prepared for the project and, as appropriate, below.

### B.     Adequacy of Notice

6.     Two commenters assert that they did not receive proper notice of their right to comment on the project application.[12] Notice procedures are governed by section 157.9 of the Commission's regulations and require that the Commission's notice of the application be issued within ten business days of Saguaro's filing[13] and published in the *Federal Register*.[14] Additionally, section 157.6 of the Commission's regulations require, among other things, that Saguaro publish notice of the project "in a daily or weekly newspaper of general circulation in each county in which the project is located."[15] Here, Saguaro published the notice in the Hudspeth County Herald[16] and the Commission properly issued a notice, which was published in the *Federal Register*. Accordingly, the public was provided proper notice of the application. The fact that these commenters filed comments demonstrates that they did receive notice, and although their comments

---

[10] February 21, 2023 Notice Granting Late Intervention; March 22, 2023 Notice Grating Late Interventions.

[11] Although the Commission's Rules of Practice and Procedure do not permit answers to protests, 18 C.F.R. § 385.213(a)(2 ) (2023), we will accept the answers because they provide information that assists in our decision-making.

[12] Bill Guerra Addington Mar. 7, 2023 Comments; Gracie Zent & Vickie Wilson Mar. 17, 2023 Comments.

[13] Saguaro filed its application on December 20, 2022. The Commission issued its notice ten business days later, on January 5, 2023. Notice of Application and Establishing Intervention Deadline, CP23-29-000 (Jan. 5, 2023). Monday, December 26, 2022, and Monday, January 2, 2023, were recognized as federal holidays because Christmas and New Year's Day fell during weekends.

[14] 18 C.F.R. §§ 153.4, 157.9(a) (2023).

[15] 18 C.F.R. *Id.* §§ 153.4, 157.6(d)(1)(iii) (2023).

[16] Saguaro Apr. 6, 2023 Response to Environmental Information Request at 58.

were filed after the comment deadline, we have fully considered them. We conclude that their concerns about notice have been resolved.

### C.     Request for Evidentiary Hearing

7.      In its protest, Public Citizen requests an evidentiary hearing,[17] which Saguaro opposed.[18] Although our regulations provide for a hearing on applications,[19] neither section 3 of the NGA nor the Commission's regulations require that such a hearing be a trial-type evidentiary hearing. When the written record provides a sufficient basis for resolving the relevant issues, it is our practice to provide for a paper hearing.[20] That is the case here. We have reviewed the request for a hearing and conclude that all issues of material fact relating to Saguaro's proposal are capable of being resolved on the basis of the written record, which contains substantial evidence on the issues presented by Public Citizen. Accordingly, we will deny the request for a formal hearing.

## III.    Consultation with Secretaries of State and Defense

8.      On February 16, 2023, pursuant to Executive Order 10485, the Commission sent letters to the Secretary of Defense and Secretary of State seeking their recommendations on Saguaro's request for issuance of a Presidential Permit authorizing the construction and operation of the subject border crossing facilities. By letters filed September 12, 2023, and November 28, 2023, the Secretary of Defense and the Secretary of State, respectively, indicated that they have no objections to the issuance of the proposed Presidential Permit to Saguaro.

## IV.    Discussion

### A.     Public Interest Standard Under Section 3 of the NGA

9.      Because the proposed facilities will be used to export natural gas across the international border between the United States and Mexico, the siting, construction, and operation of the facilities are subject to the Commission's jurisdiction under section 3 of

---

[17] Public Citizen Jan. 26, 2023 Protest at 1.

[18] Saguaro Feb. 24, 2023 Answer at 18-19.

[19] 18 C.F.R. §§ 153.4, 157.11 (2023).

[20] *See*, *e.g.*, *Moreau v. FERC*, 982 F.2d 556, 568 (D.C. Cir. 1993) ("[the Commission] need not conduct such [an evidentiary] hearing if [the issues at hand] may be adequately resolved on the written record."); *Tenn. Gas Pipeline Co., LLC*, 158 FERC ¶ 61,110, at P 11 (2017).

the NGA.[21]  Section 3 provides that an application shall be approved if the Commission finds the proposal "will not be [in]consistent with the public interest," subject to "such terms and conditions as the Commission [may] find necessary or appropriate."[22]

10.     Commenters argue that, although NGA section 3 states that natural gas exports to free trade agreement nations are deemed to be consistent with the public interest, that standard does not apply to the Border Facility because the gas will ultimately be re-exported to countries with which the United States does not have a free trade agreement.[23]  Sierra Club also asserts that Mexico's status as a free trade agreement nation is irrelevant to the Commission's public interest analysis because the Commission is not required to approve the infrastructure that would enable a DOE-approved export of

---

[21] 15 U.S.C. § 717b(a).  The regulatory functions of NGA section 3 were transferred to the Secretary of the Department of Energy (DOE) in 1977 pursuant to section 301(b) of the Department of Energy Organization Act, Pub. L. No. 95-91, 42 U.S.C. § 7101 *et seq.*  The Secretary subsequently delegated to the Commission the authority to approve or disapprove the construction and operation of natural gas import and export facilities and the site at which such facilities shall be located.  The most recent delegation is in DOE Delegation Order No. S1-DEL-FERC-2006, effective May 16, 2006.  The Commission does not authorize importation or exportation of the commodity itself.  Rather, applications for authorization to import or export natural gas must be submitted to the DOE.  *See EarthReports, Inc. v. FERC*, 828 F.3d 949, 952-53 (D.C. Cir. 2016) (detailing how regulatory oversight for the export of LNG and supporting facilities is divided between the Commission and DOE).

[22] 15 U.S.C. § 717b(a).  For a discussion of the Commission's authority to condition its approvals of facilities under section 3 of the NGA, *see, e.g., Distrigas Corp. v. FPC*, 495 F.2d 1057, 1063-64 (D.C. Cir. 1974), *cert. denied*, 419 U.S. 834 (1974); *Dynegy LNG Prod. Terminal, L.P.*, 97 FERC ¶ 61,231 (2001).

[23] *See* Public Citizen Jan. 26, 2023 Protest at 1-4 (arguing that approval of the project would "punch[ ] a destabilizing loophole in the Natural Gas Act [by] exploiting the automatic public interest treatment granted to Mexico to re-export U.S. produced gas to countries . . . that do not qualify for automatic public interest determination"); Sierra Club Jan. 26, 2023 Protest at 15 ("Mexico's status as [free trade agreement] nation is irrelevant where, as here, the gas will be re-exported from Mexico to other, non-[free trade agreement] nations."); Cindy Cochran Feb. 28, 2023 Comments at 1 ("None of this gas will supply domestic needs or the needs of our free-trade partner Mexico."); Bill Guerra Addington Mar. 7, 2023 Comments at 3; Antionette Reyes Sept. 26, 2023 Comments at 1.

natural gas.[24]  Sierra Club states that section 3's presumption toward approving border-crossing infrastructure is rebuttable, and the Commission should make its public interest determination by balancing a project's benefits and harms, which includes a comprehensive environmental review.[25]  Here, commenters claim that the project's adverse impacts outweigh its benefits because natural gas exports harm domestic consumers,[26] because the project will result in negative environmental impacts on surrounding communities[27] and because the project will result in increased greenhouse gas (GHG) emissions from the extraction, transportation, and burning of natural gas.[28]

11.     Section 3(a) of the NGA provides, in part, that "no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so."[29]  As noted above, the Department of Energy Organization Act transferred the regulatory functions of section 3 of the NGA to the Secretary of Energy.  Subsequently, the Secretary of Energy delegated to the Commission authority to "[a]pprove or disapprove the construction and operation of particular facilities, the site at which such

---

[24] Sierra Club Jan. 26, 2023 Protest at 15.

[25] Sierra Club Jan. 26, 2023 Protest at 14-15 & n.12; *see also* Sierra Club Sept. 25, 2023 Comments on EA at 90 (incorporating by reference Sierra Club's comments on MPL's DOE gas export applications, in which Sierra Club states that the proposed export of natural gas would negatively affect the climate, raise domestic gas prices, and fail to protect national security).

[26] Sierra Club Jan. 26, 2023 Protest at 16-17; Public Citizen Jan. 26, 2023 Protest at 1; *see also* Antionette Reyes Sept. 26, 2023 Comments on EA at 2-3.

[27] Sierra Club Jan. 26, 2023 Protest at 15; Juan Benito Mancias Feb. 2, 2023 Motion to Intervene at 1-2 (describing how the project would harm local tribal resources and ancestral lands and further environmental racism); Cindy Cochran Feb. 28, 2023 Comments at 1-2 (stating that the project will result in health threats to nearby populations, further environmental racism, and threaten nearby cultural resources such as the historic Indian Hot Springs); Bill Guerra Addington Mar. 7, 2023 Comments at 2-4 (alleging the project could further environmental racism because it would worsen cumulative health and environmental impacts and noting the presence of the Indian Hot Springs and other culturally significant sites).

[28] Sierra Club Jan. 26, 2023 Protest at 15-16.

[29] 15 U.S.C. § 717b(a).

facilities shall be located, and with respect to natural gas that involves the construction of new domestic facilities, the place of entry for imports or exit for exports."[30]

12.     However, as we have previously explained, the Secretary has not delegated to the Commission any authority to approve or disapprove the import or export of the commodity itself.[31]  The Commission's authority under section 3 of the NGA applies "only to the siting and operation of the facilities necessary to accomplish an export[,]"[32] while "export decisions [are] squarely and exclusively within the [DOE]'s wheelhouse."[33]  Therefore, we decline to address commenters' claims regarding the ultimate destination of the gas[34] and potential commodity-related economic harm.  These claims are relevant only to the exportation of the commodity of natural gas, which is within DOE's exclusive jurisdiction; these claims are not implicated by our limited action

---

[30] DOE Delegation Order No. S1-DEL-FERC-2006 (effective May 16, 2006).

[31] *Freeport LNG Dev., L.P.*, 148 FERC ¶ 61,076, *reh'g denied*, 149 FERC ¶ 61,119 (2014), *aff'd sub nom. Sierra Club v. FERC*, 827 F.3d 36 (D.C. Cir. 2016) (*Freeport*) (finding that because the DOE, not the Commission, has sole authority to license the export of any natural gas through LNG facilities, the Commission is not required to address the indirect effects of the anticipated export of natural gas in its NEPA analysis); *Sabine Pass Liquefaction, LLC*, 146 FERC ¶ 61,117, *reh'g denied*, 148 FERC ¶ 61,200 (2014), *aff'd sub nom. Sierra Club v. FERC*, 827 F.3d 59 (D.C. Cir. 2016)*.

[32] *Trunkline Gas Co., LLC*, 155 FERC ¶ 61,328, at P 18 (2016).  With respect to border-crossing projects, the Commission has consistently interpreted its section 3 authority to extend only to the "small segment of . . . pipeline close to the border . . . deemed to be the import or export facility . . .."  *E.g.*, *Trans-Pecos Pipeline, LLC*, 155 FERC ¶ 61,140, at P 31 n.33 (2016) (*Trans-Pecos*) (citing *S. LNG, Inc.*, 131 FERC ¶ 61,155, at P 15 n.17 (2010)).

[33] *Freeport*, 827 F.3d at 46; *see Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1185 (D.C. Cir. 2023) (*Alaska LNG*) (". . .[T]he Department of Energy has exclusive jurisdiction over whether to approve natural gas exports . . ..").

[34] In any event, both Saguaro and Continental Resources note that some of the gas for export may be consumed in Mexico.  *See* Saguaro Feb. 24, 2023 Answer at 17-18 n.62 (explaining that "[t]he downstream pipeline in Mexico could deliver to points other than the LNG facility" and that some LNG could be exported to other parts of Mexico); Continental Resources Mar. 13, 2023 Answer at 2 (explaining that Continental Resources could transport gas produced from recently acquired production sites to markets within Mexico via the downstream pipeline).

of reviewing the proposed border crossing facilities.[35]  Similarly, Sierra Club's concerns regarding the effects of GHGs resulting from the project are primarily related to DOE's authorization of the export of gas and not the Commission's siting of the facilities.[36]

13.     As the U.S. Court of Appeals for the D.C. Circuit (D.C. Circuit) has explained, the NGA section 3 standard that a proposal "shall" be authorized unless it "will not be consistent with the public interest[,]"[37] "sets out a general presumption favoring such authorizations."[38]  To overcome this favorable presumption and support denial of an NGA section 3 application, there must be an "affirmative showing of inconsistency with the public interest."[39]  This same standard applies to the Commission's consideration of the siting and operation of facilities regardless of whether such facilities are exporting natural gas to free trade or non-free trade agreement nations.[40]

---

[35] *See, e.g.*, *Cameron LNG, LLC*, 182 FERC ¶ 61,173, at P 13 (2023) (declining to address economic arguments); *Valley Crossing Pipeline, LLC*, 161 FERC ¶ 61,084, at P 12 (2017) (*Valley Crossing*) (same); *Trans-Pecos*, 155 FERC ¶ 61,140 at PP 14-15 (explaining why commenters' arguments that proposed border-crossing facilities would exceed demand by customers in Mexico are not under the Commission's purview) (citing *Nat'l Steel Corp.*, 45 FERC ¶ 61,100, at 61-332-333 (1988)).

[36] *Alaska LNG*, 67 F.4th at 1185; *Freeport*, 827 F.3d at 46; *see Commonwealth LNG*, 181 FERC ¶ 61,143, at PP 11-13 (2022).

[37] 15 U.S.C. § 717b(a).

[38] *Alaska LNG*, 67 F.4th at 1188 (quoting *W. Va. Pub. Servs. Comm'n v. U.S. Dep't of Energy*, 681 F.2d 847, 856 (D.C. Cir. 1982)); *see also Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 203 (D.C. Cir. 2017) (*Freeport II*).

[39] *Freeport II*, 867 F.3d at 203 (quoting *Panhandle Producers & Royalty Owners Ass'n v. Econ. Regul. Admin.*, 822 F.2d 1105, 1111 (D.C. Cir. 1987)).

[40] *Compare Commonwealth LNG, LLC*, 181 FERC ¶ 61,143 at PP 6, 10, 14-15 (applying the public interest standard to an LNG project authorized by DOE to export to free-trade nations) *with Alaska Gasline Dev. Corp.*, 171 FERC ¶ 61,134, at PP 5, 12-20 (2020) (applying the same public interest standard for an LNG project authorized by DOE to export to both free trade and non-free trade agreement nations); *see also Steel Reef Pipelines US LLC*, 164 FERC ¶ 61,090, at PP 7-9 (2018) (*Steel Reef*) (applying the same public interest standard for a border crossing facility which would export gas to a free-trade nation).  Moreover, we note that the re-export of U.S.-sourced gas from Mexico requires DOE authorization.  *See Mexico Pacific Limited, LLC*, DOE/FE Order No. 4248, Docket No. 18-70-LNG (Sept. 19, 2018) (authorizing the export of natural gas to Mexico "for purposes of end use in Mexico, and to re-export U.S.-sourced natural

14.     We have reviewed Saguaro's application to determine if the siting, construction, and operation of its facilities as proposed would be inconsistent with the public interest. The construction and operation of the border-crossing facility will have a minimal impact on landowners because, although the construction activities in the United States will temporarily disturb approximately 35.5 acres of land, only 1.2 acres will be permanently maintained for operation and maintenance.[41]  After construction, Saguaro will restore and revegetate the disturbed areas to allow for preconstruction usage (e.g., grazing) in accordance with the Commission's *Upland Erosion Control, Revegetation, and Maintenance Plan* and the *Wetland and Waterbody Construction and Mitigation Procedures*.[42]  As discussed below and in the EA, the project will not have significant direct or indirect impacts on the environment if it is constructed and operated in compliance with the conditions in Appendix A to this order.

15.     Sierra Club argues that the proposed project is not needed because MPL, the entity developing the downstream LNG export terminal in Mexico, has stated that its LNG export facility does not need the natural gas from the Saguaro Pipeline and that existing border-crossing capacity can support exports from MPL's facility.[43]  This assertion is incorrect.  Although the MPL LNG terminal may receive gas from other border-crossing facilities, MPL explains that the Saguaro border crossing will significantly expand the supply options available to MPL and its customers.[44]

16.     In view of the above considerations, we find that the arguments raised do not amount to an affirmative showing of inconsistency with the public interest that is necessary to overcome the presumption in section 3 of the NGA.  Thus, the Commission

---

gas. . ." to free trade agreement nations); *Mexico Pacific Limited, LLC*, DOE/FE Order No. 4312, Docket No. 18-70 LNG (Dec. 14, 2018) (authorizing the export to Mexico and re-export of U.S.-sourced natural gas to non-free trade agreement nations); *Mexico Pacific Limited, LLC*, DOE/FE Order No. 4995, Docket No. 22-167-LNG (Apr. 28, 2023) (authorizing the export to Mexico and re-export of an additional 291.22 Billion cubic-feet per day of U.S.-sourced gas to free-trade agreement nations, and deciding to address MPL's requested authorization to re-export natural gas to non-free trade agreement nations in a future order).

[41] EA at 4.

[42] *Id.* at 5.

[43] Sierra Club Nov. 13, 2023 Supplemental Comments at 4-5 (citing MPL's Oct. 17, 2023 Reply Comments and MPL's Apr. 19, 2023 Answer to Protests in DOE/FE Docket No. 22-167-LNG).

[44] MPL Oct. 17, 2023 Reply Comments at 8.

will issue a Presidential Permit, set forth in Appendix B to this order, and an NGA
section 3 authorization to site, construct, and operate the proposed facilities.

### B.    Jurisdictional Arguments

17.    Sierra Club argues that the Commission should assert section 3 jurisdiction over
the 155-mile-long intrastate pipeline because it is an interconnected project with the sole
purpose of exporting gas to foreign markets.[45]  In the alternative, Sierra Club claims that
the Commission should assert jurisdiction over the pipeline under section 7 of the NGA
because it will transport interstate gas, and because, as a new pipeline, it is not eligible to
provide Natural Gas Policy Act (NGPA) section 311[46] service.[47]

### 1.    Section 3 Jurisdiction

18.    Sierra Club claims that the Commission's jurisdiction under NGA section 3 is not
limited to small segments of export pipelines immediately adjacent to the international
border[48] and asserts that the Commission has arbitrarily chosen, without statutory or
regulatory support, to limit its review to 1,000 feet of border-crossing pipe.[49]  It contends
that in *Louisiana Gas Systems, Inc. v. Panhandle Eastern Corp.*[50] and *KansOk
Partnership v. Kansas Pipeline Operating Co.*,[51] the Commission asserted jurisdiction
over interconnected pipelines as singular, integrated pipeline systems, and that the
Commission should treat the Connector Pipeline and Border Facility together under
section 3.[52]  Sierra Club notes that the schedule for construction and the initial 20-year

---

[45] Sierra Club Jan. 26, 2023 Protest at 4-5; Sierra Club Sept. 25, 2023 Comments
on EA, at 2-4, 55.

[46] 15 U.S.C. § 3371.

[47] Sierra Club Jan. 26, 2023 Protest at 5-9.

[48] *Id.* at 2-5.

[49] Sierra Club Sept. 25, 2023 Comments on EA at 8-9 (citing *Del. Riverkeeper
Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014)).

[50] 73 FERC ¶ 61,161 (1995) (*Louisiana Gas*).

[51] 73 FERC ¶ 61,160 (1995) (*KansOk*).

[52] Sierra Club Jan. 26, 2023 Protest at 4-5; Sierra Club Sept. 25, 2023 Comments
on EA at 4-8.

service terms are the same for the Border Facility and Connector Pipeline,[53] that the projects will be constructed and operated by affiliated entities,[54] and that Saguaro has not identified any delivery points within the State of Texas.[55]

19.    Section 3(a) of the NGA provides that "no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so."[56]  That provision does not include the term "facilities" and, initially, following enactment of the Natural Gas Act in 1938, the Commission did not view section 3 as providing it jurisdiction over the construction and operation of import or export facilities.[57]  Instead, the Commission exercised jurisdiction over those facilities only under the executive authority delegated to it to act on applications for Presidential Permits.[58]  In *Distrigas Corp.*,[59] however, the court determined that section 3 provides the Commission authority over the construction and operation of natural gas import or export facilities.  Since then, the Commission has explained that "when companies construct a pipeline to transport import or export volumes, only a small segment of the pipeline close to the border is deemed to be the import or export facility for which section 3 authorization is necessary[.]"[60]  This interpretation of section 3(a) is also consistent with DOE's delegation order, which grants the Commission the limited authority to approve "the construction and operation of particular facilities, the site at which such facilities

---

[53] Sierra Club Sept. 25, 2023 Comments on EA at 6-7.

[54] *Id*. at 4-6.

[55] Sierra Club Nov. 13, 2023 Supplemental Comments at 3.

[56] 15 U.S.C. § 717b(a).

[57] *Shell U.S. Gas & Power LLC*, 148 FERC ¶ 61,163, at n.10 (2014).

[58] *Id.*

[59] 495 F.2d at 1064.

[60] *See, e.g., Valley Crossing*, 161 FERC ¶ 61,084 at P 18; *Atl. Richfield Co.*, 49 FERC ¶ 61,294, at 62,109-10 (1989) ("The Commission's authority under section 3 is limited to approval of the site of the import/export of gas . . . .").  The pipeline segment that is deemed to be the import or export facility has been generally about the same length as the border crossing facilities here.  *See, e.g., NET Mex. Pipeline Partners, LLC*, 145 FERC ¶ 61,112 (2013) (1,400 feet long); *Oasis Pipeline, LP*, 127 FERC ¶ 61,263, at P 18 (2009) (836 feet long); *Valero Transmission, L.P.*, 57 FERC ¶ 61,299, at 61,954-55 (1991) (1,000 feet long).

shall be located, and with respect to natural gas that involves the construction of new domestic facilities, the place of entry for imports or exit for exports . . ..”[61]  Therefore, we find that NGA section 3 does not provide a basis for the Commission to extend its jurisdiction beyond the "particular facilities" located at the place of export, which, in this case, is the approximately 1,000 feet of pipeline crossing the border.

20.     Moreover, neither *Louisiana Gas* nor *KansOk*, both of which were compliance proceedings, support expanding the Commission's NGA section 3 jurisdiction over border crossing facilities to interconnected intrastate facilities.  In *Louisiana Gas*, three affiliated pipelines — an intrastate pipeline, an interstate pipeline, and a Hinshaw pipeline — sought to avoid the Commission's NGA section 7 jurisdiction over the construction and operation of facilities used to transport gas from Texas into Louisiana by connecting three separate pipeline segments, including a short, interstate segment that would not be contiguous with the rest of the interstate company's other facilities (the interstate segment would be constructed, and interstate service over the various facilities would purportedly be provided, under NGPA section 311).[62]  Similarly, *KansOk* involved an intrastate pipeline in Oklahoma which interconnected with a one-mile segment of interstate pipeline, owned by an affiliate, Riverside Pipeline Company (Riverside), that crossed the Oklahoma/Kansas border.  Riverside then connected to an affiliated Hinshaw pipeline in Kansas that extended to the Kansas/Missouri border where the Hinshaw pipeline connected to a second segment of interstate pipeline owned by Riverside which crossed the state border into Missouri.[63]  The three pipelines were purportedly transporting gas under NGPA section 311.  On review, the Commission held that both the contemplated facilities in *Louisiana Gas* and the existing facilities in *KansOk* constituted integrated interstate pipelines, subject in their entirety to the Commission's jurisdiction under section 7 of the NGA, as opposed to individual segments of pipeline each with a different jurisdictional status.[64] These cases are not relevant to this proceeding because there is no evidence in the record to show Saguaro is combining pipelines to circumvent the Commission's NGA section 7(c) jurisdiction over interstate transportation facilities.

---

[61] DOE Delegation Order No. S1-DEL-FERC-2006 (effective May 16, 2006).

[62] *Louisiana Gas*, 73 FERC at 61,493-94.

[63] *KansOk*, 73 FERC at 61,480-81.

[64] *Louisiana Gas*, 73 FERC at 61,500-03; *KansOk*, 73 FERC at 61,484-88.

Docket No. CP23-29-000                                                                                                       - 13 -

## 2.     __Section 7 Jurisdiction__

21.     In the alternative, Sierra Club states that the Commission should assert jurisdiction over the Connector Pipeline under section 7 of the NGA.[65]  It avers that the Connector Pipeline will likely transport interstate gas when it begins providing service and that Saguaro has failed to provide sufficient information to support its statement that the pipeline will initially operate as an intrastate pipeline.[66]  Sierra Club notes that the Connector Pipeline will receive gas from the WesTex Pipeline system, which interconnects with 20 interstate gas pipelines, at the Waha Hub, a major interstate gas trading hub.[67]  Sierra Club also notes that the WesTex Pipeline system has a capacity of less than one million cubic feet per day, while the Connector Pipeline would have a capacity of 2.8 billion cubic feet per day.[68]  It claims that these interconnections and the difference in capacity between the WesTex and the Connector Pipeline demonstrate that the purpose of the project—and Saguaro's "ultimate intent"—is to transport interstate gas.[69]  Sierra Club further notes that Saguaro admits that it may seek authority to transport gas pursuant to NGPA section 311 at some point in the future and speculates that Saguaro may seek to do so immediately after pipeline construction.[70]  Sierra Club

---

[65] 15 U.S.C. § 717f.

[66] Sierra Club Jan. 26, 2023 Protest at 5-6 (citing *Associated Gas Distribs. v. FERC*, 899 F.2d 1250, 1255 (D.C. Cir. 1990); *Ga. Strait Crossing Pipeline LP*, 100 FERC ¶ 61,280 (2002)); Sierra Club Sept. 25, 2023 Comments on EA at 9-10 (citations omitted); Sierra Club Nov. 13, 2023 Supplemental Comments at 5-6.

[67] Sierra Club Jan. 26, 2023 Protest at 6-7; Sierra Club Sept. 25, 2023 Comments on EA at 10-12, 16-18 (further detailing the structure and interconnections of the WesTex system); *see also* Antionette Reyes Sept. 26, 2023 Comments on EA 1.

[68] Sierra Club Sept. 25, 2023 Comments on EA at 20-21.

[69] Sierra Club Jan. 26, 2023 Protest at 6-8; Sierra Club Sept. 25, 2023 Comments on EA at 12-14, 18-20.

[70] Sierra Club Jan. 26, 2023 Protest at 8; Sierra Club Sept. 25, 2023 Comments on EA at 21.

avers that NGPA section 311[71] was not intended to allow new pipelines that will transport interstate gas to avoid the Commission's NGA regulation.[72]

22.     Section 1(b) of the NGA provides that the NGA "shall apply to the transportation of natural gas in interstate commerce," but not "to any other transportation … of natural gas."[73]  Under section 2(16) of the Natural Gas Policy Act (NGPA),[74] an "intrastate pipeline" is "any person engaged in natural gas transportation (not including gathering) which is not subject to the jurisdiction of the Commission under the NGA."  Generally, an intrastate pipeline exists within the borders of one state and delivers gas produced in the same state to end-users or a local distribution company (LDC) to be consumed within the same state.[75]  The export of natural gas constitutes foreign commerce, which is distinct from, and mutually exclusive of, interstate commerce.[76]  Thus, in this case, if the Connector Pipeline transports only Texas-sourced gas that will not enter interstate commerce, the pipeline is an intrastate pipeline not subject to the Commission's NGA jurisdiction.[77]

23.     Saguaro's proposal mirrors that of the Valley Crossing Pipeline, a similar upstream, intrastate pipeline in Texas that delivered natural gas to a border crossing facility.[78]  There, the Commission explained that "[t]he mere existence of a physical

---

[71] Section 311(a) of the NGPA permits the Commission to authorize transportation by an intrastate pipeline on behalf of an interstate pipeline or local distribution company. 15 U.S.C. § 3371(a).

[72] Sierra Club Jan. 26, 2023 Protest at 8 (citing *Associated Gas Distribs.*, 899 F.2d at 1260); Sierra Club Sept. 25, 2023 Comments on EA at 21-24 (citing recent examples of pipelines that obtained NGPA section 311 service within a year of initially providing intrastate service).

[73] 15 U.S.C. § 717(b).

[74] *Id.* § 3301(16).

[75] *Three Rivers Pipeline Co.,* 84 FERC ¶ 61,238, at 62,208 (1998).

[76] *See* TP Rehearing Order, 157 FERC ¶ 61,081 at P 8 (citing *Comanche Trail Pipeline, LLC,* 155 FERC ¶ 61,182, at P 18 (2016)).

[77] *See Big Bend Conservation All. v. FERC*, 896 F.3d 418 (D.C. Cir. 2018) (*Big Bend*) (holding that an upstream pipeline transporting intrastate natural gas to a border crossing facility is not subject to the Commission's jurisdiction under NGA section 7).

[78] *Valley Crossing*, 161 FERC ¶ 61,084.

interconnection with an interstate pipeline is not sufficient to bring an intrastate pipeline under the Commission's jurisdiction, since being capable of receiving interstate gas is not the same as actually receiving it" and the record demonstrated that the pipeline would be located entirely in Texas and transport only Texas-produced gas when it began service.[79]

24.     Sierra Club attempts to distinguish the Connector Pipeline from the D.C. Circuit's decision in *Big Bend*, which Sierra Club states found that the pipeline at issue was non-jurisdictional because it would not connect to the Waha Hub.[80]  Although the pipeline at issue in *Big Bend* did not connect to an intrastate pipeline at the Waha Hub, such a distinction is immaterial.  As explained above, the determining factor is the source of the gas, and, as in *Valley Crossing*, Saguaro has demonstrated that the Connector Pipeline will initiate service transporting only natural gas produced in Texas.[81]

25.     Further, we disagree with Sierra Club's contention that Saguaro is using NGPA section 311 to avoid the Commission's NGA jurisdiction.  As the Commission has previously explained, we look to whether the pipeline plans to operate solely as an intrastate pipeline when it begins service and do not consider the number of potential interconnections with interstate pipelines.[82]  Nor are we persuaded by Sierra Club's assertion that the commingling of interstate and intrastate natural gas on an upstream intrastate pipeline renders the downstream intrastate pipeline jurisdictional.  As we have explained, "NGPA [s]ection 601(a)(2)(B) insulates the otherwise intrastate activities of any person from becoming jurisdictional activities by reason of, or with respect to, that

---

[79] *Id.* PP 16-19; *see also* TP Rehearing Order, 157 FERC ¶ 61,081 at PP 7-9 (explaining that intervenors incorrectly assumed Texas intrastate pipeline's termination near the Waha Hub meant the pipeline would necessarily transport comingled interstate gas, which was rebutted by the record); Saguaro Feb. 24, 2023 Answer at 6 (explaining that a pipeline does not transport gas in interstate commerce "simply because [it] transports gas from the Waha Hub").

[80] Sierra Club Jan. 26, 2023 Protest at 7; Sierra Club Sept. 25, 2023 Comments on EA at 14.

[81] Saguaro Feb. 24, 2023 Answer at 12 (explaining that, at the start of service, all gas flowing through the Connector Pipeline will be "produced in Texas and . . . transported in intrastate commerce"); Saguaro Application at 5 (stating that the Connector Pipeline will "tie into the existing WesTex intrastate natural gas pipeline"); Saguaro Oct. 27, 2023 Response to Data Request at App. A (noting eight potential upstream sources of intrastate gas totaling up to five billion cubic feet per day for delivery to the Connector Pipeline).

[82] *Parker v. Permian Highway Pipeline LLC*, 180 FERC ¶ 61,179, at P 11 (2022) (citing *Valley Crossing*, 161 FERC ¶ 61,084 at PP 22-23).

person's participation in an NGPA Section 311(a) transaction."[83]  Therefore, "an interstate pipeline could transport gas between two points within the same state for an intrastate pipeline without the commingling of molecules rendering the intrastate pipeline jurisdictional."[84]  Sierra Club further argues that *Big Bend* held that the Commission may only authorize "existing" intrastate pipelines under section 311 of the NGPA.[85]  In that case, however, the court upheld the Commission's longstanding practice of allowing new intrastate pipelines to provide section 311 service after initially providing only intrastate service.[86]  Our action here is consistent with that holding.

26.     Next, Sierra Club contends that Saguaro has failed to provide sufficient information regarding the Connector Pipeline's potential interconnections with intrastate and interstate pipeline systems.[87]  It claims that, in response to Commission staff's data request, Saguaro only references eight potential sources of intrastate gas and fails to describe any potential interconnections with interstate pipeline systems.[88]  Further, Sierra Club notes that Saguaro states that it has not entered into a precedent agreement for the upstream intrastate pipeline.[89]  Sierra Club asserts that the Commission has an obligation to verify the information submitted by an applicant and cannot blindly accept the applicant's statements.[90]

27.     We find that the record includes sufficient information to support Saguaro's assertion that, upon commencement of service, the Connector Pipeline will provide intrastate transportation service.  Saguaro identified eight potential sources of intrastate natural gas, totaling 5 Bcf per day, which far exceeds the capacity of the proposed

---

[83] *Delhi Gas Pipeline Corp.*, 19 FERC ¶ 61,189, at 61,366 (1982).

[84] *Id.*

[85] Sierra Club Jan. 26, 2023 Protest at 8.

[86] *See Big Bend*, 896 F.3d at 423 (explaining how the Trans-Pecos pipeline comported "with FERC precedent recognizing that new intrastate pipelines may provide Section 311 service after being placed into service") (citations omitted).

[87] Sierra Club Nov. 13, 2023 Supplemental Comments at 7-9.

[88] *Id.* at 7.

[89] *Id*. at 10.

[90] *Id.* at 12-13.

pipeline.[91]  Moreover, as noted above, even if Saguaro were to immediately establish a physical interconnection with an interstate pipeline, that would not be sufficient to bring the Connector Pipeline under the Commission's jurisdiction if the Connector Pipeline initially only flows intrastate gas.  Sierra Club has speculated that the purpose of the Connector Pipeline is to transport interstate natural gas sources upon commencement of service, but Sierra Club has not provided sufficient evidence to support such claims or to rebut Saguaro's demonstration that sufficient sources of intrastate gas are available to support the project and Saguaro's statement that the project will initially only transport intrastate gas supplies.

28.     Next, Sierra Club relies on *Egan Hub Partners, L.P.*, where the Commission held that an existing intrastate pipeline's contemplated use of storage facilities for NGPA section 311 service was subject to NGA jurisdiction.[92]  This case is distinguishable, however, because the storage facilities in question were not contiguous with Egan Hub's existing intrastate system and were physically connected only to interstate pipelines.  The Commission stated that the storage facilities appeared to have no intrastate or other non-jurisdictional purpose and found that Egan Hub's "sole purpose in constructing the storage facilities was to provide interstate storage and hub services."[93]  Here, Saguaro's intrastate pipeline will interconnect with another intrastate pipeline and, upon being placed in service, will exclusively carry Texas-sourced gas.

29.     Additionally, Sierra Club cites *Louisiana Gas* and *KansOk* to support its claim that Saguaro is attempting to use the NGPA to circumvent the Commission's NGA section 7 jurisdiction.[94]  As discussed above, those cases are not relevant to this proceeding because there is no evidence in the record to show Saguaro is combining pipelines to circumvent the Commission's NGA section 7(c) jurisdiction.

30.     Sierra Club also argues that, under *CNG Transmission Corporation*,[95] the Commission subjects facilities that ultimately intend to engage in interstate commerce to its NGA section 7 jurisdiction.  In that case, CNG leased natural gas storage from Bath Petroleum, a liquid hydrocarbon storage cavern company that agreed to convert existing storage caverns for natural gas and construct new gas storage caverns.  CNG argued the

---

[91] Saguaro Oct. 27, 2023 Response to Data Request at app. A.

[92] 73 FERC ¶ 61,334 (1995).

[93] *Id.* at 61,930.

[94] Sierra Club Jan. 26, 2023 Protest at 8-9; Sierra Club Sept. 25, 2023 Comments on EA at 22.

[95] 79 FERC ¶ 61,295 (1997).

natural gas storage would remain non-jurisdictional because the caverns would not be used solely for interstate storage, as Bath Petroleum would continue to provide some non-jurisdictional liquid hydrocarbon storage activity.[96]   The Commission disagreed, explaining that although Bath Petroleum might originally have contemplated that its storage facilities would be used for a non-jurisdictional purpose, it was clear at the time of the rehearing order that "the parties contemplate providing interstate service through these facilities."[97]   The Commission explained that its NGA section 7 jurisdiction is not limited when facilities that provide interstate service "may also have a non-jurisdictional use."[98]

31.     *CNG Transmission Corporation* is not applicable because that case did not contemplate service provided pursuant to section 311 of the NGPA, and, as discussed above, when determining whether an intrastate pipeline is properly providing section 311 service, the Commission looks only to whether the pipeline plans to operate solely as an intrastate pipeline when it begins service.[99]   Thus, even if the Connector Pipeline will later provide transportation service pursuant to section 311 of the NGPA, such service would not subject the facility to the Commission's NGA section 7 jurisdiction.[100]

---

[96] *Id.* at 62,325-26.

[97] *Id.* at 62,329.

[98] *Id.*

[99] The Commission's grant of NGA section 3 authorization to transport intrastate gas internationally does not signal prospective approval of a future NGPA section 311 filing.  *See Big Bend*, 896 F.3d at 422-23 (explaining that the orders granting NGA section 3 authorization to the Trans-Pecos Pipeline "do not prospectively authorize the [pipeline] to transport natural gas under Section 311" but instead "simply observe that *if* the pipeline someday provides qualifying service under Section 311, that service will not subject the pipeline to Section 7" (emphasis in original)).

[100] *Valley Crossing*, 161 FERC ¶ 61,084 at P 2; TP Rehearing Order, 157 FERC ¶ 61,081 at P 11; *see* 15 U.S.C. § 3431(a)(2)(A) ("For purposes of section 1(b) of the Natural Gas Act, the provisions of such Act and the jurisdiction of the Commission under such Act shall not apply to any transportation in interstate commerce of natural gas if such transportation is … (ii) authorized by the Commission under section 3371(a) of this title."); *see also* 15 U.S.C. § 3431(a)(1)(C) ("For purposes of the Natural Gas Act, the term 'natural-gas company' (as defined in section 2(6) of such Act) shall not include any person by reason of, or with respect to, any sale of natural gas if the provisions of the Natural Gas Act and the jurisdiction of the Commission do not apply to such sale solely by reason of subparagraph (A) or (B) of this paragraph."); 18 C.F.R. § 284.3(c) (2023)

32.     Last, commenters assert that the Railroad Commission of Texas lacks jurisdiction over the siting of an intrastate pipeline that delivers gas for export.[101]  They assert that if the Commission fails to take jurisdiction over the Connector Pipeline, then no entity would have oversight over the environmental impacts of constructing the pipeline or the use of eminent domain.[102]  As the court explained in *ExxonMobil Gas Marketing Company v. FERC*, the "need for regulation cannot alone create authority to regulate," and "jurisdiction may not be presumed based solely on the fact that there is not an express withholding of jurisdiction."[103]  As discussed above, we find that the Connector Pipeline is an intrastate pipeline not subject to the Commission's jurisdiction under the NGA.  The fact that the Railroad Commission of Texas does not regulate the siting of such pipelines does not vest the Commission with additional authority.[104]  We note that federal and state laws protecting environmental, cultural, and other resources will apply to the Connector Pipeline even without centralized oversight by the Railroad Commission.[105]

## C.     **Environmental Analysis**

33.     On February 3, 2023, the Commission issued a *Notice of Scoping Period Requesting Comments on Environmental Issues for the Proposed Border Facilities Project* (Notice of Scoping), establishing a 30-day public scoping period.  The Notice of Scoping was published in the *Federal Register* on February 9, 2023,[106] and mailed to interested stakeholders including federal, state, and local officials; agency representatives; environmental and public interest groups; Native American Tribes; potentially affected landowners; local libraries; and newspapers.

---

("The Natural Gas Act shall not apply to facilities utilized solely for transportation authorized by section 311(a) of the NGPA.").

[101] *See, e.g.,* Property Rights and Pipeline Center Nov. 13, 2023 Comments.

[102] *See, e.g. id*; Property Rights and Pipeline Center Nov. 2, 2023 Comments; *see also* John Doe Nov. 13, 2023 Comments.

[103] *ExxonMobil Gas Mktg. Co. v. FERC*, 297 F.3d 1071, 1088 (D.C. Cir. 2002).

[104] With respect to the use of eminent domain, we note that section 3 of the NGA does not authorize Saguaro to acquire necessary land rights for the Border Facility via eminent domain.  15 U.S.C. 717b(a).

[105] *See* Saguaro Oct. 27, 2023 Response to Data Request at Appendix A.

[106] 88 Fed. Reg. 8418 (Feb. 9, 2023).

34.     In response to the Notice of Scoping, the Commission received comments from
the U.S. Environmental Protection Agency (EPA), Sierra Club, and six individuals.  The
primary issues raised during the scoping process included concerns about cultural
resources, greenhouse gas emissions, environmental justice, air and water quality, public
safety, flooding, property values, and the impacts of the upstream Connector Pipeline.

35.     On March 15, 2023, the Commission issued a *Notice of Schedule for the
Preparation of an Environmental Assessment for the Border Facilities Project.*  The
notice was published in the *Federal Register* on March 22, 2023,[107] and mailed to
stakeholders on the project's environmental mailing list.

36.     To satisfy the requirements of the National Environmental Policy Act of 1969
(NEPA),[108] Commission staff prepared an Environmental Assessment (EA) for Saguaro's
proposal, which was issued on August 25, 2023.  The notice of availability of the EA,
which was published in the *Federal Register*[109] and mailed to the environmental mailing
list, established a 30-day comment period.  The analysis in the EA addresses geology,
soils, water resources, wetlands, vegetation, fisheries, wildlife, threatened and
endangered species, land use, recreation, visual resources, environmental justice,[110]
cultural resources, air quality, noise, safety, cumulative impacts, and alternatives.  All
substantive environmental comments received in response to the Notice of Scoping were
addressed in the EA.

37.     In response to the EA, the Commission received comments from the EPA,
Sierra Club, the Pipeline Rights and Pipeline Center,[111] Juan Mancias on behalf of
Carrizo Comecrudo Tribe of Texas, and several individuals.  The comments included

---

[107] 88 Fed. Reg. 17,208 (Mar. 22, 2023).

[108] 42 U.S.C. §§ 4321 *et seq.*  *See also* 18 C.F.R. pt. 380 (2023) (Commission's
regulations implementing NEPA).

[109] 88 Fed. Reg. 60,199 (Aug. 31, 2023).

[110] Under NEPA, the Commission considers impacts to all potentially affected
communities.  Consistent with Executive Order 12,898 and Executive Order 14,008, the
Commission separately identifies and addresses "disproportionately high and adverse
human health or environmental effects" on environmental justice communities.  Exec.
Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 11, 1994); Exec. Order No. 14,008,
86 Fed. Reg. 7619 (Jan. 27, 2021).  *See infra* PP 89-102.

[111] The Pipeline Rights and Pipeline Center filed comments on the EA on
September 25, 2023, November 2, 2023, and November 13, 2023, and included letters
from individuals in Texas and New Mexico.

concerns regarding the EA's stated purpose and need, environmental justice, impacts to endangered species, climate change and GHG emissions, impacts on water resources, pipeline safety, Tribal consultation, impacts on cultural resources, cumulative impacts, and alternatives. Saguaro and MPL filed reply comments. The comments are addressed below.

38. After Commission staff issued the Notice of Scoping, Congress enacted the *Fiscal Responsibility Act of 2023*.[112] A section titled "Builder Act" amended NEPA in several ways.[113] NEPA section 102(C), as amended, requires that agencies prepare NEPA documents on:

> **(i)** reasonably foreseeable environmental effects of the proposed agency action;
>
> **(ii)** any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;
>
> **(iii)** a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal;
>
> **(iv)** the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and
>
> **(v)** any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented.[114]

---

[112] *See* FISCAL RESPONSIBILITY ACT OF 2023, PL 118-5, 137 Stat 10 (June 3, 2023). The Commission relied on the *Fiscal Responsibility Act of 2023* in a recent order. *See Mountain Valley Pipeline, LLC*, 183 FERC ¶ 61,221, at PP 7, 9, 11 n.20 (2023).

[113] *See* FISCAL RESPONSIBILITY ACT OF 2023, PL 118-5, 137 Stat 10, at § 321 (June 3, 2023) (providing the "Builder Act").

[114] 42 U.S.C. § 4332(c)(i).

39.     The Commission has complied with its NEPA responsibilities under both versions of the statute.[115]

### 1.     Inadequate Comment Period

40.     Sierra Club requested an extension of the EA's 30-day comment period.[116]  It is the Commission's practice to consider all comments filed in natural gas infrastructure proceedings, even those filed after established deadlines, to the extent practicable without delaying Commission action.  This order addresses comments that were filed well after the close of the comment period, and we therefore find no reason to extend it.

### 2.     Connected Actions

41.     Sierra Club asserts that the Commission's approval of the Border Facility and DOE's approval of MPL's application to export natural gas are connected actions that the Commission should evaluate in an environmental impact statement (EIS).[117]  It contends that the EIS should evaluate all connected federal actions and include an analysis of the upstream and downstream GHG emissions associated with the projects, effects on waterbodies from potential inadvertent releases, and effects on federally listed endangered and threatened species.[118]

42.     Actions are "connected" for the purpose of NEPA review if they:
(1) automatically trigger other actions that may require environmental impact statements;
(2) cannot or will not proceed unless other actions are taken previously or simultaneously; or (3) are interdependent parts of a larger action and depend on the larger

---

[115] We note that the Council on Environmental Quality published a Notice of Proposed Rulemaking to revise its regulations implementing NEPA, including to implement the Builder Act amendments.  88 Fed. Reg. 49,924 (July 31, 2023).  The Commission will monitor this proceeding to inform the Commission's practices going forward.

[116] Sierra Club Sept. 25, 2023 Motion to for Extension of Comment Deadline; *see* Antionette Reyes Sept. 26, 2023 Comments on EA (requesting an extension of the comment period); Pipeline Rights and Pipeline Center Sept. 25, 2023 Comments on EA (same).

[117] Sierra Club Jan. 26, 2023 Protest at 10; Sierra Club Sept. 25, 2023 Comments on EA at 28-30 (citing 40 C.F.R. § 1501.9(e) (2023), *Del. Riverkeeper*, 753 F.3d 1304, and *City of Boston Delegation v. FERC*, 897 F.3d 241 (D.C. Cir. 2018)).

[118] Sierra Club Sept. 25, 2023 Comments on EA at 30-31.

action for their justification.[119]  An agency is required to consider "connected actions" in a single environmental document to prevent the agency from "dividing one project into multiple individual actions" with less significant environmental effects.[120]  The proposal before the Commission is to site, construct, and operate the Border Facility.  The export of natural gas to the MPL facility, and the subsequent re-export of that natural gas, were proposed before DOE, not the Commission.  Therefore, because "[DOE], not the Commission, has [the] sole authority to license the export of any natural gas going through the facilities,"[121] we disagree that any of the connected action factors apply in this case.[122]

43.      Moreover, MPL explains that the authorization of gas exports to its facility is not dependent on approval of Saguaro's project.  MPL notes that it expects that Saguaro's

---

[119] 40 C.F.R. § 1501.9(e)(1)(i)-(iii).

[120] *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1326 (D.C. Cir. 2015) (upholding the Commission's determination that, although a Dominion-owned pipeline project's excess capacity may be used to move gas to the Cove Point terminal for export, the projects are "unrelated" for purposes of NEPA) (citation omitted); *see City of W. Chicago, Ill. v. U.S. Nuclear Regul. Comm'n*, 701 F.2d 632, 650 (7th Cir. 1983) ("'Piecemealing' or 'segmentation' allows an agency to avoid the NEPA requirement that an EIS be prepared for all major federal action with significant environmental impacts by segmenting an overall plan into smaller parts involving action with less significant environmental effects.") (citing *City of Rochester v. U.S. Postal Serv.*, 541 F.2d 967, 972 (2d Cir. 1976)); *see also Columbia Gulf Transmission, LLC*,   180 FERC ¶ 61,206, at PP 21, 83 (2022); *Tenn. Gas Pipeline Co., L.L.C.*, 180 FERC ¶ 61,205, at PP 30, 67 (2022).

[121] *Freeport*, 827 F.3d at 47 ("[T]he Commission's NEPA analysis did not have to address the indirect effects of the anticipated *export* of natural gas.") (discussing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004)); *see also Alaska LNG*, 67 F.4th at 1185 (stating that the Commission's "lack of jurisdiction over export approvals also means it has no NEPA obligation stemming from the effects of export-bound gas" and that the Commission is "forbidden to rely on the effects of gas exports as a justification for denying permission to an LNG project") (cleaned up); *Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206 at PP 21, 83; *Tenn. Gas Pipeline Co., L.L.C.*, 180 FERC ¶ 61,205 at PP 30, 67.

[122] *See, e.g.*, *Commonwealth LNG,* 181 FERC ¶ 61,143 at PP 78-80, *order on reh'g*, 183 FERC ¶ 61,173, at PP 42-44 (2023) (explaining why DOE's approval of gas exports from LNG terminal was not a connected action with the Commission's approval of the LNG terminal's siting).

project would be one of several border-crossing pipelines MPL could use to move gas to the export facility. Having already obtained authorization from DOE to re-export 1046.57 Bcf/year of natural gas to free-trade nations and 621 Bcf/year to non-free trade agreement nations,[123] MPL may obtain gas via any transboundary pipeline currently in operation or that will become operational in the future.[124] Therefore, the Saguaro project does not depend on MPL obtaining a DOE authorization to re-export additional volumes to non-free trade agreement nations. Accordingly, our authorization of the project does not automatically trigger another action that may require an environmental impact statement, there is no showing that the project cannot or will not proceed unless other actions are taken previously or simultaneously, and the project is not an interdependent part of a larger action that depends on the larger action for its justification.[125]

44.    Next, Sierra Club claims that the upstream pipeline and Border Facility are interdependent connected actions. Sierra Club asserts that the D.C. Circuit's decision in *Sierra Club v. U.S. Army Corps of Engineers*,[126] which "suggested that the connected action regulation applied only to areas within federal jurisdiction" is an outlier that "conflicts with decades of NEPA precedent."[127] Sierra Club argues that the court in *Flanagan South* distinguished between crude oil pipelines, which do not require a federal agency to find the project is in the public interest, and the holding in *Delaware Riverkeeper Network v. FERC*, where the court held that the Commission impermissibly

---

[123] *See Mexico Pacific Limited, LLC*, DOE/FE Order No. 4248, Docket No. 18-70-LNG (Sept. 19, 2018) (authorizing the re-export of up to 621 Bcf/year of gas to free trade nations); DOE/FE Order No. 4312, Docket No. 18-70 LNG (Dec. 14, 2018) (authorizing re-export of the same volume to non-free trade nations); *Mexico Pacific Limited, LLC*, DOE/FE Order No. 4995, Docket No. 22-167-LNG (Apr. 28, 2023) (authorizing the export to Mexico and re-export of an additional 291.22 Bcf/year of U.S.-sourced gas to free-trade nations, and deciding to address MPL's requested authorization to re-export the additional capacity to non-free trade nations in a future order).

[124] MPL Oct.17, 2023 Answer at 6-8.

[125] *See e.g., Commonwealth LNG*, 183 ¶ 61,173 at PP 43-44.

[126] 803 F.3d 31 (D.C. Cir. 2015) (*Flanagan South*).

[127] Sierra Club Sept. 25, 2023 Comments on EA at 31 (citing *White Tanks Concerned Citizens, Inc. v. Strock*, 563 F.3d 1033, 1041-42 (9th Cir. 2009); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1122-23 (9th Cir. 2005) (same); *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 105 (D.D.C. 2006); *Hammond v. Norton*, 370 F. Supp. 2d 226, 244 (D.D.C. 2005)).

segmented portions of a pipeline that required NGA section 7 approval.[128]  According to Sierra Club, this means that the Connector Pipeline and Border Facility are interdependent and resemble the facilities in *Delaware Riverkeeper* more than the oil pipeline in *Flanagan South*.[129]  Sierra Club also states, without citation, that the Council on Environmental Quality (CEQ) recently amended its scoping regulations in a way that did not limit its definition of connected actions to areas within federal control.[130]

45.     Contrary to Sierra Club's assertion, the D.C. Circuit held in *Big Bend*, which also involved a border crossing facility and non-jurisdictional upstream pipeline, that "[t]he connected-actions doctrine does not require the aggregation of federal and non-federal actions."[131]  Rather, even where separate pipeline segments are physically, functionally, and financially connected, the "key point [is] that the bulk [is] not subject to federal jurisdiction."[132]  The court in *Big Bend* rejected petitioners' reliance on *Delaware Riverkeeper* because unlike that case, where the entire pipeline was subject to NGA section 7 jurisdiction, in *Big Bend*, only the export facility was subject to federal jurisdiction.[133]  Here, too, only the export facility is subject to the Commission's jurisdiction while the upstream pipeline is "outside the scope of geographically limited federal actions."[134]  Thus, the connected-actions regulation does not apply.

### 3.     Environmental Effects of the Connector Pipeline

46.     Notwithstanding the lack of connected federal actions, Sierra Club asserts that, under the four-factor-test set out in *Algonquin Gas Transmission Co.*,[135] the Commission should evaluate the environmental effects of the Connector Pipeline.[136]  Under the

---

[128] Sierra Club Sept. 25, 2023 Comments on EA at 31 ((citing *Del. Riverkeeper Network v. FERC*, 753 F.3d at 1313).

[129] *Id.* at 31-32.

[130] *Id.*

[131] *Big Bend*, 896 F.3d at 424.

[132] *Id.* (citing *Flanagan South*, 803 F.3d at 49-50).

[133] *Id.*

[134] *Id.* (internal citations and quotation marks omitted).

[135] 59 FERC ¶ 61,255, at 61,934 (1992) (*Algonquin*).

[136] Sierra Club Sept. 25, 2023 Comments on EA at 33 (citing 40 C.F.R. § 1580.1(g)(2)-(3)); Sierra Club Nov. 13, 2023 Supplemental Comments at 16-17

four-factor test, to determine whether there is sufficient federal control over a project to require environmental analysis, the Commission considers:  (i) whether or not the regulated activity comprises "merely a link" in a corridor type project (e.g., a transportation or utility transmission project); (ii) whether there are aspects of the non-jurisdictional facility in the immediate vicinity of the regulated activity that uniquely determine the location and configuration of the regulated activity; (iii) the extent to which the entire project will be within the Commission's jurisdiction; and (iv) the extent of cumulative federal control and responsibility.[137]  As explained below, the pertinent factors weigh against a finding that the Commission must consider the direct effects of the Connector Pipeline as part of its authorization of the Border Facility under NEPA.

47.     With respect to factor (i), Sierra Club acknowledges that Saguaro's project is a corridor-type project but avers that the Commission's approval of the Border Facility is the "most important" of the required federal approvals and not merely a link in a corridor-type project.[138]  Sierra Club notes that the U.S. Department of State evaluates presidential permits for oil pipelines by determining whether the project would serve the "national interest," including non-federal components; thus, the Commission should do the same by including the Connector Pipeline in its NEPA analysis.[139]  However, the Commission has consistently determined that, for border-crossing facilities, import/export facilities are merely a link between two non-jurisdictional facilities.[140]  Here, those include the upstream Connector Pipeline and the downstream pipeline in Mexico.

48.     Regarding factor (ii), Sierra Club argues that the location of the "non-federal" portions of the pipeline—i.e., the eventual interconnecting pipeline in Mexico and the Connector Pipeline—determined the location of the Border Facility.[141]  Although the Border Facility will interconnect with the Connector Pipeline, its design and location

---

(contending that the Railroad Commission of Texas' limited review requires that the Commission step in to fully analyze the Connector Pipeline's impacts).

[137] *Algonquin*, 59 FERC at 61,934.

[138] Sierra Club Sept. 25, 2023 Comments on EA at 34.

[139] *Id*. at 34-35.

[140] *See, e.g., Trans-Pecos*, 155 FERC ¶ 61,140 at P 33.

[141] Sierra Club Sept. 25, 2023 Comments on EA at 35.

were determined based on the downstream interconnect location outside United States jurisdiction, not based on the Connector Pipeline location.[142]

49.     With respect to factor (iii), Sierra Club points to its arguments about the Commission's jurisdiction under NGA sections 3 and 7 that we rejected above.[143]  The non-jurisdictional Connector Pipeline constitutes a much more significant portion of the overall facilities than the 1,000-foot Border Facility, and, as stated above, the Commission has no authority over the permitting, licensing, funding, construction, or operation of the upstream pipeline.[144]

50.     Last, with respect to factor (iv), Sierra Club states that because various aspects of the Connector Pipeline come under the jurisdiction of several federal agencies the Commission should pursue a broad NEPA review.[145]  Cumulative federal control is determined by the amount of federal financing, assistance, direction, regulation, or approval inherent in a project.[146]  Here, the extent of cumulative federal control and responsibility over the Connector Pipeline is limited.  The upstream pipeline will be owned by Saguaro with no federal financial involvement and no federal lands are crossed by the project.[147]  Saguaro is responsible for obtaining any federal permits required to construct the pipeline, including obtaining any stream-crossing permits from the U.S. Army Corps of Engineers (Corps) and consulting with the U.S. Fish and Wildlife Service (FWS) for compliance with the Endangered Species Act.  In Texas, the regulation of gas pipeline services and safety falls under the jurisdiction of the Railroad Commission of Texas.  Thus, cumulative federal control is minimal and does not warrant extending the Commission's environmental review.[148]

51.     In view of the considerations above, we are not compelled to consider the upstream intrastate pipeline as part of our action authorizing the Border Facility for

---

[142] EA at 15, 62; Saguaro Feb. 24, 2023 Reply Comments at 14; *see Trans-Pecos,* 155 FERC ¶ 61,140 at P 33.

[143] Sierra Club Sept. 25, 2023 Comments on EA at 35.

[144] *See*, *e.g.*, *Trans-Pecos,* 155 FERC ¶ 61,140 at P 33.

[145] Sierra Club Sept. 25, 2023 Comments on EA at 35-36.

[146] *Algonquin*, 59 FERC ¶ 61,255 at 61,935; *Impulsora Pipeline, LLC,* 153 FERC ¶ 61,204, at P 24 (2015).

[147] EA at 70.

[148] *See Trans-Pecos,* 155 FERC ¶ 61,140 at P 34.

purposes of our NEPA review.  Moreover, the EA analyzes the cumulative and indirect impacts of the intrastate pipeline[149] and we find that this analysis was sufficient to satisfy our NEPA responsibility for the authorized action.

### 4.  Purpose and Need

52.    Sierra Club avers that the EA's statement of purpose and need is narrower than the applicant's project description, and thus "forecloses consideration of reasonable alternatives and frustrates public participation."[150]  It contends that the Commission lacks sufficient information about the upstream supply of natural gas, the downstream demand for natural gas, and the identity of the interconnecting pipeline and LNG facility in Mexico.  As a result, Sierra Club argues that the EA fails to adequately consider alternatives to the proposed project.[151]

53.    Sierra Club is incorrect that the EA states the project purpose as only "to site, construct, connect, operate, and maintain a new International Boundary crossing between the U.S. and Mexico located in Hudspeth County, Texas."  Sierra Club has truncated the EA's statement of the project's purpose and need, which is the same as the applicant's description,[152] and then goes on to state that the project will "supply a new natural gas export facility under development on the West Coast of Mexico."[153]  With respect to project need, Sierra Club repeats its assertions that there are inadequate supplies of natural gas available to transport on the project and that the demand for natural gas in

---

[149] *See* EA at 49-50 (discussing cumulative impacts on geology and soils), 50-51 (discussing cumulative impacts on water resources), 51-53 (discussing cumulative impacts on fish and aquatic species, vegetation, and wildlife), 53-54 (discussing cumulative impacts on land use and visual resources), 54-55 (discussing cumulative impacts on environmental justice and air quality and noise), 55-60 (discussing cumulative impacts on climate change).

[150] Sierra Club Sept. 25. 2023 Comments on EA at 36.

[151] *Id.* at 36-42.

[152] *See* Saguaro Application at Resource Report 1-2 ("The purpose of the Project is to site, construct, connect, operate, and maintain a new International Boundary crossing between the U.S. and Mexico located in Hudspeth County, Texas, as more fully described herein.  Saguaro is developing the Project to connect its intrastate natural gas transmission pipeline and related facilities—originating near the Waha Hub in Pecos County, Texas—with downstream facilities located in Mexico through the Border Facilities at the International Boundary crossing.").

[153] EA at 2.

Document Accession #: 20240215-3066          Filed Date: 02/15/2024

Mexico can be met by other border-crossing pipelines.[154]  As discussed above, Saguaro has identified eight potential upstream sources of intrastate gas totaling up to five billion cubic feet per day accessible for ultimate delivery to the Border Facility.  Additionally, MPL, the developer of the downstream LNG export facility in Mexico, has stated that the Saguaro project will significantly expand the options available to MPL and its customers.[155]

54.     Next, Sierra Club argues that Saguaro is "attempting to amend the project's purpose and need" by stating for the first time in an October 27, 2023 response to a data request that some portion of the gas could meet gas demand in Mexico, as opposed to supplying the MPL export facility.[156]  According to Sierra Club, this means a supplemental environmental analysis is necessary to evaluate the project's "new" purpose and need, the Commission's public interest finding, foreseeable impacts, and alternatives.[157]  We disagree.  Contrary to Sierra Club's assertion, Saguaro previously stated that some of the natural gas transported by the project could be used for domestic consumption in Mexico.[158]  In any event, as discussed above, issues related to the consumption of gas in Mexico, or any other foreign country, are relevant only to the exportation of the commodity of natural gas, which is within DOE's exclusive jurisdiction and are not implicated by our limited action of reviewing the proposed border-crossing facilities.[159]  Therefore, we decline to prepare a supplemental environmental document on these grounds.

---

[154] Sierra Club Sept. 25. 2023 Comments on EA at 38.

[155] MPL Oct. 17, 2023 Reply Comments at 8.

[156] Sierra Club Nov. 13, 2023 Supplemental Comments at 3-5

[157] *Id.*

[158] Saguaro Feb. 24, 2023 Answer at 17-18 n. 62 ("The downstream pipeline in Mexico could deliver to points other than the LNG facility.").

[159] *See, e.g.*, *Cameron LNG, LLC*, 182 FERC ¶ 61,173, at P 13 (declining to address economic arguments); *Valley Crossing*, 161 FERC ¶ 61,084 at P 12 (same); *Trans-Pecos*, 155 FERC ¶ 61,140 at PP 14-15 (explaining why commenters' arguments that proposed border-crossing facilities would exceed demand by customers in Mexico are not under the Commission's purview) (citing *National Steel Corp.*, 45 FERC at 61,332-61,333).

Docket No. CP23-29-000                                                    - 30 -

## 5. <u>Alternatives</u>

55.     Sierra Club argues that the EA fails to appropriately consider both the use of existing border-crossing pipelines to substitute for the transportation capacity that would be created by the project and also the use of alternative locations for the proposed Border Facility.[160]

56.     NEPA provides that agencies include "a detailed statement" of "a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal."[161]  An applicant's statement of purpose and need informs the choice of alternatives considered by the Commission under NEPA.[162]  Courts have upheld federal agencies' use of applicants' project purpose and need in environmental documents and as the basis for evaluating alternatives.[163]  When an agency is asked to consider a specific proposal, the needs and goals of the parties involved in the application should be taken into account.[164]

57.     We recognize that a project's purpose and need may not be so narrowly defined as to preclude consideration of reasonable alternatives.  Nonetheless, an agency need only consider alternatives that will bring about the ends of the proposed action, and the evaluation is "shaped by the application at issue and by the function that the agency plays in the decisional process."[165]  Moreover, because the alternatives considered under NEPA

---

[160] Sierra Club Sept. 25, 2023 Comments on EA at 42-54.

[161] 42 U.S.C. § 4332(c)(iii).

[162] CEQ advises that "a reasonable range of alternatives depends on the nature of the proposal and the facts in each case."  *CEQ, Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026, 18,027 (1981).

[163] *E.g.*, *City of Grapevine v. U.S. Dep't of Transp.*, 17 F.3d 1502, 1506 (D.C. Cir. 1994); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991) (*Citizens Against Burlington*) (explaining that the evaluation of alternatives is "shaped by the application at issue and by the function that the agency plays in the decisional process.").

[164] *Citizens Against Burlington*, 938 F.2d at 196.

[165] *Id.* at 199.

are informed both by "the project sponsor's goals,"[166] as well as "the goals that Congress has set for the agency,"[167] i.e., the goals set in enacting the NGA, the Commission's consideration of alternatives includes the no-action alternative and alternatives that achieve the purpose of the project.

58.    First, Sierra Club claims that existing border-crossing pipelines could supply MPL's full export volume, potentially rendering the Saguaro project "superfluous," and that the Commission failed to independently consider whether other border-crossing pipelines could fulfill the project's purpose and need.[168]  An agency may eliminate those alternatives that will not achieve a project's goals or which cannot be carried out because they are too speculative, infeasible, or impractical.[169]  The purpose of Saguaro's project is to interconnect two non-jurisdictional pipelines at the U.S.-Mexico border to transport gas to supply a new LNG facility under development on the West Coast of Mexico.  As MPL states in its comments, the proposed project would significantly expand the options available to MPL and its customers to supply natural gas to its terminal.[170]  Sierra Club provides insufficient evidence that existing border-crossing pipelines can provide MPL and its customers similar flexibility.[171]  Because the proposed system alternative would not achieve the project's aims, the EA appropriately eliminated the alternative.

---

[166] *Id.* at 196.

[167] *Sierra Club v. U.S. Forest Serv.*, 897 F.3d 582, 598-99 (4th Cir. 2018).

[168] Sierra Club Sept. 25, 2023 Comments on EA at 39-41, 50-51.

[169] *See Alaska LNG*, 67 F.4th at 1182 (recognizing that agencies may reject alternatives that will be impractical or fail to further the proposed action's purpose after only brief discussion); *Fuel Safe Wash. V. FERC*, 389 F.3d 1313, 1323 (10th Cir. 2004) (stating that the Commission need not analyze "the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or . . . impractical or ineffective.") (quoting *All Indian Pueblo Council v. U. S.*, 975 F.2d 1437, 1444 (10th Cir. 1992) (internal quotation marks omitted)); *Nat. Res. Def. Council, Inc. v. Morton*, 458 F.2d 827, 837-38 (D.C. Cir. 1972) (same); *see also Nat'l Wildlife Fed'n v. FERC*, 912 F.2d 1471, 1485 (D.C. Cir. 1990) (stating that "NEPA does not require detailed discussion of the environmental effects of remote and speculative alternatives") (citation omitted).

[170] MPL Oct. 17, 2023 Reply Comments at 8.

[171] Sierra Club Sept. 25, 2023 Comments on EA at 44-45, 50-51 (noting other border-crossing pipelines with "potential availability" for additional gas transportation

59.    Next, Sierra Club contends that the EA failed to analyze alternative locations for the Border Facility.  It asserts that the EA wrongly determines that the location of the facility is constrained by the upstream and downstream pipelines, noting that the EA does not include a construction schedule for the Connector Pipeline or information on the status of state and federal permitting processes.[172]  Sierra Club asserts that because the Railroad Commission of Texas lacks authority over the siting of the Connector Pipeline, the Commission could consider alternative locations.[173]  With respect to the interconnecting pipeline in Mexico, Sierra Club argues that the EA wrongly accepts Saguaro's statement that the Border Facility's location is constrained by the location of the pipeline in Mexico.[174]  It notes that the pipeline is pending authorization in Mexico and the Commission should not forgo obtaining additional information about the pipeline or allow foreign regulators to "dictate the location of a project in the United States."[175]  Sierra Club contends that by limiting the alternatives analysis, the EA fails to examine whether collocating the Border Facility at the sites of other border-crossing pipelines, utility crossings, and pipelines carrying other commodities, such as oil, would reduce impacts to environmentally and culturally sensitive areas in the Rio Grande River Basin.[176]

60.    The EA properly limits its alternatives discussion based on "the application at issue and . . . the function that the agency plays in the decisional process[,]"[177] as the Commission has no authority over the siting or timing of the Connector Pipeline or the pipeline in Mexico.  As explained in the EA, the location of the Border Facility was chosen to accommodate a specific interconnection location in Mexico that meets the project's purpose.[178]  Given that the range of alternative locations for the crossing is

---

that originate at or near the Waha Hub, including the Sierrita, Comanche, Roadrunner, and Trans-Pecos pipelines).

    [172] *Id.* at 43-44.

    [173] *Id.* at 43-44.

    [174] *Id.* at 45.

    [175] *See id.* at 46-48 (citing *Sierra Club v. Watkins*, 808 F. Supp. 852 (D.C. Cir. 1991)).

    [176] *Id.* at 50-52.

    [177] *Citizens Against Burlington*, 938 F.2d at 199.

    [178] EA at 15, 62.

constrained by the location of the Mexican facilities,[179] the EA correctly did not identify another technically and economically feasible location or crossing. Further, because of the minimal level of impacts associated with the project as proposed, staff could not identify any alternatives that would "provide a significant environmental advantage" over the proposed project, while meeting the objectives of the project.[180]

61.     Notwithstanding the Commission's limited jurisdiction, Sierra Club contends that the EA should have considered a broader range of alternatives. Sierra Club cites to *Indigenous Environmental Network v. U.S. Department of State*,[181] where the court required the State Department to prepare a supplemental EIS to analyze an alternative route for the Keystone XL Pipeline that the State Department was aware of based on the applicant's pending application with the Nebraska Public Service Commission. Sierra Club states this "was true despite the fact that the State Department's jurisdiction was limited to the border crossing[ ] and the new route was in Nebraska."[182]

62.     We disagree that this holding applies here. As stated above, an agency need only consider alternatives that will bring about the ends of the proposed action, and the evaluation is "shaped by the application at issue and by the function that the agency plays in the decisional process."[183] Unlike the alternative at issue in *Indigenous Environmental Network*, the Commission is not aware of any alternative route for the interconnecting pipelines under consideration by another domestic or foreign government agency that would require the Commission to evaluate an alternative crossing location.

63.     Last, Sierra Club asserts that the EA should have evaluated smaller-diameter pipeline alternatives to the 48-inch-diameter line proposed for the project because a smaller pipeline could reduce the risks of and impacts from "likely" frac-outs[184] that would occur when drilling under the Rio Grande using the Direct Pipe method. Relatedly, Sierra Club argues that the EA should have evaluated alternative crossing

---

[179] Sierra Club correctly notes that "[t]he [intrastate] pipeline route is determined by the proponent and ultimately the outcome of landowner negotiations or litigation." Sierra Club Sept. 25, 2023 Comments on EA at 44.

[180] EA at 61-62.

[181] 317 F.Supp.3d 1118, 1123 (D. Mont. 2018).

[182] Sierra Club Sept 25, 2023 Comments on EA at 48.

[183] *Citizens Against Burlington*, 938 F.2d at 199.

[184] A "frac-out" is an inadvertent release of sediment and other drilling material into aquatic resources during drilling underneath bodies of water.

methods, including horizontal direction drilling (HDD).[185]  As stated in the EA, the Direct Pipe trenchless crossing, which uses a guided micro-tunneling head to install the pipeline in one pass, has a lower probability of inadvertent releases than HDD because multiple reaming passes are not required.[186]  And while a potential inadvertent release may occur, Commission staff's review of the geological resources, Saguaro's *Spill Prevention, Containment, and Countermeasure Plan*, and the project-specific *Inadvertent Release Control Plan* indicated that the Direct Pipe method would not result in significant impacts to the Rio Grande.[187]  Moreover, Saguaro has demonstrated that the 48-inch-diameter pipeline is necessary for transporting 2.834 Bcf/day.[188]

## 6.      Greenhouse Gas Emissions and Climate Change

64.      NEPA requires agencies to include in NEPA documents reasonably foreseeable environmental effects of the proposed agency action.[189]  CEQ defines effects or impacts as "changes to the human environment from the proposed action or alternatives that are reasonably foreseeable," which include those effects that "occur at the same time and place" and those that "are later in time or farther removed in distance, but are still reasonably foreseeable."[190]  An impact is reasonably foreseeable if it is "sufficiently likely to occur such that a person of ordinary prudence would take it into account in reaching a decision."[191]

---

[185] Sierra Club Sept. 25, 2023 Comments on EA at 53.

[186] EA at 5-6, 62.

[187] *Id.* at 14-15, 17-19, 25-26.

[188] Sierra Club claims that Saguaro has failed to justify the need for a 48-inch-diameter pipeline because the company has not demonstrated it has sufficient supplies to transport the full 2.834 Bcf/day of capacity.  As discussed above, Saguaro has demonstrated it has access to ample gas supply to meet the full project capacity.

[189] *See* FISCAL RESPONSIBILITY ACT OF 2023, PL 118-5, 137 Stat 10, at § 321 (June 3, 2023).

[190] 40 C.F.R. § 1508.1(g).

[191] *Id.* § 1508.1(aa).  *See generally Pub. Citizen*, 541 U.S. at 767 (explaining that "NEPA requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause" and that "[t]he Court analogized this requirement to the 'familiar doctrine of proximate cause from tort law") (citation omitted); *Food & Water Watch v. FERC*, 28 F.4th 277, 288 (D.C. Cir. 2022) ("Foreseeability depends on information about the 'destination and end use of the gas in question.'") (citation

65.    We find that the project's construction emissions are reasonably foreseeable.[192] The EA estimates that construction of the project may result in emissions of up to about 6,869.2 metric tons of carbon dioxide equivalents ($CO_2$e) over the duration of construction and commissioning.  The estimated social cost of GHGs from the project is equal to $106,454 (assuming a discount rate of five percent), $367,251 (assuming a discount rate of three percent), $544,754 (assuming a discount rate of 2.5%), or $1,100,016 (using the 95th percentile of the social cost of GHGs with a discount rate of three percent).[193]  The EA states "[c]onstruction of the Project would increase the atmospheric concentration of GHGs, in combination with past and future emissions from all other sources and would contribute incrementally to future climate change impacts."[194]

66.    Sierra Club argues that the EA should analyze the upstream and downstream GHG emissions associated with the project.  Under *Freeport*,[195] the Commission need not consider the effects of upstream production or downstream transportation, consumption, or combustion of exported gas because the DOE's "independent decision to allow exports—a decision over which the Commission has no regulatory authority—breaks the NEPA causal chain and absolves the Commission of responsibility to include in its NEPA analysis considerations that it "could not act on" and for which it cannot be "the

---

omitted); *Sierra Club v. FERC*, 867 F.3d 1357, 1371 (D.C. Cir. 2017) (*Sabal Trail*) ("FERC should have estimated the amount of power-plant carbon emissions that the pipelines will make possible.").

[192] There are no stationary combustion sources, pig launchers and receivers, pneumatic devices, or aboveground facilities associated with the project; therefore, the project would not have natural gas blowdowns or other sources of operational emissions. Fugitive emissions from pipeline leaks would not be significant given the method of pipeline construction and installation.  EA at 43.

[193] The values for the social cost of GHGs have been corrected from those reported in the EA, which included a calculation error.  *Id.* at 59-60.  The EA describes the method and assumptions staff used for calculating the social cost of GHGs.  *Id.* at 57-60.  The IWG draft guidance identifies costs in 2020 dollars.  Interagency Working Group on Social Cost of Greenhouse Gases, United States Government, *Technical Support Document:  Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990*, at 5 (Table ES-1) (Feb. 2021).

[194] EA at 57-58.

[195] 827 F.3d 36 (D.C. Cir. 2016).

legally relevant cause."[196]  Accordingly, we conclude that the upstream and downstream GHG emissions are not reasonably foreseeable.

67.    Acknowledging that *Freeport* is binding on the Commission,[197] Sierra Club nonetheless argues that the Commission should calculate the indirect emissions from the project because:  (1) the analysis would inform the Commission's decision making regarding emissions within the Commission's control;[198] (2) DOE's evaluation of MPL's exports is a connected action that cannot be segmented from the Commission's review of the project; and (3) the *Freeport* court declined to analyze whether the Commission's responsibility under the NGA to act as "lead agency" requires the Commission to consider indirect upstream and downstream impacts.

68.    We are not persuaded that these arguments lead to a different outcome than the court reached in *Freeport*.  As we have recently explained in response to similar arguments:

> NGA section 15(b)(1) directs the Commission to act as "lead agency for the purposes of coordinating all applicable Federal authorizations and for the purposes of complying with the National Environmental Policy Act." Although the lead agency supervises the preparation of the environmental document where more than one federal agency is involved, the "lead agency" designation does not alter the scope of the project before the Commission either for approval or environmental review.  Nor does the lead agency role

---

[196] *Id.* at 48 (quoting *Pub. Citizen*, 541 U.S. at 769).  *See also Alaska LNG*, 67 F.4th at 1185 ("[T]he Commission does not have authority over, and need not address the effects of, the anticipated export of the gas.") (citations omitted).

[197] Sierra Club also asserts that *Freeport* was wrongly decided and urges the Commission to seek to clarification from the court.  The Commission is not free to ignore controlling precedent, as the comments acknowledge, and declines to ask the D.C. Circuit to clarify or overrule *Freeport.  See Commonwealth LNG*, 181 FERC ¶ 61,143 at n.205 (rejecting request by environmental intervenors to ask the D.C. Circuit to clarify or overrule *Freeport*), *order on reh'g*, 183 FERC ¶ 61,173 at P 45 (same).

[198] Sierra Club Sept. 25, 2023 Comments on EA at 57-63.  Sierra Club also notes that nothing in *Freeport* prevents the Commission from providing information on upstream and downstream GHG emissions, and thus the Commission should so do to provide "important information to the public and to cooperating agency decisionmakers." *Id.* at 57.

make the Commission responsible for ensuring a cooperating federal agency's compliance with its own NEPA responsibilities.[199]

69.     Here, the project before the Commission is the construction and operation of facilities under section 3 of the NGA to export natural gas to Mexico. The Commission fulfilled its role as lead agency in the NEPA review by issuing the EA and by our analysis here.  As the agency responsible for authorizing exports, DOE is responsible for interpreting and applying NGA section 3 to the proposed exports and for providing appropriate supplemental environmental analysis should DOE decide to authorize additional exports to non-free trade agreement nations.

70.     Additionally, "the requirement that an agency consider connected actions in a single environmental document is to 'prevent agencies from dividing one project into multiple individual actions' with less significant environmental effects."[200]  As discussed above, the proposal before the Commission is the Border Facility.  The export of natural gas was proposed before DOE and authorized by DOE, not the Commission.

71.     Next, Sierra Club attempts to distinguish the Saguaro project from the project in *Freeport* by noting that Saguaro stated in its application that it will not hold title to any of the gas transported through the Border Facility and that it remains unclear where the gas is going.  According to Sierra Club, whereas the court in *Freeport* "relieved FERC from evaluating GHG emissions based on the notion that DOE would evaluate those impacts for exports" in a separate docket, here "there is no corresponding DOE docket that will evaluate Saguaro's exports under NEPA."  Sierra Club asserts that it "believes the facts show MPL will re-export the majority, if not all, of Saguaro's gas from its LNG terminal" but that Saguaro and MPL state otherwise.[201]

72.     As discussed above, the eventual destination for the gas is immaterial to the Commission's NEPA analysis.  Regardless of the entity that holds title to or eventually receives the gas, the D.C. Circuit recently reiterated the relevant holding from *Freeport*, explicitly stating that the Commission has no "authority over, and need not address the

---

[199] *Commonwealth LNG*, 181 FERC ¶ 61,143 at P 80 (quoting *Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206 at P 82; *see Jordan Cove Energy Project LP*, 170 FERC ¶ 61,202, at P 180 (2020).

[200] *Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206 at P 83 (quoting *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d at 1326).

[201] Sierra Club Sept. 25, 2023 Comments on EA at 61-63.

effects of, the anticipated export of [] gas."[202]  In any event, contrary to Sierra Club's assertion, both Saguaro and MPL have indicated that MPL's LNG facility in Mexico is the anticipated end-destination of the gas.[203]  Thus, as explained above, DOE is the proper venue for any and all concerns related to the re-export of gas from the MPL facility[204] whether that gas were to pass through the Border Facility or any other border-crossing pipeline.

73.     Finally, Sierra Club claims that, unlike in *Freeport*, the Commission in this case can determine "where the upstream gas development is most likely to occur, at what levels, and . . . the associated environmental impacts of that development" because Saguaro identified eight potential sources of gas in Texas.[205]  As stated above, the Commission need not consider the effects of upstream production or downstream transportation, consumption, or combustion of exported gas because the DOE's "independent decision to allow exports . . .breaks the NEPA causal chain. . .."[206]

74.     As we have done in prior orders, we compare GHG emissions to the total GHG emissions of the United States as a whole and at the state level.  This comparison allows us to contextualize the project's emissions.  At a national level, 5,586 million metric tons of $CO_2e$ were emitted in 2021 (inclusive of $CO_2e$ sources and sinks).[207]  Construction

---

[202] *Alaska LNG*, 67 F.4th at 1185.  As discussed above, we also reject Sierra Club's contention that, *Freeport* notwithstanding, the NGA and NEPA compel the Commission to consider this docket and DOE's export dockets together.

[203] *See* MPL Oct. 17, 2023 Answer at 12-13; MPL Mar. 15, 2023 Answer at 2-3; MPL Jan. 23, 2023 Motion to Intervene at 2-3; Saguaro Feb. 24, 2023 Answer at 3-4, 17-18 (citing MPL's DOE-FE 2018 export orders); Saguaro Application at 6.

[204] *See Mexico Pacific Limited, LLC*, DOE/FE Order No. 4248, Docket No. 18-70-LNG (Sept. 19, 2018); *Mexico Pacific Limited, LLC*, DOE/FE Order No. 4312, Docket No. 18-70 LNG (Dec. 14, 2018); *Mexico Pacific Limited, LLC*, DOE/FE Order No. 4995, Docket No. 22-167-LNG (Apr. 28, 2023).

[205] Sierra Club Nov. 13, 2023 Supplemental Comments at 14-15 (citing Saguaro Oct. 27, 2023 Response to Data Request).  A map identifying the location of the gas sources was filed as non-public pursuant to the Commission's regulations for Critical Energy Infrastructure Information and Privileged documents, 18 C.F.R. §§ 388.112, 388.113 (2023).

[206] *Supra* P 65 (citing *Freeport*, 827 F.3d at 48).

[207] EA at 58.

emissions from the project could potentially increase $CO_2e$ emissions based on the national 2021 levels by 0.00012%.

75.     At the state level, we compare the project's GHG emissions to the total GHG emissions for the state of Texas.  For Texas, 663.5 million metric tons of $CO_2e$ were emitted in 2021.[208]  Construction emissions from the project would increase $CO_2e$ emissions, based on the state 2021 level, by 0.001%.

76.     We clarify that, for informational purposes, Commission staff disclosed an estimate of the social cost of GHGs.[209]  While we have recognized in some past orders that social cost of GHGs may have utility in certain contexts such as rulemakings,[210] we have also found that calculating the social cost of GHGs does not enable the Commission to determine credibly whether the reasonably foreseeable GHG emissions associated with a project are significant or not significant in terms of their impact on global climate change.[211]  Currently, however, there are no criteria to identify what monetized values are significant for NEPA purposes, and we are currently unable to identify any such appropriate criteria.[212]  Nor are we aware of any other currently scientifically accepted

---

[208] *Id.*

[209] *Id.* at 58-59.

[210] *Fla. Se. Connection, LLC*, 164 FERC ¶ 61,099, at PP 35-37 (2018).

[211] *See Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043, at P 296, (2017), *aff'd sub nom.*, *Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199 (D.C. Cir. 2019); *Delaware Riverkeeper*, 45 F.4th at 111.  The social cost of GHGs tool merely converts GHG emissions estimates into a range of dollar-denominated figures; it does not, in itself, provide a mechanism or standard for judging "significance."

[212] *Tenn. Gas Pipeline Co., L.L.C.*, 181 FERC ¶ 61,051 at P 37; *see also Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043 at P 296, *order on reh'g*, 163 FERC ¶ 61,197, at PP 275-297 (2018), *aff'd*, *Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199, at 2 (D.C. Cir. 2019) (unpublished) ("[The Commission] gave several reasons why it believed petitioners' preferred metric, the Social Cost of Carbon tool, is not an appropriate measure of project-level climate change impacts and their significance under NEPA or the Natural Gas Act.  That is all that is required for NEPA purposes."); *EarthReports v. FERC*, 828 F.3d at 956 (accepting the Commission's explanation why the social cost of carbon tool would not be appropriate or informative for project-specific review, including because "there are no established criteria identifying the monetized values that are to be considered significant for NEPA purposes"); *Tenn. Gas Pipeline Co., L.L.C.*, 180 FERC ¶ 61,205, at P 75 (2022); *see, e.g.*,

method that would enable the Commission to determine the significance of reasonably foreseeable GHG emissions.[213]  The D.C. Circuit has repeatedly upheld the Commission's decisions not to use the social cost of carbon, including to assess significance.[214]  In fact, the D.C. Circuit recently affirmed the Commission's decision to not analyze the social cost of carbon in its NEPA analysis,[215] rejected the suggestion that it was required to do so, found that the petitioner's arguments "fare no better when framed as NGA challenges," and then, in the very same paragraph, sustained the Commission's public interest determination as "reasonable and lawful."[216]

77.     We note that there currently are no accepted tools or methods for the Commission to use to determine significance, and therefore the Commission is not herein

---

*LA Storage, LLC*, 182 FERC ¶ 61,026, at P 14 (2023); *Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206 at P 91.

[213] *See, e.g.*, *LA Storage, LLC*, 182 FERC ¶ 61,026 at P 14 ("there are currently no criteria to identify what monetized values are significant for NEPA purposes, and we are currently unable to identify any such appropriate criteria").

[214] *See, e.g.*, *Alaska LNG*, 67 F.4th at 1184 (explaining that "the Commission compared the Project's direct emissions with existing Alaskan and nationwide emissions," "declined to apply the social cost of carbon for the same reasons it had given in a previous order"; describing those reasons as:  (1) "the lack of consensus about how to apply the social cost of carbon on a long time horizon;" (2) that "the social cost of carbon places a dollar value on carbon emissions but does not measure environmental impacts as such;" and (3) "FERC has no established criteria for translating these dollar values into an assessment of environmental impacts"; and recognizing that the Commission's "approach was reasonable and mirrors analysis . . . previously upheld" and that the Commission "had no obligation in this case to consider the social cost of carbon") (citations omitted); *EarthReports*, 828 F.3d at 956 (upholding the Commission's decision not to use the social cost of carbon tool due to a lack of standardized criteria or methodologies, among other things); *Delaware Riverkeeper*, 45 F.4th 104 (also upholding the Commission's decision not to use the social cost of carbon); *Appalachian Voices v. FERC*, 2019 WL 847199 (D.C. Cir. 2019) (same).

[215] *Alaska LNG*, 67 F.4th at 1184 ("Rather than use the social cost of carbon, the Commission compared the Project's direct emissions with existing Alaskan and nationwide emissions.  It declined to apply the social cost of carbon for the same reasons it had given in a previous order. . . FERC's approach was reasonable and mirrors analysis we have previously upheld.").

[216] *Id.*

characterizing these emissions as significant or insignificant.[217]  Accordingly, we have taken the required "hard look" and have satisfied our obligations under NEPA.

### 7.    Water Resources

#### a.    Clean Water Act Section 404

78.    Sierra Club asserts that because the Corps declined to conduct a project-level NEPA analysis and instead is evaluating Saguaro's application for a Nationwide Permit 12 permit, the EA must evaluate the impact of construction activities on waterbodies crossed by the non-jurisdictional Connector Pipeline.[218]  EPA recommends that the Commission confirm the wetland delineation for all jurisdictional Waters of the United States.[219]

79.    The EA addresses wetlands crossed by the project workspace; wetlands crossed by the existing access road (Indian Hot Spring Road); and wetlands located within 50 feet of a project workspace.  As stated in the EA, Saguaro applied for a Nationwide Permit (NWP) 12 permit for the project's proposed activities that may result in discharge or dredged or fill materials into Waters of the United States.[220]  The Corps reviews applications for impacts on Waters of the United States, and approval is pending for the use of NWP 12.  Environmental Condition 9 in Appendix A to this order requires Saguaro to provide documentation that it has received all applicable federal authorizations, including the NWP 12 approval, before the Commission authorizes construction of the project facilities.

80.    Sierra Club expresses concerns about the potential for an inadvertent release of drilling fluids.  It states that although the EA acknowledges that frac-outs are a foreseeable consequence of project construction, it does not evaluate the likelihood,

---

[217] The February 18, 2022 Interim GHG Policy Statement, *Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Revs.*, 178 FERC ¶ 61,108 (2022) which proposed to establish a NEPA significance threshold of 100,000 tons per year of $CO_2e$ as a matter of policy, has been suspended and opened to further public comment.  *Certifications of New Interstate Nat. Gas Facilities*, 178 FERC ¶ 61,197, at P 2 (2022).

[218] Sierra Club Sept. 25, 2023 Comments on EA at 66-67 (stating that the Corps is wrong to evaluate the project under the Nationwide Permit 12 for Oil and Natural Gas Pipeline Activities).

[219] EPA Feb. 28, 2023 Scoping Comments, at 2.

[220] EA at 18, 51.

magnitude, or impacts of such releases, nor the toxicity of the drilling fluids.  Sierra Club avers that the EA inadequately addresses the risks of contamination from drilling fluids on fish and wildlife, vegetation, and aquatic resources.[221]  EPA suggests the use of water-based drilling mud to minimize potential impacts on Waters of the United States.[222]

81.    The project would use the Direct Pipe method to cross the Rio Grande, not HDD.  Direct Pipe trenchless crossing has a lower probability of inadvertent releases than HDD as multiple reaming passes are not required.  Also, as stated in the EA, while a potential inadvertent release may occur, Commission staff's review of the geological resources; Saguaro's *Spill Prevention, Containment, and Countermeasure Plan*; as well as the project-specific *Inadvertent Release Control Plan* indicates that the Direct Pipe method would not result in significant impacts on the Rio Grande or federally listed species.[223]  Further, Saguaro's *Inadvertent Release Control Plan* includes a contingency plan to mitigate potential impacts from an inadvertent release of drilling fluids during the Direct Pipe drilling process in the waterbody, wetland, and upland areas.[224]  Commission staff reviewed the *Inadvertent Release Control Plan* and found it acceptable.  Finally, as stated in the EA, drilling fluids are composed of mostly water, drilling mud, and bentonite clay.[225]  Any additives that Saguaro may include in the drilling fluid must be non-petrochemical-based, nonhazardous, meet any applicable permit requirements and environmental regulations, and be on the NSF International/American National Standards Institute 60-certified list.[226]  Therefore, we agree with the EA's conclusion that the proposed project would not have significant impacts on surface water resources or wetlands.[227]

---

[221] Sierra Club Sept. 25, 2023 Comments on EA at 67-77.  Although Sierra Club makes a passing reference to the risk of frac-outs with the Direct Pipe method, *id.* at 70-71, virtually all of its discussion is about the risks associated with HDD.

[222] EPA Sept. 26, 2023 Comments on EA at 1-2.

[223] EA at 6, 13-15, 17-19, 25

[224] *Id.* at 17-19

[225] *Id.* at 11, 13, 17, 19.

[226] The NSF International/American National Standards Institute 60-certified list has been developed to establish minimum requirements for the control of potential adverse human health effects from products added to water for its treatment.

[227] EA at 15, 17-18.

b.     **National Pollution Discharge Elimination System Permit**

82.     EPA recommends that the Commission evaluate whether the project's construction activities would require a National Pollution Discharge Elimination System (NPDES) permit from the Texas Commission on Environmental Quality for stormwater discharge due to the area of disturbance.[228]  Saguaro applied for a Texas Pollutant Discharge Elimination System General Permit.[229]

c.     **Cumulative Effects and Flooding**

83.     Sierra Club argues that the EA does not adequately address cumulative effects to waterways from the Connector Pipeline.[230]  According to Sierra Club, though the EA acknowledges the possibility of cumulative effects to waterways, the EA lacks the required specificity to satisfy NEPA.[231]  Sierra Club also asserts that the EA fails to discuss the Red Light Draw, a major tributary to the Rio Grande River that the Connector Pipeline will cross.  It states that Red Light Draw can rise more than ten feet during flooding events, which could cause scouring of an arroyo that heightens risks of a pipeline rupture.[232]

84.     As stated in the EA, Commission staff disclosed the available information on the environmental impacts of the non-jurisdictional Connector Pipeline and considered cumulative impacts for each resource, adjusted to resource-specific geographic scopes.[233]  The EA evaluates cumulative impacts to surface water resources within the Hackberry Arroyo – Rio Grande Hydrologic Unit (HUC) 12, which includes approximately 6.8 miles of the proposed intrastate pipeline.[234]  It identifies increased sedimentation and turbidity as possible cumulative impacts from construction and noted other short-term

---

[228] EPA Sept. 25, 2023 Comments on EA at 2.

[229] EA at Table A-1.

[230] Sierra Club Sept. 25, 2023 Comments on EA at 78-81.

[231] *Id.* at 79-80

[232] *Id.* at 81; *see* Antionette Reyes Sept. 26, 2023 Comments on EA at 2 (referencing the risk of the pipeline to arroyos, which help prevent flash flooding).

[233] EA at 48-49.

[234] *Id.* at 50.

impacts likely to occur.[235]  The EA also acknowledges Saguaro's mitigation plans for impacts to surface waters and noted that "[u]nless a permanent aboveground facility is sited in the floodplain, there would be no reduction in floodplain capacity in the [watershed] from the intrastate pipeline."[236]  Red Light Draw is located in HUC 10, which is outside the geographic scope for cumulative effects to water resources.  The EA concludes that significant cumulative effects on surface water resources are not anticipated.[237]  We agree.

## 8.     Transboundary Impacts

85.     Sierra Club claims that court precedent and the 1997 CEQ *Guidance on NEPA Analyses for Transboundary Impacts*[238] require that the Commission evaluate the reasonably foreseeable environmental impacts on the Mexican side of the border that would result from authorizing the project.[239]  It asserts that this would include impacts in Mexico from construction of the Sierra Madre Pipeline, which Sierra Club states is the interconnecting pipeline.[240]  Sierra Club contends that transboundary impacts also include localized impacts from construction of the Border Facility, such as impacts to the Rio Grande watershed.[241]  In support, Sierra Club cites  the CEQ's requirement that agencies assess the cumulative impacts of a project when added to reasonably foreseeable actions "regardless of what agency (Federal or non-Federal) or person undertakes" the action, and the 1997 Guidance, which states that "agencies must include analysis of reasonably foreseeable transboundary effects of proposed actions in their analysis of proposed actions in the United States."[242]

---

[235] *Id.* at 50-51.

[236] *Id.* at 51

[237] *Id.*

[238] *Council on Environmental Quality Guidance on NEPA Analyses for Transboundary Impacts*, Executive Office of the President— Council on Environmental Quality (July 1, 1997), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/memorandum-transboundary-impacts-070197.pdf (1997 Guidance).

[239] Sierra Club Sept. 25, 2023 Comments on EA at 82.

[240] *Id.* at 81-82.

[241] *Id.*

[242] *Id.* at 82 (quoting 40 C.F.R. § 1508.7; 1997 Guidance).

86.     The 1997 Guidance "pertains only to those proposed actions currently covered by NEPA that take place *within the United States* and its territories, and [ ] does not change the applicability of NEPA law, regulations or case law to those actions."[243]  Thus, the guidance instructs agencies to evaluate reasonably foreseeable impacts from actions in the United States that may reach across international borders—not the effects of a separate action located entirely within a foreign country and subject exclusively to the jurisdiction of that country.  With respect to localized impacts in Mexico caused by construction of the Border Facility in the United States, the EA explains in its cumulative impacts analysis that the Border Facility would have short-term, insignificant impacts across resources.[244]  Therefore, any impacts that traverse the Mexican side of the border would be similarly insignificant, and the EA's finding of insignificant cumulative impacts from the Border Facility satisfies our NEPA obligations.

87.     Next, Sierra Club argues that there exists "a reasonably close causal relationship" that warrants environmental analysis of the pipeline in Mexico.[245]  Sierra Club states that in *Border Power Plant Working Group v. Department of Energy*,[246] the DOE was required to consider the transboundary air impacts of a power plant in Mexico that was attached to a DOE-permitted border-crossing electric transmission line.[247]  Sierra Club argues that was the case because the transmission line was the only means through which the plant could transmit power, making the transmission lines connecting at the border "two links in the same chain."[248]  *Border Power*, however, is distinguishable from

---

[243] 1997 Guidance at 1 (emphasis added).  Moreover, even if construction of the interconnecting Mexican pipeline action was somehow under the Commission's jurisdiction, the guidance explains that it does not "apply to so-called 'extraterritorial actions'; that is, U.S. actions that take place in another country or otherwise outside the jurisdiction of the United States."  *Id.*

[244] EA at 60 ("In general, small-scale pipeline construction projects such as the Border Facilities would have short-term impacts with relatively minor ground disturbance.  Cumulative impacts on geological, water, and vegetative resources would be localized.  Impacts on wildlife also would be short-term and successful revegetation would indicate that the Border Facilit[y] . . . would not lead to significant cumulative impacts on wildlife in the area.").

[245] Sierra Club Sept. 25, 2023 Comments on EA at 81-82 (quoting *Pub. Citizen*, 541 U.S. at 767).

[246] 260 F.Supp.2d 997 (S.D. Calif. 2003) (*Border Power*).

[247] Sierra Club Sept. 25, 2023 Comments on EA at 83.

[248] *Id.* (citing *Border Power*, 260 F.Supp.2d at 1017).

Sagauro's application and the related pipeline in Mexico. As Sierra Club admits, in *Border Power*, the transmission line at issue was the only means by which the electricity could be transmitted. Here, MPL states that it may export gas across multiple existing boarder-crossing pipelines and the Saguaro project is just one of those pipelines.[249] Therefore, Saguaro's proposal is more akin to the facts in *Sierra Club v. Clinton*, where the court upheld the agency's determination to not examine effects associated with upstream oil production in Canada.[250]

88.     Last, Sierra Club states that in *Backcountry Against Dumps v. Chu*,[251] the court held that Congress intended NEPA to apply extraterritorially,[252] and, in a subsequent order in the same case, the court faulted DOE for its failure to analyze the environmental impacts in Mexico of 0.65 miles of transmission line to be constructed in the United States.[253] Sierra Club notes that the court determined that DOE could attach and incorporate by reference any environmental documents prepared by the government of Mexico to satisfy its NEPA obligations.[254] Sierra Club relies on this case to assert that the Commission erred by failing to indicate whether an environmental analysis by Mexican authorities exists or by failing to incorporate by reference such analysis.[255]

89.     We disagree that *Backcountry* requires the Commission to assess the environmental impacts of activities that occur in Mexico. In finding that NEPA applies extraterritorially, the court states that "agencies must take into account *the effects of actions within the United States*, even when those effects are felt across sovereign

---

[249] MPL Oct. 17, 2023 Reply Comments at 8.

[250] 746 F. Supp. 2d 1025, 1045 & n.11 (D. Minn. 2010) ("[T]he administrative record supports Defendants' conclusion that there is not a sufficient causal relationship between the AC Pipeline and the development of the oil sands." (distinguishing from *Border Power*)).

[251] 215 F.Supp.3d 966 (S.D. Cal. 2015) (*Backcountry*). The project at issue was the construct of a 1.65-mile-long transmission line of which 0.65 miles were in the United States.

[252] *Id.* at 980.

[253] *Backcountry Against Dumps v. Perry*, 2017 WL 3712487, at *3 (S.D. Cal. Aug. 29, 2017).

[254] *Id.*

[255] Sierra Club Sept. 25, 2023 Comments on the EA at 83-84.

borders."[256]  Thus, the court's statements merely reiterate the 1997 Guidance, which, as discussed above, requires only that the Commission examine the effects of the Border Facility that occur in Mexico.  As explained above, we have done so here.

## 9.    Environmental Justice

90.    In conducting NEPA reviews of proposed natural gas projects, the Commission follows Executive Order 12898, which directs federal agencies to identify and address the "disproportionately high and adverse human health or environmental effects" of their actions on minority and low-income populations (i.e., environmental justice communities).[257]  Executive Order 14008 also directs agencies to develop "programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts."[258]  Environmental justice is "the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies."[259]

---

[256] *Backcountry*, 215 F.Supp.3d at 980 (emphasis added).

[257] Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 16, 1994).  While the Commission is not one of the specified agencies in Executive Order 12898, the Commission nonetheless addresses environmental justice in its analysis, in accordance with our governing regulations and guidance, and statutory duties.  *See* 18 C.F.R. § 380.12(g) (2023) (requiring applicants for projects involving significant aboveground facilities to submit information about the socioeconomic impact area of a project for the Commission's consideration during NEPA review); FERC, *Guidance Manual for Environmental Report Preparation* at 4-76 to 4-80 (Feb. 2017), https://www.ferc.gov/sites/default/files/2020-04/guidance-manual-volume-1.pdf.

[258] Exec. Order No. 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021).  The term "environmental justice community" includes disadvantaged communities that have been historically marginalized and overburdened by pollution.  *Id.* at 7629.  The term also includes, but may not be limited to minority populations, low-income populations, or indigenous peoples.  *See* EPA, EJ 2020 Glossary (July 31, 2023), https://www.epa.gov/environmentaljustice/ej-2020-glossary.

[259] EPA, *Learn About Environmental Justice*, https://www.epa.gov/environmentaljustice/learn-about-environmental-justice (Aug. 16, 2023).  Fair treatment means that no group of people should bear a disproportionate share of the negative environmental consequences resulting from industrial, governmental, and commercial operations or policies.  *Id.*  Meaningful involvement of potentially affected environmental justice community residents means:  (1) people have an appropriate

91.     Consistent with the CEQ[260] and EPA[261] guidance, the Commission's methodology for assessing environmental justice impacts considers:  (1) whether environmental justice communities (e.g., minority or low-income populations)[262] exist in the project area; (2) whether impacts on environmental justice communities are disproportionate and adverse; and (3) possible mitigation measures.  As recommended in *Promising Practices*, the Commission uses the 50% and the meaningfully greater analysis methods to identify minority populations.[263]  Specifically, a minority population is present where either: (1) the aggregate minority population of the block groups in the affected area exceeds 50%; or (2) the aggregate minority population in the block group affected is 10% higher than the aggregate minority population percentage in the county.[264]

92.     CEQ's *Environmental Justice Guidance* also directs low-income populations to be identified based on the annual statistical poverty thresholds from the U.S. Census Bureau.

---

opportunity to participate in decisions about a proposed activity that may affect their environment and/or health; (2) the public's contributions can influence the regulatory agency's decision; (3) community concerns will be considered in the decision-making process; and (4) decision makers will seek out and facilitate the involvement of those potentially affected.  *Id.*

[260] CEQ, *Environmental Justice: Guidance Under the National Environmental Policy Act* 4 (Dec. 1997) (CEQ's *Environmental Justice Guidance*), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/ej/justice.pdf.  CEQ offers recommendations on how federal agencies can provide opportunities for effective community participation in the NEPA process, including identifying potential effects and mitigation measures in consultation with affected communities and improving the accessibility of public meetings, crucial documents, and notices.

[261] *See generally* EPA, *Promising Practices for EJ Methodologies in NEPA Reviews* (Mar. 2016) (*Promising Practices*), https://www.epa.gov/sites/default/files/2016-08/documents/nepa_promising_practices_document_2016.pdf.

[262] *See generally* Exec. Order No. 12,898, 59 Fed. Reg. 7629.  Minority populations are those groups that include:  American Indian or Alaskan Native; Asian or Pacific Islander; Black, not of Hispanic origin; or Hispanic.

[263] *See Promising Practices* at 21-25.

[264] Here, Commission staff selected Hudspeth County as the reference community to ensure that affected environmental justice communities are properly identified.  A reference community may vary according to the characteristics of the particular project and the surrounding communities.  EA at 35-36.

Using *Promising Practices'* low-income threshold criteria method, low-income populations are identified as block groups where the percent of low-income population in the identified block group is equal to or greater than that of the county.

93.     To identify potential environmental justice communities during preparation of the EA, Commission staff used 2021 U.S. Census American Community Survey data[265] for the race, ethnicity, and poverty data at the state, county, and block group level.[266] Additionally, in accordance with *Promising Practices*, staff used EJScreen, EPA's environmental justice mapping and screening tool, as an initial step to gather information regarding minority and low-income populations, potential environmental quality issues, environmental and demographic indicators, and other important factors.

94.     Once staff collected the block group level data, as discussed in further detail below, staff conducted an impacts analysis for the identified environmental justice communities and evaluated health or environmental hazards, the natural physical environment, and associated social, economic, and cultural factors to determine whether impacts were disproportionately high and adverse on environmental justice communities and also whether those impacts were significant.[267] Commission staff assessed whether impacts to an environmental justice community were disproportionately high and adverse based on whether those impacts were predominately borne by that community, consistent with EPA's recommendations in *Promising Practices*.[268] Identified project impacts are discussed below.

---

[265] U.S. Census Bureau, American Community Survey 2021 ACS 5-Year Estimates Detailed Tables, File# B17017, *Poverty Status in the Past 12 Months by Household Type by Age of Householder*, https://data.census.gov/cedsci/table?q=B17017; File #B03002 *Hispanic or Latino Origin By Race*, https://data.census.gov/cedsci/table?q=b03002.

[266] EA at 36.

[267] *See Promising Practices* at 33 (stating that "an agency may determine that impacts are disproportionately high and adverse, but not significant within the meaning of NEPA" and in other circumstances "an agency may determine that an impact is both disproportionately high and adverse and significant within the meaning of NEPA").

[268] *Id.* at 44-46 (explaining that there are various approaches to determining whether an action will cause a disproportionately high and adverse impact, and that one recommended approach is to consider whether an impact would be "predominantly borne by minority populations or low-income populations"). We recognize that EPA and CEQ are in the process of updating their guidance regarding environmental justice and we will review and incorporate that anticipated guidance in our future analysis, as appropriate.

95.     Commission staff determined that the entire project is within Census Tract 9503, Block Group 1, which is defined as a minority population.[269]  Factors that could affect environmental justice communities include visual impacts, socioeconomic impacts including traffic impacts, and air and noise impacts from construction.  The EA concludes that environmental justice concerns are not present for other resource areas such as geology, groundwater, surface water, wetlands, wildlife, or cultural resources due to the geographic scope of these resources in relation to the environmental justice geographic scope (Hudspeth County).[270]

96.     EPA and Sierra Club state that the EA should identify and discuss effects on environmental justice communities along the Connector Pipeline, rather than only the Border Facility.[271]  Sierra Club asserts that the EA unreasonably finds that:  (1) impacts to the identified environmental justice community will be "temporary and not significant" even though "the entire border crossing Project is within a minority population;" and (2) certain environmental concerns are not present for other resources, including cultural resources.  Sierra Club points to "culturally significant artifacts" in the Rio Grande River basin, the Quitman Mountains, and areas in which "historically migratory populations" exist.[272]  As with the Commission's analysis of environmental impacts under NEPA, our analysis of communities with environmental justice concerns is limited to project facilities under the Commission's jurisdiction.[273]  Accordingly, we are reviewing the environmental justice impacts of the Border Facility within a one-mile radius to the project.[274]  Potential impacts to cultural resources are discussed below.

97.     No aboveground facilities are associated with the project.  The nearest noise sensitive area (NSA) to the pipeline is over three miles away.  Effects on visual resources would be limited to project construction activities for Direct Pipe drilling and installation.

---

[269] EA at 39.

[270] *Id.*

[271] Sierra Club Sept. 25, 2023 Comments on EA at 86-87; EPA Feb. 27, 2023 Scoping Comments at 3; *see also* Antionette Reyes Sept. 26, 2023 Comments on EA at 2 (noting prevalence of minority and low-income populations in Hudspeth County).

[272] Sierra Club Sept. 25, 2023 Comments on EA at 87-89.

[273] *See supra* PP 40-41, 43-50.

[274] Commission staff chose a one-mile radius given the "likely concentration of air emissions, noise, and traffic impacts proximal to the pipeline[,]" as communities located further away from the Border Facility are not anticipated to experience any adverse impacts from the project's construction or operation.  EA at 36.

Document Accession #: 20240215-3066          Filed Date: 02/15/2024

After construction, the disturbed soil would be recontoured and restored to conditions suitable for successful revegetation. Perceptible impacts on the environmental justice community would be temporary and less than significant.

98.     Given the nominal non-local workforce required for project construction relative to the county population (maximum of 60 non-local workers during the 160-day construction period, representing 0.02% change to Hudspeth County) and no new operational workforce required to operate the facilities, Commission staff determined that impacts on socioeconomic resources within the environmental justice communities (e.g., population, housing demand, or the provision of community services such as police, fire, or schools) would be temporary and less than significant, as there would be a negligible change from current conditions.

99.     The project is in a rural area of Hudspeth County and local roadways in this area have limited existing traffic. Saguaro anticipates that it would utilize two buses to transport work crews to and from the Direct Pipe location to a contractor yard and would make two round trips per day to reduce the number of vehicles traveling on Indian Hot Spring Road. The location of the contractor yard, which would serve as the parking lot for 40 – 60 construction personnel, has not been finalized; however, Saguaro anticipates that the contractor yard would be within Census Tract 9503.00, Block Group 1. Construction of the project would require the daily use of one or two mechanic trucks and a fuel truck for refueling equipment, as necessary. Saguaro estimates that the total number of average daily round trips generated by the project's construction activities would be approximately 10 to 20 trips. Traffic impacts on the environmental justice community would be temporary and less than significant.

100.    During construction, a temporary reduction in ambient air quality may result from criteria pollutant emissions and fugitive dust generated by construction equipment. Specifically, the EA estimates that construction of the project will result in 11.67 tons of oxides of nitrogen emissions, 8.87 tons of carbon monoxide emissions, 1.25 tons of volatile organic compound emissions, 0.02 tons of sulfur dioxide emissions, and 11.65 tons of particulate matter emissions (9.65 tons of $PM_{10}$ and 2 tons of $PM_{2.5}$).[275] Fugitive dust and other emissions due to construction activities generally do not cause a significant increase in regional pollutant levels; however, local pollutant levels could increase within the environmental justice geographic scope. Saguaro would use dust suppression techniques, such as spraying water on the right-of-way, as necessary to minimize the transport of fugitive dust onto the temporary access road (Indian Hot Spring Road is a public roadway) and environmentally sensitive areas. Construction emission

---

[275] EA at 44, Table B-2.

impacts on the environmental justice community would be temporary and less than significant.

101.     There are no stationary combustion sources associated with the project; therefore, there will be no point source emissions.  Given that Saguaro would use the Direct Pipe method, an advanced drilling technique, to install the pipeline under the Rio Grande in one stage after onsite welding and in accordance with U.S. Department of Transportation pipeline standards, fugitive emissions such as fugitive leaks from the pipeline are not anticipated.

102.     Temporary construction impacts in proximity to construction work areas could include noise.  Given that the nearest NSA is over three miles from the Direct Pipe location, the use of the Direct Pipe method would have no noise impact on the environmental justice community.  The project does not involve new aboveground facilities with continuous noise sources.  Therefore, the project would not result in any operational noise impacts on environmental justice communities.

103.     As described throughout the EA, the proposed project would have a range of impacts on the environment and on individuals living in the vicinity of the project facilities, including environmental justice populations.  As highlighted in table B-2 of the EA, there is one block group within the project area, and it is considered an environmental justice community.  Project activities within the identified environmental justice community includes the construction and operation of the project.  Impacts associated with the construction of the project on the environmental justice community would be disproportionately high and adverse as they would be predominately borne by an environmental justice community.  However, the project's construction and operational impacts associated with socioeconomics, traffic, visual, air quality, and noise for these components would be less than significant.

## 10.     Cultural Resources and Tribal Consultation

104.     Section 106 of the National Historic Preservation Act and its implementing regulations require agencies to undertake a "reasonable and good faith effort" to identify historic properties within a project's "area of potential effects" that may be affected by their undertakings, and afford the Advisory Council on Historic Preservation a reasonable opportunity to comment on the undertaking.[276]  Project construction and operation could potentially affect historic properties, such as cultural resources either listed or eligible for listing in the National Register of Historic Places (National Register).  These historic properties could include prehistoric or historic archaeological sites, districts, buildings,

---

[276] 54 U.S.C. § 306108; 36 C.F.R. pt. 800 (2023).

structures, or objects, as well as locations with traditional value to federally recognized Tribes or other groups.

105.    EPA recommends that the Commission meaningfully engage with the Carrizo Comecrudo Tribe of Texas "regarding village sites, sacred sites, and all other concerns impacted by the proposed project" and urges the Commission to provide documentation of its engagement with the Tribe's chair, Juan B. Mancias, and any agreed upon measures.[277]   Saguaro submitted information about the project to seven federally recognized tribes in November 2022 and April 2023.  Commission staff also included the Carrizo Comecrudo Tribe of Texas in the Commission's Service List and the project's environmental mailing list.  The scoping process and EA comment period afforded the Tribe an opportunity to share its knowledge of the history of and resources that should be considered

106.    Sierra Club asserts that, as with other resources, the Commission's analysis is improperly confined to the area of the Border Facility, and Sierra Club states that areas along the upstream pipeline route are "rich in cultural and archeological resources and sites."[278]   Additionally, Mr. Mancias and several individuals noted cultural sites and resources near the project, such as the Indian Hot Springs located along the Rio Grande in Hudspeth County.[279]

107.    The Commission does not have jurisdiction over the intrastate Connector Pipeline; accordingly, the EA evaluates the Border Facility's area of potential effects.  Cultural surveys identified six archaeological sites and three prehistoric isolated finds within the Border Facility's area of potential effects.  Of the sites, one site was recommended as eligible for listing in the National Register, to which the Texas State Historic Preservation Officer (SHPO) concurred; however, the site is located adjacent to an access road and would not be impacted directly by the project.  Two newly recorded sites, which were found as undetermined for eligibility for listing in the National Register, were avoided via a project re-route.  The three remaining sites were recommended not eligible for the National Register.  Following a site visit and correspondence with the SHPO, Saguaro updated and submitted its cultural survey report.  Saguaro also revised its plan to address

---

[277] EPA Sept. 26, 2023 Comments on EA at 2-3.

[278] Sierra Club Sept. 25, 2023 Comments on EA at 89-90.

[279] *See* Juan Benito Mancias Sept. 25, 2023 Comments on EA (attaching comments from tribal members and other supporters); Juan Benito Mancias Feb. 2, 2023 Motion to Intervene; Antionette Reyes Sept. 26, 2023 Comments on EA at 1.

Document Accession #: 20240215-3066     Filed Date: 02/15/2024

the unanticipated discovery of cultural resources and human remains during construction, which Commission staff found acceptable.[280]

108.    Based on the provided documentation, dated September 9, 2023, and November 22, 2023, consultation with Texas SHPO is not complete.[281]   Therefore, the EA recommends, and we require in Environmental Condition 13, that Saguaro not begin construction of facilities or use of any staging, storage, or temporary work areas until: (1) Saguaro files with the Commission all remaining cultural resources survey reports, site evaluations, and avoidance or treatment plans for NRHP-listed or NRHP-eligible sites, as necessary, and comments on those reports and plans from the Texas SHPO; (2) the Advisory Council on Historic Preservation is afforded an opportunity to comment if historic properties would be adversely affected; and (3) Commission staff reviews and approves all cultural resources reports, studies, and plans, and notifies Saguaro in writing that treatment plans and mitigation measures may be implemented and/or construction may proceed.

### 11.    **Endangered Species**

109.    Sierra Club contends that the Commission and FWS improperly limited the scope of ESA consultation by excluding the intrastate pipeline from its analysis.[282]   The EA thoroughly evaluates the potential impact of the Border Facility on federal- and state-listed threatened, endangered, and special status species.  As the Commission's non-federal representative, Saguaro requested concurrence from FWS on its determination that the project may affect, but is not likely to adversely affect the federally listed Southwestern willow flycatcher (*Empidonax trailii extimus*).[283]   FWS filed its letter of concurrence on September 22, 2023.[284]   In its concurrence letter, FWS acknowledged that the border-crossing facilities would connect with a new intrastate pipeline and noted generally the nature and location of the intrastate facilities.  FWS concurred with Commission staff's "not likely to adversely affect" determinations and found that

---

[280] EA at 28-29.

[281] Saguaro explained by letter that it continues to consult with the Texas SHPO and has submitted a revised cultural resources report that addresses prior concerns raised by the SHPO.  *See* Saguaro Nov. 22, 2023 Letter Regarding Agency Correspondence.

[282] Sierra Club Sept. 25, 2023 Comments on EA at 90-93; *see also* Antionette Reyes Sept. 26, 2023 Comments on EA (expressing concern about harm to endangered species habitat for several endangered or threatened species in west Texas).

[283] EA at 24-28.

[284] FWS Sept. 22, 2023 Letter of Concurrence.

"Section 7 of the [ESA] has been complied with." Because ESA consultation is complete, staff's recommended Environmental Condition 14 in the EA is not included in Appendix A as a condition of this order.

## 12.   Project Safety

110.    Several commenters and Sierra Club expressed concern about potential seismic events affecting the Border Facility as well as a lack of paved roads and resources in Hudspeth County to respond to an emergency.[285] Sierra Club and one individual also raised the potential for pipeline ruptures and explosions.[286] Sierra Club alleges that the EA's discussion of the Pipeline and Hazardous Materials Safety Administration (PHMSA) pipeline safety standards is inadequate and that ruptures are a "foreseeable consequence[ ] of FERC's permitting action."[287]

111.    Regarding access for emergency vehicles, the EA explains that Saguaro will work with Hudspeth County to maintain Indian Hot Springs Road, which is unpaved.[288] With respect to seismic activity, PHMSA has the exclusive authority to promulgate the federal safety standards used in the transportation of natural gas. The EA identifies and explains that the Quaternary fault, which is located 1.6 miles from the project, likely last experienced fault activity thousands of years ago.[289] The EA also notes two earthquakes that occurred eight and 13 miles from the project area, respectfully, within the past 12 years and explained that following PHMSA standards for pipelines would minimize the potential for impacts from earthquakes.[290] Moreover, the EA explains that modern gas pipelines in good conditions can withstand seismic events and ground waves.[291]

---

[285] *See, e.g.*, Catherine Crumpton Sept. 22, 2023 Comments on EA; Cindy Cochran Feb. 28, 2023 Comments at 2; Bill Guerra Addington Mar. 7, 2023 Comments at 1-2; Steve Chima Feb. 1, 2023 Comments; Steve Chima Feb. 1, 2023 Protest.

[286] Sierra Club Sept. 25, 2023 Comments on EA at 85-86; Antionette Reyes Sept. 26, 2023 Comments on EA at 3.

[287] Sierra Club Sept. 25, 2023 Comments on EA at 85-86.

[288] EA at 41. No new access roads will be constructed. *Id.*

[289] *Id.* at 10.

[290] *Id.*

[291] *Id.*

Thus, the EA concludes, and we agree, that the Border Facility will not be significantly affected by seismicity.[292]

### 13.    Environmental Conclusion

112.    We have reviewed the information and analysis contained in the EA, as well as the other information in the record, regarding potential environmental effects of the project. We accept the environmental recommendations in the EA, as modified above, and we are including them as conditions in an appendix to this order.  Based on the analysis in the EA, as supplemented or clarified in this order,[293] we conclude that if the project is constructed and operated in accordance with the Saguaro's application and supplements, and in compliance with the environmental conditions in Appendix A to this order, our approval of this proposal would not constitute a major federal action significantly affecting the quality of the human environment.[294]

## V.    Conclusion

113.    Based on the discussion above, we find that construction and operation of the proposed Border Facility is not inconsistent with the public interest.  Accordingly, we will grant Saguaro's application for a Presidential Permit and authorization under section 3 of the NGA to construct and operate the Border Facility, subject to the conditions in this order.

114.    Compliance with the environmental conditions appended to our orders is integral to ensuring that the environmental impacts of approved projects are consistent with those anticipated by our environmental analyses.  Thus, Commission staff carefully reviews all information submitted.  Only when satisfied that the applicant has complied with all applicable conditions will a notice to proceed with the activity to which the conditions are relevant be issued.  We also note that the Commission has the authority to take whatever steps are necessary to ensure the protection of environmental resources during

---

[292] *Id.* at 11; *see, e.g.*, *Transcon. Gas Pipe Line Co.*, 185 FERC ¶ 61,133 at P 112 (finding that an EA adequately addressed safety concerns where the applicant follows the "prevailing safety regulations administered by PHMSA"); *see also* 49 C.F.R. § 192.935(b)(2) (2023) (explaining that pipeline operators are required to "minimize the consequences [of] . . . outside force damage[,]" including seismicity).

[293] Although the analysis in the EA provides substantial evidence for our conclusions in this order, it is the order itself that serves as our record of decision.  The order supersedes any inconsistent discussion, analysis, or finding in the EA.

[294] We are not making a significance determination regarding GHG impacts for the reasons discussed in PP 75-76, *supra.*

construction and operation of the project, including authority to impose any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the order, as well as the avoidance or mitigation of unforeseen adverse environmental impacts resulting from project construction and operation.

115.    Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this authorization. The Commission encourages cooperation between interstate pipelines and local authorities. However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.[295]

116.    The Commission on its own motion, received and made part of the record all evidence, including the application, supplements, and exhibits thereto, and all comments submitted herein, and upon consideration of the record,

The Commission orders:

(A)    A Presidential Permit and NGA section 3 authorization are issued to Saguaro to site, construct, and operate natural gas export facilities at the border between the United States and Mexico, subject to the conditions of the Presidential Permit and compliance with the environmental conditions in Appendix A to this order.

(B)    Saguaro must sign and return the testimony of acceptance of all provisions, conditions, and requirements of the Presidential Permit to the Secretary of the Commission (Secretary) within 30 days of the issuance of this order.

(C)    The authorized export facilities must be completed and placed in service within three years of the date of issuance of this order.

(D)    Saguaro must notify the Commission's environmental staff by telephone or e-mail of any environmental noncompliance identified by federal, state, or local agencies

---

[295] *See* 15 U.S.C. § 717r(d) (state or federal agency's failure to act on a permit considered to be inconsistent with Federal law); *see also Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310 (1988) (state regulation that interferes with FERC's regulatory authority over the transportation of natural gas is preempted) and *Dominion Transmission, Inc. v. Summers,* 723 F.3d 238, 245 (D.C. Cir. 2013) (noting that state and local regulation is preempted by the NGA to the extent it conflicts with federal regulation, or would delay the construction and operation of facilities approved by the Commission).

Document Accession #: 20240215-3066    Filed Date: 02/15/2024
Docket No. CP23-29-000                                                    - 58 -

on the same day that such agency notifies Saguaro.  Saguaro must file written confirmation of such notification with the Secretary within 24 hours.

By the Commission.  Commissioner Clements is dissenting in part with a separate statement attached.

( S E A L )

Debbie-Anne A. Reese,
Acting Secretary.

Docket No. CP23-29-000                                                                          - 59 -

## Appendix A – Environmental Conditions

As recommended in the Environmental Assessment (EA) and modified herein, this authorization includes the following conditions:

1.   Saguaro Connector Pipeline (Saguaro) shall follow the construction procedures and mitigation measures described in its application and supplements, including responses to staff data requests, and as identified in the EA, unless modified by the Order.  Saguaro must:

     a.   request any modification to these procedures, measures, or conditions in a filing with the Secretary of the Commission (Secretary);
     b.   justify each modification relative to site-specific conditions;
     c.   explain how that modification provides an equal or greater level of environmental protection than the original measure; and
     d.   receive approval in writing from the Director of the Office of Energy Projects (OEP), or the Director's designee, **before using that modification.**

2.   The Director of OEP, or the Director's designee, has delegated authority to address any requests for approvals or authorizations necessary to carry out the conditions of the Order, and take whatever steps are necessary to ensure the protection of environmental resources during construction and operation of the Project.  This authority shall allow:

     a.   the modification of conditions of the Order;
     b.   stop-work authority; and
     c.   the imposition of any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the Order as well as the avoidance or mitigation of unforeseen adverse environmental impact resulting from Project construction and operation activities.

3.   **Prior to any construction**, Saguaro shall file an affirmative statement with the Secretary, certified by a senior company official, that all company personnel, environmental inspectors (EIs), and contractor personnel shall be informed of the EI's authority and have been or will be trained on the implementation of the environmental mitigation measures appropriate to their jobs **before** becoming involved with construction and restoration activities.

4.   The authorized facility location shall be as shown in the EA, as supplemented by filed alignment sheets.  **As soon as they are available, and before the start of construction**, Saguaro shall file with the Secretary any revised detailed survey alignment maps/sheets at a scale not smaller than 1:6,000 with station positions for

the facility approved by the Order. All requests for modifications of environmental conditions of the Order or site-specific clearances must be written and must reference locations designated on these alignment maps/sheets.

5.  Saguaro shall file with the Secretary detailed alignment maps/sheets and aerial photographs at a scale not smaller than 1:6,000 identifying all route realignments, staging areas, pipe storage yards, new access roads, and other areas that would be used or disturbed and have not been previously identified in filings with the Secretary. Approval for each of these areas must be explicitly requested in writing. For each area, the request must include a description of the existing land use/cover type, documentation of landowner approval, whether any cultural resources or federally listed threatened or endangered species would be affected, and whether any other environmentally sensitive areas are within or abutting the area. All areas shall be clearly identified on the maps/sheets/aerial photographs. Each area must be approved in writing by the Director of OEP, or the Director's designee, **before construction in or near that area**.

    This requirement does not apply to extra workspaces allowed by the Commission's *Upland Erosion Control, Revegetation, and Maintenance Plan* and/or minor field realignments per landowner needs and requirements, which do not affect other landowners or sensitive environmental areas such as wetlands.

    Examples of alterations requiring approval include all route realignments and facility location changes resulting from:

    a.  implementation of cultural resources mitigation measures;
    b.  implementation of endangered, threatened, or special concern species mitigation measures;
    c.  recommendations by state regulatory authorities; and
    d.  agreements with individual landowners that affect other landowners or could affect sensitive environmental areas.

6.  **Within 60 days of the authorization**, Saguaro shall file an Implementation Plan with the Secretary for review and written approval by the Director of OEP, or the Director's designee. Saguaro must file revisions to the Implementation Plan as schedules change. The Implementation Plan shall identify:

    a.  how Saguaro would implement the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests), identified in the EA, and required by the Order;
    b.  how Saguaro would incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and

specifications), and construction drawings so that the mitigation required at each site is clear to onsite construction and inspection personnel;

c.   the number of EIs assigned, and how the company would ensure that sufficient personnel are available to implement the environmental mitigation;

d.   company personnel, including EIs and contractors, who would receive copies of the appropriate material;

e.   the location and dates of the environmental compliance training and instructions Saguaro would give to all personnel involved with construction and restoration (initial and refresher training as the project progresses and personnel change);

f.   the company personnel (if known) and specific portion of Saguaro's organization having responsibility for compliance;

g.   the procedures (including use of contract penalties) Saguaro would follow if noncompliance occurs; and

h.   for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for:

   i.    the completion of all required surveys and reports;

   ii.   the environmental compliance training of onsite personnel;

   iii.  the start of construction; and

   iv.   the start and completion of restoration.

7.   Saguaro shall employ at least one EI during active construction and restoration. The EI shall be:

a.   responsible for monitoring and ensuring compliance with all mitigation measures required by the Order and other grants, permits, certificates, or other authorizing documents;

b.   responsible for evaluating the construction contractor's implementation of the environmental mitigation measures required in the contract (see condition 6 above) and any other authorizing document;

c.   empowered to order correction of acts that violate the environmental conditions of the Order, and any other authorizing document;

d.   a full-time position, separate from all other activity inspectors;

e.   responsible for documenting compliance with the environmental conditions of the Order, as well as any environmental conditions / permit requirements imposed by other federal, state, or local agencies; and

f.   responsible for maintaining status reports.

8.   Beginning with the filing of its Implementation Plan, Saguaro shall file updated status reports with the Secretary on a **biweekly** basis until all construction and restoration activities are complete. On request, these status reports shall also be

provided to other federal and state agencies with permitting responsibilities. Status reports shall include:

    a.    an update on Saguaro's efforts to obtain the necessary federal authorizations;

    b.    the construction status of the Project, work planned for the following reporting period, and any schedule changes for stream crossings or work in environmentally sensitive areas;

    c.    a listing of all problems encountered and each instance of noncompliance observed by the EI during the reporting period (both for the conditions imposed by the Commission and any environmental conditions / permit requirements imposed by other federal, state, or local agencies);

    d.    a description of the corrective actions implemented in response to all instances of noncompliance;

    e.    the effectiveness of all corrective actions implemented;

    f.    a description of any landowner / resident complaints, which may relate to compliance with the requirements of the Order, and the measures taken to satisfy their concerns; and

    g.    copies of any correspondence received by Saguaro from other federal, state, or local permitting agencies concerning instances of noncompliance, and Saguaro's response.

9.    Saguaro must receive written authorization from the Director of OEP, or the Director's designee, **before commencing construction of any Project facilities.** To obtain such authorization, Saguaro must file with the Secretary documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof).

10.    Saguaro must receive written authorization from the Director of OEP, or the Director's designee, **before placing the Project into service**. Such authorization will only be granted following a determination that rehabilitation and restoration of the right-of-way and other areas affected by the Project are proceeding satisfactorily.

11.    **Within 30 days of placing the authorized facilities in service**, Saguaro shall file an affirmative statement with the Secretary, certified by a senior company official:

    a.    that the facilities have been constructed and installed in compliance with all applicable conditions, and that continuing activities would be consistent with all applicable conditions; or

    b.    identifying which of the conditions in the Order Saguaro has complied with or will comply with. This statement shall also identify any areas affected by the Project where compliance measures were not properly implemented,

Docket No. CP23-29-000                                                    - 63 -

if not previously identified in filed status reports, and the reason for noncompliance.

12. **Within five days of the final determination of the use of the Nationwide Permit 12 issued by the U.S. Army Corps of Engineers**, Saguaro shall file the complete water quality certification issued categorically by the Railroad Commission of Texas, including all conditions, for review by the Director of OEP, or the Director's designee, under 40 Code of Federal Regulations (CFR) § 121.9. All conditions attached to the water quality certification except those that the Director of OEP, or the Director's designee, may identify as waived pursuant to 40 CFR § 121.9, constitute mandatory conditions of this Certificate Order. **Prior to construction**, Saguaro shall file, for review and written approval by the Director of OEP, or the Director's designee, any revisions to its project design necessary to comply with the water quality certification conditions.

13. Saguaro **shall not begin** construction of facilities and/or use of all staging, storage, or temporary work areas **until**:

    a    Saguaro files with the Secretary:
        (1)    remaining cultural resources survey report(s);
        (2)    site evaluation report(s) and avoidance/treatment plan(s), as required; and
        (3)    comments on the cultural resources reports and plans from the Texas State Historic Preservation Office.
    b.    The Advisory Council on Historic Preservation is afforded an opportunity to comment if historic properties would be adversely affected; and
    c.    the FERC staff reviews and the Director of OEP, or the Director's designee, approves the cultural resources reports and plans, and notifies Saguaro in writing that treatment plans / mitigation measures (including archaeological data recovery) may be implemented and/or construction may proceed.

All materials filed with the Commission containing **location, character, and ownership** information about cultural resources must have the cover and any relevant pages therein clearly labeled in bold lettering: "**CUI//PRIV- DO NOT RELEASE.**"

**APPENDIX B**

**PRESIDENTIAL PERMIT AUTHORIZING SAGUARO CONNECTOR
PIPELINE, L.L.C. TO OPERATE AND MAINTAIN NATURAL GAS
FACILITIES AT THE INTERNATIONAL BOUNDARY BETWEEN THE
UNITED STATES AND MEXICO IN HUDSPETH COUNTY, TEXAS**

**FEDERAL ENERGY REGULATORY COMMISSION
DOCKET NO. CP23-29-000**

(Issued XX, XXXX)

Saguaro Connector Pipeline, L.L.C. (Saguaro) filed on December 20, 2022, in
Docket No. CP23-29-000 an application pursuant to Executive Order Nos. 10485 and
12038, dated September 3, 1953, and February 3, 1978, respectively, and the Secretary of
Energy's Delegation Order No. S1-DEL-FERC-2006, effective May 16, 2006, requesting
that the Commission issue an order under section 3 of the NGA and a Presidential Permit
authorizing Saguaro to site, construct, and operate certain natural gas pipeline facilities,
as described in Article 2 below, for the export of natural gas to Mexico.

By letter filed November 28, 2023, the Secretary of State, and by letter filed
September 12, 2023, the Secretary of Defense favorably recommend that the Permit be
granted. The Federal Energy Regulatory Commission finds that the issuance of a Permit
is appropriate and consistent with the public interest.

Pursuant to the provisions of Executive Order Nos. 10485 and 12038, the
Secretary of Energy's Delegation Order No. S1-DEL-FERC-2006, and the Commission's
regulations, permission is granted to the Permittee to construct, operate, and maintain the
natural gas facilities described in Article 2 below, upon the terms and conditions of the
Permit.

Article 1.  It is expressly agreed by the Permittee that the facilities herein
described shall be subject to all provisions and requirements of this Permit. This Permit
may be modified or revoked by the President of the United States or the Federal Energy
Regulatory Commission and may be amended by the Federal Energy Regulatory
Commission upon proper application therefor.

Article 2.  The following facilities are subject to this Permit:

An approximately 1,000-foot-long, 48-inch-diameter natural gas pipeline
extending from the international boundary at the center of the Rio Grande River to

an interconnection with an intrastate natural gas pipeline 1,000 feet inland from the river, approximately 18 miles from Sierra Blanca, Hudspeth County, Texas.

Article 3.  The natural gas facilities subject to this Permit, or which may subsequently be included herein by modification or amendment, may be used for the transportation of natural gas between the United States and Mexico only in the amount, at the rate, and in the manner authorized under section 3 of the Natural Gas Act.

Article 4.  The operation and maintenance of the aforesaid facilities shall be subject to the inspection and approval of representatives of the United States.  The Permittee shall allow officers and employees of the United States, showing proper credentials, free and unrestricted access to the land occupied by the facilities in the performance of their official duties.

Article 5.  If in the future, it should appear to the Secretary of Defense that any facilities or operations permitted hereunder cause unreasonable obstruction to the free navigation of any of the navigable waters of the United States, the Permittee may be required, upon notice from the Secretary of Defense, to remove or alter the same so as to render navigation through such water free and unobstructed.

Article 6.  The Permittee shall be liable for all damages occasioned to the property of others by the operation or maintenance of the facilities, and in no event shall the United States be liable therefor.  The Permittee shall do everything reasonable within its power to prevent or suppress fires on or near land occupied under this Permit.

Article 7.  The Permittee agrees to file with the Commission, under oath and in such detail as the Commission may require, such statements or reports with respect to the natural gas exported or imported, or the facilities described herein, as the Commission may, from time to time, request.  Such information may be made available to any federal, state, or local agency requesting such information.

Article 8.  Neither this Permit nor the facilities, nor any part thereof, covered by this Permit shall be voluntarily transferred in any manner, but the Permit shall continue in effect temporarily for a reasonable time in the event of the involuntary transfer of the facilities by operation of law (including transfer to receivers, trustees, or purchasers under foreclosure or judicial sale) pending the making of an application for a permanent Permit thereon and decision thereon, provided notice is promptly given in writing to the Commission accompanied by a statement that the facilities authorized by this Permit remain substantially the same as before the involuntary transfer.  The Permittee shall maintain the facilities in a condition of repair for the efficient transportation of natural gas and shall make all necessary renewals and replacements.

Document Accession #: 20240215-3066       Filed Date: 02/15/2024
Docket No. CP23-29-000                                                    - 66 -

 Article 9.  At such time that this Permit is surrendered, revoked, or otherwise terminated, the Commission shall determine which of the authorized facilities shall be removed and which shall remain in place.  The Commission will specify the time within which any authorized facilities shall be removed, and the Permittee shall remove those facilities within such time and at the Permittee's expense.  Upon failure of the Permittee to comply with the Commission's direction to remove any authorized facilities, the Commission may direct that possession of the same be taken and the facilities be removed at Permittee's expense, and the Permittee shall have no claim for damages by reason of such possession or removal.

 Article 10.  The Permittee agrees that when, in the opinion of the President of the United States, evidenced by a written order addressed to it as holder of this Permit, the safety of the United States demands it, the United States shall have the right to enter upon and take possession of any of the facilities, or parts thereof, maintained or operated under this Permit, and all contracts covering the transportation or sale of natural gas by means of said facilities, to retain possession, management, and control thereof for such length of time as may appear to the President to be necessary to accomplish said purposes, and then to restore possession and control to the Permittee; and in the event that the United States shall exercise such right, it shall pay the Permittee just and fair compensation for the use of said facilities upon the basis of a reasonable profit in time of peace, and the costs of restoring said facilities to as good condition as existed at the time of taking over thereof, less the reasonable value of any improvements that may be made thereto by the United States and which are valuable and serviceable to the Permittee.

 Article 11.  This Permit is subject to any action which the Government of the United States may in the future deem expedient or necessary to take in case any part of the aforesaid facilities comes into the control of any foreign government.

 Article 12.  The Government of the United States shall be entitled to the same or similar privileges as may by law, regulation, agreement, or otherwise, be granted by the Permittee to any foreign government.

 By direction of the Commission.


        Kimberly D. Bose,
        Secretary.

Document Accession #: 20240215-3066     Filed Date: 02/15/2024

     IN TESTIMONY OF ACCEPTANCE of all the provisions, conditions, and requirements of this Permit, the Permittee this day of _____ has caused its name to be signed by _____, pursuant to a resolution of its Board of Directors duly adopted on the _____day of _____, 2023, a certified copy of the record of which is attached hereto.


                              Saguaro Connector Pipeline, L.L.C.

                              By _____


(Attest)



_____
Executed in triplicate

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Saguaro Connector Pipeline, LLC                    Docket No.     CP23-29-000

(Issued February 15, 2024)

CLEMENTS, Commissioner, *dissenting in part:*

1.      I concur with the result of today's Order, but I dissent from the majority's conclusion that the Commission is incapable of assessing the significance of the impacts of greenhouse gas (GHG) emissions associated with the Saguaro Border Facility.[1]  The Commission should have simply found that the project's minor GHG emissions are insignificant for purposes of both the National Environmental Policy Act[2] and the Commission's public interest determination under section 3 of the Natural Gas Act.[3]  Instead, the Order imports wrong-headed language used in other recent certificate orders to find there are no acceptable tools for determining the significance of GHG emissions.

2.      In *Northern Natural Gas Co*., the Commission found that it could determine the significance of GHG emissions of a natural gas project by applying its experience, judgment, and expertise to the evidence in the record.[4]  The combined construction related and operational GHG emissions in that case amounted to 20,006 metric tons of carbon dioxide equivalents ($CO_2e$), which the Commission found to be insignificant.  The Saguaro Border Facility will generate a third of the projected emissions in *Northern Natural*: 6,869.2 metric tons $CO_2e$ of construction related GHG emissions and no operational emissions.[5]  Where, as here, the GHG emissions clearly would be deemed insignificant under any reasonable framework for assessing significance, the Commission should simply say so.

3.      Rather than reaching the obvious conclusion that the GHG emissions would be insignificant, the majority strains to include in the Order the same unnecessary and

---

[1] *Saguaro Connector Pipeline, LLC*, 186 FERC ¶ 61,114, at PP 76-77 (2024) (Order).

[2] 42 U.S.C. §§ 4321 *et seq*.

[3] 15 U.S.C. § 717b.

[4] *See N. Nat. Gas Co*., 174 FERC ¶ 61,189, at PP 32, 36 (2021).

[5] Order, 186 FERC ¶ 61,114 at P 65.

misguided language to which I have previously objected. In my concurrence in *Transco*, I explained the history of the language in Paragraphs 76 and 77 of the Order,[6] which is the so-called "Driftwood compromise."[7] In *Driftwood*, the majority suddenly adopted new language declaring that there are no methods for assessing the significance of GHG emissions, and particularly criticizing the Social Cost of GHGs protocol.[8] I have dissented from this language in *Driftwood* and subsequent orders because (1) it reflects a final Commission decision that it cannot determine the significance of GHG emissions, despite the fact the Commission has never responded to comments in the GHG Policy Statement docket[9] addressing methods for doing so; and (2) the language departs from previous Commission precedent without reasoned explanation, thereby violating the Administrative Procedure Act.[10] I dissent from Paragraphs 76 and 77 of this Order for the same reasons.

---

[6] *See Transcon. Gas Pipe Line Co.*, 184 FERC ¶ 61,066 (2023) (Clements, Comm'r, concurring at PP 2-3) (*Transco*).

[7] *See id.* (Phillips, Chairman, and Christie, Comm'r, concurring at PP 1-2).

[8] *See Driftwood Pipeline LLC*, 183 FERC ¶ 61,049, at PP 61, 63 (2023) (*Driftwood*).

[9] Docket No. PL21-3. On February 18, 2022, the Commission issued an Interim GHG Policy Statement, *Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Revs.*, 178 FERC ¶ 61,108 (2022), which proposed a NEPA significance threshold of 100,000 tons per year of $CO_2e$. The Commission subsequently suspended the Interim GHG Policy Statement and opened it to further public comment. Order on Draft Policy Statements, 178 FERC ¶ 61,197, at P 2 (2022). The Commission has not yet addressed the comments in the reopened docket.

[10] *See Driftwood,* 183 FERC ¶ 61,049 (Clements, Comm'r, dissenting at PP 2-3 & n.5); *see also Transcon. Gas Pipe Line Co.*, 186 FERC ¶ 61,063 (2024) (Clements, Comm'r, dissenting in part at PP 2-3); *Columbia Gas Transmission, LLC*, 186 FERC ¶ 61,048 (2024) (Clements, Comm'r, dissenting in part at PP 2-4); *Transcon. Gas Pipe Line Co.*, 186 FERC ¶ 61,047 (2024) (Clements, Comm'r, dissenting at PP 8-9); *Tenn. Gas Pipeline Co.*, 186 FERC ¶ 61,046 (2024) (Clements, Comm'r, dissenting in part at PP 1-2); *ANR Pipeline Co.*, 185 FERC ¶ 61,191 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Transcon. Gas Pipe Line Co.*, 185 FERC ¶ 61,133 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Transcon. Gas Pipe Line Co.*, 185 FERC ¶ 61,130 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Tex. LNG Brownsville LLC*, 185 FERC ¶ 61,079 (2023) (Clements, Comm'r, dissenting at PP 9-10); *Rio Grande LNG, LLC*, 185 FERC ¶ 61,080 (2023) (Clements, Comm'r, dissenting at PP 9-10); *Gas Transmission Nw., LLC,* 185 FERC ¶ 61,035 (2023) (Clements, Comm'r, concurring in

Document Accession #: 20240215-3066          Filed Date: 02/15/2024

4.      As I have said before, the Commission has not seriously studied whether the
Social Cost of GHGs protocol or another tool can or should be used to determine
significance.  I cannot countenance the Commission's continued refusal to objectively
consider potential methods for assessing the impacts of GHG emissions and transparently
incorporate analysis of GHG impacts in its substantive decision-making under the
Natural Gas Act.  At the very least, however, the Commission should rely on our
precedent in *Northern Natural* to find that the GHG emissions here are not significant.

        For these reasons, I respectfully dissent in part.


_____

Allison Clements
Commissioner

---

part and dissenting in part at PP 7-8); *WBI Energy Transmission, Inc.*, 185 FERC ¶
61,036 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Venture Global
Plaquemines LNG, LLC*, 185 FERC ¶ 61,037 (2023) (Clements, Comm'r, dissenting in
part at PP 2-3); *Tex. E. Transmission, LP*, 185 FERC ¶ 61,038 (2023) (Clements,
Comm'r, dissenting in part at PP 2-3); *Trailblazer Pipeline Co.*, 185 FERC ¶ 61,039
(2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Equitrans, L.P.*, 185 FERC ¶
61,040 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Port Arthur LNG Phase
II, LLC*, 184 FERC ¶ 61,184 (2023) (Clements, Comm'r, dissenting in part at PP 2-3);
*Venture Global Calcasieu Pass, LLC*, 184 FERC ¶ 61,185 (2023) (Clements, Comm'r,
dissenting in part at PP 2-4); *N. Nat. Gas Co.*, 184 FERC ¶ 61,186 (2023) (Clements,
Comm'r, dissenting in part at PP 2-3); *Tex. E. Transmission, LP*, 184 FERC ¶ 61,187
(2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Equitrans, L.P.*, 183 FERC ¶
61,200 (2023) (Clements, Comm'r dissenting at PP 2-3); *Commonwealth LNG, LLC*, 183
FERC ¶ 61,173 (2023) (Clements, Comm'r, dissenting at PP 5-8); *Rio Grande LNG,
LLC*, 183 FERC ¶ 61,046 (2023) (Clements, Comm'r, dissenting at PP 14-15); *Tex. LNG
Brownsville LLC*, 183 FERC ¶ 61,047 (2023) (Clements, Comm'r, dissenting at PP 14-
15).

Document Content(s)

CP23 29 000.docx.........................................................1

# EXHIBIT B

187 FERC ¶ 62,050
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Saguaro Connector Pipeline, LLC                    Docket No. CP23-29-001

NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND
PROVIDING FOR FURTHER CONSIDERATION

(April 18, 2024)

Rehearing has been timely requested of the Commission's order issued on February 15, 2024, in this proceeding. *Saguaro Connector Pipeline, LLC*, 186 FERC ¶ 61,114 (2024). In the absence of Commission action on a request for rehearing within 30 days from the date it is filed, the request for rehearing may be deemed to have been denied. 15 U.S.C. § 717r(a); 18 C.F.R. § 385.713 (2023); *Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).

As provided in 15 U.S.C. § 717r(a), the request for rehearing of the above-cited order filed in this proceeding will be addressed in a future order to be issued consistent with the requirements of such section. As also provided in 15 U.S.C. § 717r(a), the Commission may modify or set aside its above-cited order, in whole or in part, in such manner as it shall deem proper.

Debbie-Anne A. Reese,
Acting Secretary.

Document Accession #: 20240418-3015      Filed Date: 04/18/2024

Document Content(s)

CP23 29 001.docx......................................................1