**PUBLIC COPY--SEALED MATERIAL DELETED**

**ORAL ARGUMENT NOT YET SCHEDULED**

No. 24-1199

―――――――――――――――

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

―――――――――――――――

SIERRA CLUB and PUBLIC CITIZEN,

*Petitioners,*

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent,*

MEXICO PACIFIC LIMITED LLC and
SAGUARO CONNECTOR PIPELINE, L.L.C.,

*Respondent-Intervenors.*

―――――――――――――――

On Petition for Review of Orders of the Federal Energy Regulatory Commission

―――――――――――――――

**JOINT ANSWER BRIEF OF RESPONDENT-INTERVENORS**

(Counsel listed inside cover.)

James F. Bowe, Jr.
Ashley C. Parrish
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, D.C. 20006
Phone: 202.737.0500
Email: aparrish@kslaw.com

*Counsel for Respondent-Intervenor*
*Mexico Pacific Limited LLC*

Jeremy C. Marwell
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Phone: 202.639.6507
Email: jmarwell@velaw.com

Garrett T. Meisman
VINSON & ELKINS LLP
845 Texas Avenue, Suite 4700
Houston, TX 77002
Phone: 713.758.2559
Email: gmeisman@velaw.com

Ryan J. Collins
WRIGHT & TALISMAN, P.C.
1200 G Street, NW
Suite 600
Washington, DC 20005-3898
Phone: 202.349.9471
Email: collins@wrightlaw.com

*Counsel for Respondent-Intervenor*
*Saguaro Connector Pipeline, L.L.C.*

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

Pursuant to D.C. Circuit Rule 28(a)(1), Respondent-Intervenors Saguaro Connector Pipeline, L.L.C. and Mexico Pacific Limited LLC submit this provisional certificate as to parties, rulings, and related cases.

**Parties and *Amici*.**  All parties, intervenors, and *amici* appearing in this Court are listed in the answer brief of Respondent Federal Energy Regulatory Commission.

**Ruling Under Review.**  References to the rulings at issue appear in the Commission's answer brief.

**Related Cases.**  The case on review has not previously been before this Court or any other court, within the meaning of D.C. Circuit Rule 28(a)(1)(C).  At this time, counsel is unaware of any other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

Dated: January 24, 2025

Respectfully submitted,

*/s/ Ashley C. Parrish*
 (by permission)
James F. Bowe, Jr.
Ashley C. Parrish
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, D.C. 20006
Phone: 202.737.0500
Email: aparrish@kslaw.com

*Counsel for Respondent-Intervenor*
*Mexico Pacific Limited LLC*

*/s/ Jeremy C. Marwell*
Jeremy C. Marwell
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Phone: 202.639.6507
Email: jmarwell@velaw.com

Garrett T. Meisman
VINSON & ELKINS LLP
845 Texas Avenue, Suite 4700
Houston, TX 77002
Phone: 713.758.2559
Email: gmeisman@velaw.com

Ryan J. Collins
WRIGHT & TALISMAN, P.C.
1200 G Street, NW
Suite 600
Washington, DC 20005-3898
Phone: 202.349.9471
Email: collins@wrightlaw.com

*Counsel for Respondent-Intervenor*
*Saguaro Connector Pipeline, L.L.C.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Respondent-Intervenors make the following disclosures:

**Saguaro Connector Pipeline, L.L.C.** ("Saguaro") is a limited liability company organized under the laws of Delaware. Saguaro seeks to engage in the export of natural gas across the United States-Mexico border.

1. Saguaro is wholly owned by Saguaro Connector Pipeline Holdings, L.L.C.

2. Saguaro Connector Pipeline Holdings, L.L.C. is wholly owned by ONEOK Gas Storage Holdings, L.L.C.

3. ONEOK Gas Storage Holdings, L.L.C. is wholly owned by ONEOK Partners Intermediate Limited Partnership.

4. ONEOK Partners Intermediate Limited Partnership is wholly owned by ONEOK ILP GP, L.L.C. and ONEOK Partners, L.P.

5. ONEOK ILP GP, L.L.C. is wholly owned by ONEOK Partners, L.P.

6. ONEOK Partners, L.P. is wholly owned by ONEOK, Inc., ONEOK Partners GP, L.L.C. and ONEOK Unit Holdings, Inc.

7. ONEOK Partners GP, L.L.C. is wholly owned by ONEOK, Inc.

8. ONEOK Unit Holdings, Inc. is wholly owned by ONEOK, Inc.

9. ONEOK, Inc., an Oklahoma corporation, is publicly traded on the NYSE under the symbol OKE.

**Mexico Pacific Limited LLC** is a limited liability company organized under the laws of Delaware with its principal place of business at 700 Louisiana Avenue, Suite 2410, Houston, TX 77002. The only entity that has a 10% or greater ownership interest in Mexico Pacific Limited is QLNG Holdings, LLC.

Dated: January 24, 2025

Respectfully submitted,

*/s/ Ashley C. Parrish*
(by permission)
James F. Bowe, Jr.
Ashley C. Parrish
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, D.C. 20006
Phone: 202.737.0500
Email: aparrish@kslaw.com

*Counsel for Respondent-Intervenor*
*Mexico Pacific Limited LLC*

*/s/ Jeremy C. Marwell*
Jeremy C. Marwell
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Phone: 202.639.6507
Email: jmarwell@velaw.com

Garrett T. Meisman
VINSON & ELKINS LLP
845 Texas Avenue, Suite 4700
Houston, TX 77002
Phone: 713.758.2559
Email: gmeisman@velaw.com

Ryan J. Collins
WRIGHT & TALISMAN, P.C.
1200 G Street, NW
Suite 600
Washington, DC 20005-3898
Phone: 202.349.9471
Email: collins@wrightlaw.com

*Counsel for Respondent-Intervenor*
*Saguaro Connector Pipeline, L.L.C.*

# TABLE OF CONTENTS

**Page**

Certificate as to Parties, Rulings, and Related Cases ................................................. i

Corporate Disclosure Statement ............................................................................... iii

Table of Authorities ................................................................................................. vii

Glossary..................................................................................................................... xii

Introduction ................................................................................................................. 1

Counterstatement of Jurisdiction ............................................................................... 3

Statement of the Issues............................................................................................... 3

Statutes and Regulations ............................................................................................ 3

Statement of the Case.................................................................................................. 3

Summary of Argument ................................................................................................ 3

Standard of Review..................................................................................................... 7

Argument..................................................................................................................... 7

I. The Commission properly exercised its Section 3 authority............................. 7

    A. The Commission correctly concluded that Section 3 extends
    only to the Border Facility, not to the intrastate Connector Pipeline......... 7

    B. The Commission properly applied Section 3's public interest
    standard.................................................................................................... 13

II. The Commission correctly held that the intrastate Connector Pipeline is
not subject to Section 7................................................................................... 14

    A. The Commission's Section 7 analysis is supported by statutory
    text, precedent, and record evidence. ...................................................... 16

    B. Sierra Club cannot overcome the substantial-evidence standard........ 18

    C. Even if the Connector Pipeline were to receive gas transported
    on upstream intrastate pipelines under Section 311, that would not
    trigger Section 7. ..................................................................................... 24

III. FERC complied with NEPA. ........................................................................ 31

    A. The Commission reasonably crafted its statement of purpose
    and need and analysis of alternatives. ..................................................... 32

B. NEPA did not require the Commission to consider the indirect effects of the Connector Pipeline. ................................................................34

C. The Commission reasonably applied its four-factor test. ...................36

IV. If the Court finds merit in any of Sierra Club's arguments, it should remand without vacatur. ................................................................37

Conclusion ................................................................41

Certificate of Compliance ................................................................42

Addendum ................................................................43

Certificate of Service ................................................................ *(After Addendum)*

## TABLE OF AUTHORITIES

**Cases:**                                                                                          **Page(s)**

*Allied-Signal v. Nuclear Regulatory Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993) ...............................................................37

*Altamont Gas Transmission Co. v. FERC*,
   965 F.2d 1098 (D.C. Cir. 1992) ...........................................................19

*American Rivers v. FERC*,
   895 F.3d 32 (D.C. Cir. 2018) ...............................................................19

*Associated Gas Distribs. v. FERC*,
   824 F.2d 981 (D.C. Cir. 1987) .............................................................28

*Associated Gas Distribs. v. FERC*,
   899 F.2d 1250 (D.C. Cir. 1990) ...........................................................24

*Big Bend Conservation Alliance v. FERC*,
   896 F.3d 418 (D.C. Cir. 2018) .................................. 11, 17, 18, 24, 26, 27, 28, 29

*Black Oak Energy, LLC v. FERC*,
   725 F.3d 230 (D.C. Cir. 2013) .............................................................37

*Border Pipe Line Co. v. Fed. Power Comm'n*,
   171 F.2d 149 (D.C. Cir. 1948) ...............................................................9

*Center for Biological Diversity v. NHTSA*,
   538 F.3d 1172 (9th Cir. 2008)...............................................................13

*Center for Biological Diversity v. U.S. Army Corps of Eng'rs*,
   941 F.3d 1288 (11th Cir. 2019).............................................................14

*Citizens Action Coal. of Ind., Inc. v. FERC*,
   --- F.4th ---, No. 23-1046, 2025 WL 37052 (D.C. Cir. Jan. 7, 2025) .................33

*City of Port Isabel v. FERC*,
   111 F.4th 1198 (D.C. Cir. 2024) .........................................................39

*Consolidated Edison Co. of N.Y., Inc. v. FERC*,
   510 F.3d 333 (D.C. Cir. 2007) .............................................................34

*Delaware Riverkeeper Network v. FERC*,
   753 F.3d 1304 (D.C. Cir. 2014) ...........................................................11

*Department of Transp. v. Public Citizen*,
   541 U.S. 752 (2004) ...........................................................................35

**Cases—Continued:**                                                              **Page(s)**

*Distrigas Corp. v. Fed. Power Comm'n*,
   495 F.2d 1057 (D.C. Cir. 1974) ........................................................9

*Dolan v. U.S. Postal Serv.*,
   546 U.S. 481 (2006) ........................................................................8

*Environmental Defense Fund v. FERC*,
   2 F.4th 953 (D.C. Cir. 2021) ........................................................38

*ExxonMobil Gas Marketing Co. v. FERC*,
   297 F.3d 1071 (D.C. Cir. 2002) ....................................................12

*Federal Power Comm'n v. La. Power & Light Co.*,
   406 U.S. 621 (1972) ........................................................................7

*Florida Gas Transmission Co. v. FERC*,
   604 F.3d 636 (D.C. Cir. 2010) ......................................................18

*Food & Water Watch v. FERC*,
   28 F.4th 277 (D.C. Cir. 2022) ......................................................38

*Healthy Gulf v. FERC*,
   107 F.4th 1033 (D.C. Cir. 2024) ............................................ 38, 40

*Intermountain Mun. Gas Agency v. FERC*,
   326 F.3d 1281 (D.C. Cir. 2003) ....................................................36

*Loper Bright Enters. v. Raimondo*,
   144 S. Ct. 2244 (2024) ..................................................................10

*Louisiana Pub. Serv. Comm'n v. FERC*,
   20 F.4th 1 (D.C. Cir. 2021) ..........................................................18

*Marin Audubon Society v. FAA*,
   121 F.4th 902 (D.C. Cir. 2024) ....................................................32

*Minisink Residents for Env't Pres. & Safety v. FERC*,
   762 F.3d 97 (D.C. Cir. 2014) ........................................................18

*Mozilla Corp. v. FCC*,
   940 F.3d 1 (D.C. Cir. 2019)...........................................................10

*Myersville Citizens for a Rural Cmty., Inc. v. FERC*,
   783 F.3d 1301 (D.C. Cir. 2015) ....................................................31

*New Jersey Conservation Found. v. FERC*,
   111 F.4th 42 (D.C. Cir. 2024) ......................................................33

**Cases—Continued:**                                                    Page(s)

*North Carolina v. EPA,*
   550 F.3d 1176 (D.C. Cir. 2008) ...........................................39

*Panhandle E. Pipe Line Co. v. Pub. Serv. Comm'n,*
   332 U.S. 507 (1947) ................................................ 1, 7, 8

*Sierra Club v. FERC,*
   827 F.3d 36 (D.C. Cir. 2016) .......................................... 35, 36

*Sierra Club, Inc. v. U.S. Forest Serv.,*
   897 F.3d 582 (4th Cir. 2018) ...........................................33

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
   985 F.3d 1032 (D.C. Cir. 2021) .........................................39

*Vecinos para el Bienestar de la Comunidad Costera v. FERC,*
   6 F.4th 1321 (D.C. Cir. 2021) ..........................................40

*Vermont Yankee Nuclear Power Corp. v. NRDC,*
   435 U.S. 519 (1978) ...................................................11

*Village of Barrington v. Surface Transp. Bd.,*
   636 F.3d 650 (D.C. Cir. 2011) .........................................11

*Whitman v. Am. Trucking Ass'ns, Inc.,*
   531 U.S. 457 (2001) ...................................................10

**Statutes:**

15 U.S.C. § 3371(a)(2) ................................................ 15, 24

15 U.S.C. § 3431(a)(2) ...................................................26

15 U.S.C. § 3431(a)(2)(A) ........................................ 15, 21, 24

15 U.S.C. § 3431(a)(2)(B) .................................................26

15 U.S.C. § 717(b) .........................................................8

15 U.S.C. § 717(c) .........................................................8

15 U.S.C. § 717b(a) ................................................. 7, 9, 38

15 U.S.C. § 717f ..........................................................14

15 U.S.C. § 717r(b) ................................................ 3, 23, 34

42 U.S.C. § 4332(2)(C)(i) .................................................35

42 U.S.C. § 4332(2)(C)(iii) ...............................................32

**Statutes—Continued:**                                                    **Page(s)**

Tex. Nat. Res. Code § 81.051 ..................................................................10

**Regulations:**

18 C.F.R. § 157.6(a)(4)(i) .......................................................................19

18 C.F.R. § 284.123(e) ...........................................................................25

18 C.F.R. § 380.1 ...................................................................................32

18 C.F.R. § 385.2005(b)(1) .....................................................................19

18 C.F.R. § 388.112(b)(2)(iii)-(iv) ..........................................................23

**Administrative Materials:**

DOE Delegation Order No. S1-DEL-FERC-2006 § 1.21.A (May 16, 2006) ..........7

*Enterprise Tex. Pipeline LLC,*
    144 FERC ¶ 61,156 (2013).................................................................30

*Oasis Pipeline, LP,*
    127 FERC ¶ 61,263 (2009).................................................................24

*Oasis Pipeline, LP,*
    149 FERC ¶ 61,153 (2014).................................................................24

*ONEOK WesTex Transmission, L.L.C.,*
    161 FERC ¶ 61,128 (2017).................................................................23

*Parker v. Permian Highway Pipeline LLC,*
    180 FERC ¶ 61,179 (2022)................................................ 18, 23, 26, 29

*Roadrunner Gas Transmission, LLC,*
    153 FERC ¶ 61,041 (2015).................................................................24

*San Diego Gas & Elec. Co.,*
    64 FERC ¶ 61,221 (1993)...................................................................14

*Valley Crossing Pipeline, LLC,*
    161 FERC ¶ 61,084 (2017).................................................................32

*Westar Transmission Co.,*
    43 FERC ¶ 61,050 (1988)...................................................................31

**Other Authorities:** <u>**Page(s)**</u>

Fed. Reserve Bank of Dallas, *Permian Basin*, https://perma.cc/WXP4-GYUB .....17

ONEOK, *ONEOK WesTex Transmission, L.L.C.,*
    https://perma.cc/5ZR3-B78J (last visited Dec. 28, 2024) ...................................25

ONEOK, *Roadrunner Gas Transmission, LLC*,
    https://perma.cc/CQY6-NMM7 (last visited Jan. 4, 2025) .................................24

*Texas Waha Hub Gas Prices Plunge to Record Lows,*
    *Hit Negative Territory*, Pipeline & Gas Journal (Sept. 1, 2024),
    https://perma.cc/JU8N-JCQ9 ...............................................................................30

U.S. Energy Info. Admin., *Market Dynamics Vary at Key Natural Gas Pricing*
    *Hubs* (Oct. 23, 2024), https://perma.cc/U6FP-XFCB ..........................................15

U.S. Energy Info. Admin., *Pipeline Projects Announced to Expand*
    *Permian Natural Gas Capacity* (Aug. 4, 2022),
    https://perma.cc/4Y7L-XVSY ...............................................................................21

U.S. Energy Info. Admin., *Short-Term Energy Outlook –*
    *Marketed (Wet) Natural Gas Production: Permian* (Dec. 10, 2024),
     https://perma.cc/CQ22-R25Y ...............................................................................17

# GLOSSARY

As used herein,

**Act** means the Natural Gas Act, 15 U.S.C. § 717, *et seq.*;

**Authorization Order** (Auth. Order) means the Commission's *Order Issuing Presidential Permit and Granting Authorization Under Section 3 of the Natural Gas Act*, 186 FERC ¶ 61,114 (2024), R.107, JA__-__;

**Border Facility** means the proposed pipeline and related facilities extending from the U.S.-Mexico border at the center of the Rio Grande River to a point approximately 1,000 feet inland in Hudspeth County, Texas;

**CEQ** means the Council on Environmental Quality;

**Connector Pipeline** means the planned 155-mile pipeline connecting the Border Facility to an interconnection with ONEOK WesTex Transmission, L.L.C. in Pecos County, Texas;

**FERC** and **Commission** mean Federal Energy Regulatory Commission;

**NEPA** means the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq*;

**NGPA** means the Natural Gas Policy Act, 15 U.S.C. § 3301, *et seq*;

**P** means the internal paragraph within a FERC order;

**R.** means the Record Item Number in the Commission's Certified Index to the Record, filed on July 29, 2024 (Doc. 2066963); and

**Rehearing Order** (Reh'g Order) means the Commission's *Order Addressing Arguments Raised on Rehearing*, 188 FERC ¶ 61,029 (2024), R.126, JA__-__.

## INTRODUCTION

The Natural Gas Act "was drawn with meticulous regard for the continued exercise of state power, not to handicap or dilute it in any way." *Panhandle E. Pipe Line Co. v. Pub. Serv. Comm'n*, 332 U.S. 507, 517-18 (1947). This appeal is part of a campaign by two environmental advocacy groups (collectively, "Sierra Club") seeking to expand the Federal Energy Regulatory Commission's authority over natural gas pipelines and displace longstanding state dominion over intrastate gas transportation. The Court should reject Sierra Club's arguments, which disregard the governing statutory text and, if accepted, would distort the careful balance Congress struck between federal and state authority.

Intervenor Saguaro Connector Pipeline, L.L.C. ("Saguaro") sought a Presidential Permit and authorization under Section 3 of the Natural Gas Act ("Act") to construct and operate a 1,000-foot natural gas export pipeline at the U.S.-Mexico border. In unanimously granting that authorization in 2024, the Commission recognized that its Section 3 authority—which applies to facilities used in natural gas exports—extends only to the 1,000-foot facility at the border. Yet Sierra Club argues that the Act required FERC to assert jurisdiction over a *155-mile* upstream intrastate pipeline regulated by the State of Texas merely because that pipeline will transport gas to the border facility. In rejecting that position, FERC took a measured

1

approach that is faithful to the statutory text, this Court's decisions, and longstanding agency precedent.

Failing to ground jurisdiction in Section 3, Sierra Club falls back on Section 7 of the Act, which governs interstate gas transportation. But Section 7 does not apply because the planned 155-mile pipeline will be located entirely in Texas and, upon entering service, will transport only Texas-sourced gas. Sierra Club's contrary arguments misstate the record and misunderstand operational realities—and certainly cannot overcome the deferential "substantial evidence" standard of review. Moreover, even if in the future the 155-mile intrastate pipeline were to receive any gas originating outside Texas, via connections to upstream intrastate pipelines, Section 311 of the Natural Gas Policy Act would exempt that gas and its transportation from Natural Gas Act jurisdiction.

Sierra Club separately attempts to stretch the Commission's upstream reach via its Section 3 public interest analysis, or its National Environmental Policy Act ("NEPA") review. Both arguments fail largely for the same reason: there is no legal requirement for the Commission to account for impacts of a pipeline separately regulated by Texas.

In short, Sierra Club urges this Court to ignore multiple limits on the Commission's statutory authority, and to trench on areas of longstanding state primacy. This Court should deny the petition for review.

2

## COUNTERSTATEMENT OF JURISDICTION

This Court lacks jurisdiction to entertain arguments not preserved on administrative rehearing. 15 U.S.C. § 717r(b).

## STATEMENT OF THE ISSUES

Intervenors adopt FERC's statement of issues. FERC Br. 3-4.

## STATUTES AND REGULATIONS

Except for the additional statute and regulations in the addendum bound with this brief, all applicable statutes and regulations are contained in the briefs filed by Sierra Club and FERC.

## STATEMENT OF THE CASE

Intervenors adopt FERC's Statement of Facts. FERC Br. 4-14.

## SUMMARY OF ARGUMENT

**1.** The Commission properly exercised Section 3 jurisdiction only over Saguaro's proposed 1,000-foot Border Facility, and not over the 155-mile Connector Pipeline regulated by the Texas Railroad Commission. Given Congress's careful division of authority between the federal and state governments in the area of natural gas sales and transportation, Section 3(a) is best read as giving FERC authority only over export facilities near the border.

Sierra Club's contrary arguments fail for two overarching reasons. First, in arguing that the Commission could not treat the Border Facility separately from the Connector Pipeline, Sierra Club relies heavily on the NEPA doctrine of

3

"segmentation." But as a procedural statute, NEPA cannot expand FERC's substantive jurisdiction. Second, Sierra Club's Section 3 argument raises primarily *factual* concerns (themselves baseless), but FERC's decision rested principally on the *legal* limits of its jurisdiction.

The Commission properly applied Section 3's "public interest" standard. The Commission found that Sierra Club failed to meet its statutory burden to show that the project is inconsistent with the public interest. Sierra Club does not challenge that finding on appeal. Instead, it argues only that FERC's public-interest analysis relied on an inconsistent "scope" by focusing on the Border Facility's impacts, while noting that the project would have downstream benefits for Mexico Pacific Limited LLC ("Mexico Pacific") by expanding gas supply options. That argument is wrong on the facts and the law, and no authority supports it.

**2.** As to Section 7 of the Act, FERC found that the Connector Pipeline will be an *intrastate* pipeline located entirely within Texas and, upon commencement of service, will transport only gas produced in Texas. Those findings are supported by substantial record evidence, including certified submissions by Saguaro and a detailed schematic map identifying eight sources of intrastate gas for the Connector Pipeline. FERC reasonably credited Saguaro's submissions, particularly in the absence of probative contrary evidence.

4

That the Connector Pipeline will connect with intrastate facilities belonging to ONEOK WesTex Transmission, L.L.C. ("WesTex") in the Waha Hub region does not prove Section 7 jurisdiction. The "Waha Hub" is a geographic area where many pipelines intersect, facilitating trading and making it a convenient place to report prices. But it is not a location where gas is indiscriminately commingled or all pipelines interconnect. The Commission properly credited the specific record evidence about the Connector Pipeline's planned interconnections, over Sierra Club's generalized assertions. And to the extent that WesTex or the other upstream sources of gas *might* transport gas originating outside Texas, they do so under Section 311 of the Natural Gas Policy Act ("NGPA"), exempt from FERC's jurisdiction under the Act. Accordingly, Section 7 would not be triggered even if the Connector Pipeline received gas transported under Section 311 in the future.

The Court should reject the speculative suggestion that the Connector Pipeline's "primary purpose" is to transport interstate gas, as a basis for asserting Section 7 jurisdiction. That argument is contrary to statutory text, unsupported by record evidence, has been rejected by this Court, ignores economic realities, and ultimately amounts to a policy disagreement with Section 311.

**3.** The Commission fully complied with NEPA and (to the extent relevant) regulations implementing it. FERC acted within its discretion in defining the project's purpose and need in terms of the source, destination, and volume of gas to

be transported, an approach this Court and others have upheld. Sierra Club offered no viable alternatives that would accomplish that purpose.

The Commission was not required to evaluate the indirect environmental impacts of the non-jurisdictional *Connector Pipeline*. Sierra Club forfeited any other argument sounding in indirect effects, such as whether the Connector Pipeline's impacts are indirect effects of FERC's approval of the *Border Facility*. But regardless, such an argument would fail because Texas, not FERC, is the legally relevant cause of the intrastate Connector Pipeline's impacts.

Sierra Club cannot overcome FERC's conclusions by challenging only two of the four factors that the Commission analyzed in finding insufficient federal "control and responsibility" over the Connector Pipeline to trigger NEPA review. And Sierra Club misreads the record by invoking evidence that does not concern the Connector Pipeline.

**4.** Although the Court should deny the petition outright, if it finds merit in any of Sierra Club's arguments, it should remand *without* vacatur. Given the process-based nature of the claims on appeal, and the statutory presumption favoring approval of the export facility, FERC could readily cure any deficiencies on remand. Vacatur would have severely disruptive consequences for Saguaro, given the substantial time and resources it has devoted to developing, proposing, and preparing for construction of the Border Facility to serve its customer Mexico Pacific. Vacatur

6

would also disrupt contractual arrangements between Saguaro and Mexico Pacific, and jeopardize Mexico Pacific's preparations and investments.

## STANDARD OF REVIEW

Intervenors agree with FERC's articulation of the standard of review. FERC Br. 18.

## <u>ARGUMENT</u>

I.    **The Commission properly exercised its Section 3 authority.**

    A.    **The Commission correctly concluded that Section 3 extends only to the Border Facility, not to the intrastate Connector Pipeline.**

**1.** Section 3(a) of the Act gives the Commission authority to regulate facilities used for the "*export*" of "natural gas from the United States to a foreign country." 15 U.S.C. § 717b(a) (emphasis added); *see* DOE Delegation Order No. S1-DEL-FERC-2006 § 1.21.A (May 16, 2006) (delegating to FERC authority over "particular facilities" used in exports, as well as "the place of . . . exit for exports."); FERC Br. 6-7. Section 3 reflects the careful balance Congress struck by providing federal authority over gas imports and exports, and sales and transportation of gas in interstate commerce, while showing "meticulous regard" for the states' longstanding authority over production, gathering, and *intrastate* sales and transportation of gas. *Panhandle E. Pipe Line Co.*, 332 U.S. at 517-18; *accord Fed. Power Comm'n v. La. Power & Light Co.*, 406 U.S. 621, 631 (1972) (federal regulation under the Act is "complementary to that reserved to the states").

In the context of border pipelines, Section 3(a) applies to the siting and operation of a short pipeline segment necessary to accomplish the export, at the site of export.  Reh'g Order P 23, JA__; FERC Br. 19-21.  In identifying the bounds of the Commission's authority, this Court should consider the "whole statutory text" and "context."  *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006).  That context weighs heavily against Sierra Club's proposed interpretation.  While vesting the Commission with authority over interstate transportation and sales of natural gas (Section 7), and foreign imports and exports (Section 3), the Act shields from federal jurisdiction essentially all other aspects of the natural gas trade.

The Act commands that it "shall not apply to *any other transportation or sale of natural gas* or to the *local distribution* of natural gas or to the facilities used for such distribution or to the *production or gathering* of natural gas."  15 U.S.C. § 717(b) (emphases added); *see also id.* § 717(c) (further exempting certain intrastate pipelines that receive natural gas at a state boundary that is consumed within the state and subject to state regulation).  The Act thus draws a dividing line between, on one hand, federal jurisdiction over interstate and border facilities and imports and exports, and on the other hand, traditional state jurisdiction over the realms of production, gathering, distribution, and intrastate transportation of natural gas.  *See Panhandle E. Pipe Line Co.*, 332 U.S. at 516; *Border Pipe Line Co. v. Fed.*

*Power Comm'n*, 171 F.2d 149, 150-53 (D.C. Cir. 1948) (Section 7 does not apply to pipeline located within Texas exporting gas to Mexico).

Given Congress's expressed intent, the best and only plausible reading of Section 3(a)'s application to border pipelines is that FERC's jurisdiction extends only to the export facilities in the immediate vicinity of the border—not upstream intrastate pipeline facilities. Reh'g Order PP 23-24, JA__-__. It would violate basic interpretative principles to conclude that Congress gave FERC sweeping jurisdiction over hundreds or even thousands of miles of intrastate pipelines directly or indirectly transporting gas to the border—by means of a statutory provision (Section 3(a)) that explicitly refers only to the import or export of natural gas commodity, and is silent as to pipeline facilities. *See* 15 U.S.C. § 717b(a).[1]

The interpretation advanced by Sierra Club would invert the lines that Congress carefully drew between state and federal authority, through the implausible mechanism of a backdoor reference to commodity exports. But Congress "'does not alter the fundamental details of a regulatory scheme,' let alone step so heavily on the balance of power between the federal government and the States, 'in vague terms or

---

[1] *Distrigas Corp. v. Federal Power Commission*, 495 F.2d 1057, 1064 (D.C. Cir. 1974), concluded, in the context of a liquefied natural gas import terminal, that FERC's Section 3 authority could extend to facilities. But the Court did not suggest that Section 3 would extend to facilities or transportation beyond the scope of exportation or importation.

ancillary provisions.'" *Mozilla Corp. v. FCC*, 940 F.3d 1, 84 (D.C. Cir. 2019) (quoting *Whitman v. Am. Trucking Ass'ns, Inc*., 531 U.S. 457, 468 (2001)).

Consistent with the statutory text, FERC has long and correctly understood Section 3 as limited to a "small segment of pipeline close to the border." Reh'g Order PP 12, 23-24, 34 JA__-__, __-__, __-__ (collecting authorities); FERC Br. 26-27. Although this Court must exercise its "independent judgment" in construing Section 3, to the extent the Court looks beyond the plain statutory text, the Commission's interpretation is entitled to particular "respect" because it has been consistently applied over decades, honors Congress's efforts to protect traditional areas of state and local primacy, and reflects the Commission's considered view. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2257-58 (2024).

**2.** Sierra Club asserts that FERC's Section 3 jurisdiction extends not only to the 1,000-foot Border Facility, but also to the 155-mile upstream intrastate Connector Pipeline. Opening Br. 15-16; *contra* Tex. Nat. Res. Code § 81.051. That position would upset decades of precedent on which billions of dollars of investment rest. *See* Reh'g Order P 35 n.132, JA__ (citing numerous similar projects). It would also trample longstanding state jurisdiction. In addition to the arguments advanced by the Commission, *see* FERC Br. 21-27, intervenors offer the following points:

*First*, in arguing that the Commission violated Section 3 by supposedly "segmenting" the Border Facility and Connector Pipeline, Sierra Club improperly

10

attempts to import the NEPA doctrine and language of "segmentation" to expand the scope of FERC's substantive jurisdiction. *See* Opening Br. 15 (arguing FERC improperly "segmented" its review), *id.* at 19 (invoking *Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304 (D.C. Cir. 2014), a NEPA segmentation case), *id.* at 18-19 (applying NEPA segmentation factors, such as functional interdependence and common ownership). The segmentation doctrine addresses whether two proposals pending before an agency are "connected actions" that must be considered in one NEPA document. *See Del. Riverkeeper*, 753 F.3d at 1313-14. But "[b]ecause NEPA's 'mandate to . . . agencies is essentially procedural,' it does not expand an agency's substantive powers." *Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 665 (D.C. Cir. 2011) (quoting *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978)).[2]

*Second*, although Sierra Club claims a violation of the Act, it devotes scant attention to the statutory text, instead focusing on *factual arguments*. *E.g.*, Opening Br. 17 (arguing that "substantial evidence" does not support "FERC's treatment of the Saguaro Pipeline as two distinct projects"). But the "division between the jurisdictional Border Facility and non-jurisdictional Connector Pipeline is a function

---

[2] The NEPA section of Sierra Club's brief makes no segmentation argument, *see* Opening Br. 54-67, presumably because this Court rejected that argument in *Big Bend Conservation Alliance v. FERC*, 896 F.3d 418, 423-24 (D.C. Cir. 2018).

of the [Act]," Reh'g Order P 29, JA__-__, not factual or operational distinctions.  In this context, the Act limits FERC's Section 3 jurisdiction to the immediate vicinity of the border, regardless of any operational relationship between the Connector Pipeline and the Border Facility.

*Third,* Sierra Club suggests that the Commission arbitrarily drew the jurisdictional line at 1,000 feet.  Opening Br. 20.  But other than arguing that the Commission must assert jurisdiction over the entire 155- mile intrastate Connector Pipeline, Sierra Club makes no specific argument to support a length other than 1,000 feet.  The Commission has consistently applied its Section 3 jurisdiction to similarly sized border pipeline facilities.   Reh'g Order P 35 & n.132, JA__ (collecting examples).[3]  Here, the Commission needed to draw the jurisdictional line *somewhere*, and it reasonably did so at a point near the border.  The Commission has "wide discretion" in "draw[ing] administrative lines,"  *ExxonMobil Gas Marketing Co. v. FERC*, 297 F.3d 1071, 1085 (D.C. Cir. 2002), and struck "a reasonable balance" here between federal and state interests.  Reh'g Order P 35, JA__.

---

[3] Sierra Club never mentioned on rehearing *San Diego Gas & Elec. Co*., 64 FERC ¶ 61,221 (1993), thus forfeiting any argument that the Commission should have explained how its approach here relates to that specific order.  Opening Br. 24-25 n.8.  Regardless, the *San Diego* order adopted no general rule, and gives no indication that the length of the Section 3 facility was disputed.

**B.    The Commission properly applied Section 3's public interest standard.**

Sierra Club attacks the Commission's application of Section 3's "public interest" standard on one ground: that FERC inconsistently defined the "scope" of the project by considering downstream *benefits* beyond the Border Facility, while focusing its discussion of adverse *impacts* on the Border Facility, not the intrastate Connector Pipeline.  Opening Br. 52-54.

This argument overlooks the Commission's determination that Sierra Club failed to overcome Section 3's "presumption favoring authorization" because it never made "an affirmative showing of inconsistency with the public interest." Reh'g Order PP 11, 13-14, JA__, __-__; Auth. Order P 16, JA__-__.  Sierra Club neither challenges this legal standard on appeal, nor disputes FERC's conclusion that Sierra Club failed to meet the standard—failings that are fatal to its claim.  Opening Br. 52-54; *see also* FERC Br. 57-59.

The inconsistent-scope argument fails for other reasons too.  Sierra Club cites no authority supporting its interpretation of Section 3.  Opening Br. 52-54.  Beyond a general reference to the arbitrary-and-capricious standard of review, Sierra Club's only precedent is an inapposite case involving formal cost-benefit analysis.  *See Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1198-1201 (9th Cir. 2008).

The factual predicate of the inconsistent-scope argument is the Commission's statement that the project would "significantly expand the supply options available

to [Mexico Pacific] and its customers." Auth. Order P 15, JA___; Opening Br. 53. But FERC explained that it "described the expansion of [Mexico Pacific's] supply options only to correct [Sierra Club's] misunderstanding of [Mexico Pacific's] statements." Reh'g Order P 16, JA___-___. Sierra Club does not even acknowledge this explanation, let alone show error therein. Opening Br. 52-54.

Even if Sierra Club's framing of the Commission's public-interest analysis were accurate, courts have consistently recognized that where an agency has statutory authority only over a small part of a larger undertaking, "[t]he scope of the benefit of a project cannot . . . always define the scope of the agency's consideration [of impacts]." *Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, 941 F.3d 1288, 1301-02 (11th Cir. 2019) (citing cases). An agency can acknowledge why the limited, jurisdictional portion of a project is being undertaken, without "having to consider all manner of downstream effects" beyond its jurisdiction. *Id.* at 1302.

## II.    The Commission correctly held that the intrastate Connector Pipeline is not subject to Section 7.

Sierra Club argues that the Connector Pipeline is an interstate pipeline subject to Section 7, 15 U.S.C. § 717f.  Opening Br. 27-52.  That argument fails for numerous reasons; two cross-cutting flaws—one factual, one legal—bear particular emphasis.

Factually, the crux of Sierra Club's appeal is its belief that the Connector Pipeline will physically connect to the "Waha Hub," which it treats as proof that the

14

MATERIAL UNDER SEAL DELETED

pipeline will transport *interstate* gas from day one.  Opening Br. 29-33, 39, 46, 48.  But the "Waha Hub" is primarily a price-reporting concept; that term does *not* mean that all pipelines in the area interconnect, or that all gas is commingled.  FERC Br. 43-46; U.S. Energy Info. Admin., *Market Dynamics Vary at Key Natural Gas Pricing Hubs* (Oct. 23, 2024), https://perma.cc/U6FP-XFCB (discussing "[t]he Waha natural gas pricing hub").  The record of *this* proceeding shows that the Connector Pipeline will interconnect only to ████████████████████████ ████████████ the WesTex pipeline, offering Saguaro indirect connections to eight specific sources of intrastate gas.  Saguaro Resp. to Data Request, Appendix A at 3, 6 (Oct. 27, 2023), R.91, JA__, __; *id.* Appendix B, Attachment 2, R.90, JA__.  The record shows the Connector Pipeline will transport only Texas-sourced gas upon commencing service.  *Id.*, Appendix A at 7, JA__.

    As a legal matter, Sierra Club ignores the balance Congress struck between federal and state jurisdiction in both the Act and the NGPA.  Most glaringly, its position cannot be reconciled with NGPA Section 311, which authorizes intrastate pipelines to transport interstate gas—without that gas, or its transportation, triggering Natural Gas Act jurisdiction.  *Compare* Opening Br. 31-32, 39-43, *with* 15 U.S.C. §§ 3371(a)(2), 3431(a)(2)(A), *and* FERC Br. 47-52.

**MATERIAL UNDER SEAL DELETED**

In addition to these cross-cutting flaws, Sierra Club's attempts to invoke Section 7 jurisdiction are inconsistent with the statutory text and cannot overcome the deferential substantial-evidence standard of review.

### A.    The Commission's Section 7 analysis is supported by statutory text, precedent, and record evidence.

In determining whether a pipeline is subject to Section 7, "the Commission looks to whether the pipeline plans to operate . . . solely as an intrastate pipeline when it beg[i]n[s] service." *Parker v. Permian Highway Pipeline LLC*, 180 FERC ¶ 61,179, at P 11 (2022); Reh'g Order P 57, JA__. The Connector Pipeline will be located entirely in Texas. Permit Application at 4 (Dec. 20, 2022), R.1, JA__. Moreover, substantial evidence supports the Commission's finding that, upon commencing service, that pipeline will carry only Texas-sourced gas. Auth. Order P 24, JA__; Saguaro Resp. to Data Request, Appendix A at 7, JA__.

Saguaro expressly certified that the Connector Pipeline will initially transport only Texas-sourced gas. Saguaro Resp. to Data Request, Appendix A at 7, JA__. In response to FERC's inquiries, Saguaro provided a detailed schematic, showing the Connector Pipeline's proposed connection to the WesTex intrastate pipeline, and identifying eight facilities that would serve as upstream sources of intrastate gas █████████████████████████████████████████ *Id.*, Appendix B, Attachment 2, JA__; FERC Br. 54-55. The different sources of intrastate gas reflect a basic feature of the pipeline industry: Saguaro designed its system to create optionality

16

for its shippers, which may choose different sources of gas over time, in response to changing supply and market conditions.

Saguaro further explained that the capacity of those eight intrastate sources totals some 5 billion cubic feet per day—far exceeding the Connector Pipeline's design capacity of 2.8 billion cubic feet per day. Saguaro Resp. to Data Request, Appendix A at 3-4, 6, JA__-__, __. Moreover, the Permian Basin production region—to which the Connector Pipeline will have indirect access via WesTex and other upstream intrastate pipeline facilities—produces over *20 billion* cubic feet of natural gas per day, dwarfing the Connector Pipeline's design capacity. U.S. Energy Info. Admin., *Short-Term Energy Outlook – Marketed (Wet) Natural Gas Production: Permian* (Dec. 10, 2024), https://perma.cc/CQ22-R25Y; Fed. Reserve Bank of Dallas, *Permian Basin*, https://perma.cc/WXP4-GYUB ("Texas counties in the Permian Basin produce the majority of the region's natural gas").

In this context, the Commission reasonably credited Saguaro's assurance that, upon commencement of service, the Connector Pipeline will transport only Texas-produced gas. Indeed, noting similar record evidence that an upstream intrastate pipeline would initially carry only Texas-produced gas bound for export, this Court rejected an essentially identical Section 7 argument raised by project opponents in *Big Bend Conservation Alliance v. FERC*, 896 F.3d 418, 422 (D.C. Cir. 2018).

17

### B.    Sierra Club cannot overcome the substantial-evidence standard.

Sierra Club's factual arguments fundamentally misperceive the substantial-evidence standard of review.  The Commission's factual findings are "conclusive" if supported by substantial evidence—a highly deferential standard "satisfied by something less than a preponderance of the evidence." *Minisink Residents for Env't Pres. & Safety v. FERC*, 762 F.3d 97, 108 (D.C. Cir. 2014); *accord La. Pub. Serv. Comm'n v. FERC*, 20 F.4th 1, 7 (D.C. Cir. 2021) ("low bar").  The question is whether substantial evidence supports FERC's determination—not whether "evidence could support the petitioner's view." *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010).

### 1.    The Commission was not required to independently verify Saguaro's certifications about the sources of gas.

Contrary to Sierra Club's assertion, Opening Br. 33-36, the Commission was not required to undertake additional investigation into Saguaro's factual representations, merely because Sierra Club questioned those statements in a conclusory fashion, without offering specific or probative contrary evidence.  *Big Bend* noted with approval FERC's reliance on similar applicant statements representing that a pipeline would "carry only gas produced in Texas," without requiring more verification.  896 F.3d at 422.

Saguaro has direct knowledge about its proposed facilities, and formally certified the truthfulness of its filings in compliance with Commission regulations.

18

*See* Reh'g Order P 8 & n.24, JA__-__ (discussing 18 C.F.R. §§ 157.6(a)(4)(i) and 385.2005(b)(1), under which a filer's signature "constitutes a certification" that information is "true to the best knowledge and belief of the signer"). The Commission would have understood Saguaro's statements against the Commission's own considerable knowledge of the region's pipelines and natural gas markets. *See infra* pp. 20-21 (citing FERC orders addressing WesTex and other intrastate pipelines). If Sierra Club means to suggest that the Commission cannot ever rely on information provided by project applicants, it cites no supporting authority, and such a rule would upend Commission practice and procedure. Authorities discussing independent verification are plainly distinguishable. Opening Br. 35-36.[4]

Sierra Club shows nothing arbitrary in the Commission's decision to credit information specific to this project over generalized statements about gas flows

---

[4] *American Rivers v. FERC* faulted the Commission for relying on a "more-than-a-decade-old-survey" of a project's impacts on fish. 895 F.3d 32, 50 (D.C. Cir. 2018). Here, there is no argument that FERC relied on antiquated information. *See* Reh'g Order at P 112 n.473, JA__-__. Unlike the environmental data in *American Rivers*, the proposed facilities and interconnected sources of gas are information a pipeline developer knows firsthand, *see id.* at P 8, JA__-__, so contemporaneous developer statements are appropriate evidence. *Altamont Gas Transmission Co. v. FERC* merely upheld the Commission's dismissal of an incomplete application; that the Commission there questioned an applicant's assurances does not show that FERC acted arbitrarily in crediting Saguaro's statements here. 965 F.2d 1098, 1100-01 (D.C. Cir. 1992).

MATERIAL UNDER SEAL DELETED

through other facilities in the region, or statements from other dockets relating to other projects. *E.g.*, Opening Br. 29-31, 39 n.11.

Sierra Club suggests that Saguaro failed to respond to a Commission data request by not "describ[ing] the origin" of Texas-sourced natural gas. Opening Br. 34-35. This is incorrect: The Commission asked questions regarding the origin of natural gas, and Saguaro responded by identifying eight specific intrastate sources. Saguaro Resp. to Data Request, Appendix A at 3, 6-7, JA__, __-__; *id.*, Appendix B, Attachment 2, JA__; *see* FERC Br. 40-42.

█████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████ The Commission is intimately familiar with the WesTex pipeline, its location and intrastate status, and authority to provide Section 311 service. *E.g.*, *ONEOK WesTex Transmission, L.L.C.*, 161 FERC ¶ 61,128, at PP 2-3 (2017). █████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

**MATERIAL UNDER SEAL DELETED**

███████████████████████████████████████

███████████████████████████████████████

██████████

### 2.    Sierra Club's other factual arguments fail.

In attempting to meet the high bar of substantial-evidence review, Sierra Club relies on conclusory assertions and off-point "facts."  For example, Sierra Club fixates on the location of the Connector Pipeline's interconnections in the vicinity of the "Waha Hub," Auth. Order P 53 n.152, JA__, as supposed proof that the Connector Pipeline will transport interstate gas.  In reality, the "Waha Hub" is a region crossed by many different pipelines that serves as a convenient price-reporting point; it does not involve universal pipeline interconnections or gas commingling.  FERC Br. 43-46.

Arguments about various upstream interconnections via WesTex, Opening Br. 30, prove nothing.  Saguaro certified that only Texas-sourced gas would flow on the Connector Pipeline when it enters service.  Saguaro Resp. to Data Request, Appendix A at 7, JA__.  Moreover, any indirect upstream connections to interstate pipelines do not trigger Section 7 because if they were to deliver interstate gas into the Connector Pipeline, the connected intrastate pipelines would do so pursuant to NGPA Section 311, thereby preventing the gas or this transportation from triggering Section 7.  Reh'g Order PP 42-43, JA__-__; 15 U.S.C. § 3431(a)(2)(A).

More generally, Sierra Club's suggestions of indiscriminate commingling and gas sourcing are unrealistic. Pipelines have obligations to their customers to account for gas transported on their systems, and they provide specific service pursuant to tariffs and contracts. It would be profoundly uncommercial for pipelines to design or operate systems in a way that would render it impossible for the pipeline to know whether it was providing the kind of service (intrastate, interstate, Section 311) that they contracted to provide. *Contra* Opening Br. 29-30.

In this context, the Commission reasonably credited Saguaro's representation that when the Connector Pipeline enters service, it will transport only Texas-sourced gas. Auth. Order P 24, JA__. Like any pipeline, Saguaro can and will implement this limitation through physical flow controls (e.g., opening or closing valves for connections to one or more of the various upstream intrastate pipelines Saguaro identified; giving instructions to operations teams) and contractual arrangements and other shipper assurances. *See* FERC Br. 38 (explaining that pipeline "may choose to access gas" only "from its connections with intrastate sources"). Such limitations would be particularly effective for Saguaro, given the lack of any direct connection between the Connector Pipeline and *any* interstate pipeline. *See Parker*, 180 FERC ¶ 61,179, at PP 8-11 (concluding pipeline was intrastate even with direct connections to interstate pipelines).

22

**MATERIAL UNDER SEAL DELETED**

Sierra Club points to nothing else in the record to satisfy its burden.  Sierra Club observes that Saguaro will not source or purchase gas for its customers.  Opening Br. 31.  But that is just a description of how the pipeline industry operates (i.e., pipelines provide transportation service, they do not source gas), not evidence that the Connector Pipeline will transport interstate gas—particularly because the record shows that Saguaro's customers will choose from multiple sources of *intrastate* gas.  The Commission reasonably credited Saguaro's specific, certified representations that initially the pipeline will transport only Texas-sourced natural gas.  Auth. Order P 24, JA__; Reh'g Order P 8, JA__-__ (assertions "unsupported by specific evidence, are insufficient to rebut record evidence").

Sierra Club belatedly nit-picks information Saguaro provided under seal identifying upstream sources of gas.  Opening Br. 37-39.  ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[5] That the information was filed under seal at the Commission does not excuse forfeiture. 15 U.S.C. § 717r(b).  Longstanding regulations gave Sierra Club multiple pathways to obtain timely access to that information.  *E.g.*, 18 C.F.R. § 388.112(b)(2)(iii)-(iv).  Sierra Club did not even ask for the information until long after filing their appeal.  When it did, Saguaro promptly provided it.

**MATERIAL UNDER SEAL DELETED**

**C.    Even if the Connector Pipeline were to receive gas transported on upstream intrastate pipelines under Section 311, that would not trigger Section 7.**

**1.    Sierra Club ignores Section 311's plain language.**

Under Section 311 of the NGPA, the Commission may authorize an intrastate pipeline "to transport natural gas on behalf of . . . any interstate pipeline," with such transportation service exempted from the Commission's jurisdiction under the Act. 15 U.S.C. §§ 3371(a)(2), 3431(a)(2)(A); *Big Bend*, 896 F.3d at 420. Even so, Sierra Club argues that potential Section 311 service on upstream intrastate pipelines

**MATERIAL UNDER SEAL DELETED**

triggers Section 7 jurisdiction over the Connector Pipeline.  Opening Br. 40-43.

Sierra Club's concerns about Section 311 service are hypothetical as to the Connector Pipeline itself because Saguaro has not sought, and does not have, FERC's authorization to transport natural gas pursuant to Section 311.  Opening Br. 42 n.13.  ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ But even if the Connector Pipeline *were* to receive gas that had been transported upstream under Section 311, that would not trigger Section 7.  FERC Br. 35-36, 48-51.  Sierra Club's contrary argument, Opening Br. 40-43, has no basis in statutory text, and would effectively gut Section 311, subjecting

---

[6] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████

countless state-regulated intrastate pipelines nationwide to Commission jurisdiction because they connect to other pipelines providing Section 311 service.

"[T]he Natural Gas Policy Act provides that 'the jurisdiction of the Commission' under the Natural Gas Act 'shall not apply' to transportation authorized under Section 311." *Big Bend*, 896 F.3d at 423. The NGPA "exempts from the Commission's . . . jurisdiction downstream intrastate pipelines that may interconnect with a non-jurisdictional intrastate pipeline transporting intrastate and interstate natural gas pursuant to NGPA section 311, so long as the downstream intrastate pipeline does not engage in *transactions* that could render them subject to the Commission's jurisdiction." Reh'g Order P 43, JA__-__ (citing authorities). That conclusion follows from the text of the NGPA, which provides that "the provisions of [the Natural Gas Act] and the jurisdiction of the Commission under such Act *shall not apply* to any transportation in interstate commerce of natural gas" that is "authorized by the Commission under section [311]." 15 U.S.C. § 3431(a)(2) (emphasis added). That statute further provides that Section 7's key jurisdictional term "natural-gas company" "shall not include *any person* by reason of, or with respect to," transportation of gas exempted by Section 311 (and Section 601) of the NGPA. *Id.* § 3431(a)(2)(B) (emphasis added); Reh'g Order P 43, JA__-__; *accord Westar Transmission Co.*, 43 FERC ¶ 61,050, 61,141 (1988) (so concluding, based on analysis of statutory text, history, and purpose). The statutory text forecloses the

26

argument that upstream Section 311 service triggers Section 7 jurisdiction over the Connector Pipeline.

FERC's discussion of Section 311 does not "contradict," Opening Br. 41-42, Saguaro's representations about the initial sources of natural gas. Reh'g Order PP 41-44, JA__-__. FERC credited Saguaro's submissions showing that, upon commencing service, the Connector Pipeline will transport *exclusively* natural gas physically produced in Texas—i.e., not gas transported via Section 311. Auth. Order P 27, JA__-__. The Commission *also* responded to Sierra Club's arguments about the jurisdictional (in)significance of potential upstream Section 311 service, and potential future Section 311 service on the Connector Pipeline. Reh'g Order PP 40-44, JA__-__. Nothing in that discussion of Section 311 is inconsistent with the Commission's factual determination that the Connector Pipeline would initially flow only Texas-sourced gas.

Sierra Club wrongly argues that FERC must exercise Section 7 jurisdiction because the Connector Pipeline might, in the future, transport interstate gas under Section 311.[7] This Court rejected that proposition in *Big Bend*, 896 F.3d at 423-24,

---

[7] Sierra Club implausibly suggests that the Court should rewrite Section 311 to apply only to pipelines in existence in 1978. Opening Br. 49-50. This Court declined to adopt such a position in *Big Bend*, 896 F.3d at 422-23, and the argument fares no better now. Section 311 draws no textual distinction between pre-existing and new pipelines, and applying it prospectively effectuates both the statutory text and Congress's intent to "break down the regulatory barriers between the interstate and

where a developer explained that its intrastate pipeline would initially flow only Texas-sourced gas, even if it might later invoke Section 311.  It is commonplace and appropriate for pipelines initially to offer intrastate service flowing gas produced only in-state, and then at some later point to seek authorization to transport gas under Section 7.  Opening Br. 50 n.15; Reh'g Order PP 57, 59 & n.242, JA__-__, __-__; *see Valley Crossing Pipeline, LLC*, 161 FERC ¶ 61,084, at P 22 (2017).  Billions of dollars of investments and many operating pipelines rest on this well-understood approach.

### 2.    Sierra Club's "primary purpose" theory provides no basis for Section 7 jurisdiction.

Unable to marshal facts or existing law, Sierra Club asks this Court to adopt and apply a "primary purpose" test to find Section 7 applies.  Opening Br. 43-52.  Sierra Club divines that test from a paragraph in *Big Bend* rejecting concerns that a project developer was using Section 311 to evade Section 7.  *Id.* 44 (quoting *Big Bend*, 896 F.3d at 422-23).

*Big Bend* declined to reach "the merits of such concerns [about jurisdictional evasion]" or to endorse evasion as a basis for jurisdiction, finding those concerns "misplaced" on that record.  896 F.3d at 422-23.  There (as here) the pipeline demonstrated that it would initially transport only intrastate gas.  *Id.*; Auth. Order

---

intrastate markets."  *Associated Gas Distribs. v. FERC*, 824 F.2d 981, 1001 (D.C. Cir. 1987).

MATERIAL UNDER SEAL DELETED

P 27, JA__-__.  As in *Big Bend*, nothing in the orders challenged here prejudges what the Commission might do if Saguaro seeks Section 311 authorization in the future.  *See* 896 F.3d at 423.

In support of its "primary purpose" argument, Opening Br. 43-52, Sierra Club offers flimsy and inapposite evidence.  It invokes Saguaro's statement that the Connector Pipeline will *not* receive Section 311 interstate gas until some point after establishing intrastate service.  Opening Br. 45-46 (citing Saguaro Answer to Protests at 4-5 (Feb. 24, 2023), R.22, JA__-__).  It also mistakenly touts the Connector Pipeline's potential access, via the WesTex interconnection, to upstream pipelines providing Section 311 service.  *Id.* at 46; *see* FERC Br. 35-38, 47-48 (explaining that mere access to interstate gas does not prove that a pipeline will transport such gas).

Sierra Club errs in suggesting that the Connector Pipeline's capacity will "dwarf" that of WesTex, and that this supposed disparity evinces a purpose to transport interstate gas.  Opening Br. 48.  Saguaro anticipates that the Connector Pipeline will have access to at least eight upstream intrastate sources of natural gas, ██████████████████████████████████  Saguaro Resp. to Data Request, Appendix A at 3, 6, JA__, __; *id.*, Appendix B, Attachment 2, JA__ ███████

███████████████████████████████████████████████████

**MATERIAL UNDER SEAL DELETED**

████████████████████████████████████████████

████████████████████    *See* FERC Br. 53-55.

Although the Court need not reach the issue, Sierra Club's fear that Saguaro and its shippers harbor a hidden intent to ship interstate gas disregards economic reality. For much of 2024, the price of intrastate natural gas produced in the Permian Basin was *negative* in the Waha Hub region, given high production levels and constraints in takeaway pipeline capacity. *E.g.*, *Texas Waha Hub Gas Prices Plunge to Record Lows, Hit Negative Territory*, Pipeline & Gas Journal (Sept. 1, 2024), https://perma.cc/JU8N-JCQ9. The price of gas flowing on long-distance interstate pipelines, by contrast, includes the additional transportation costs of shipping gas over greater distances, as compared to gas produced close to the point of delivery. The basic economic reality that Saguaro's shipper will prefer the lowest-price source of gas undercuts the suggestion, Opening Br. 45, that in the FERC proceedings here Saguaro and Mexico Pacific concealed a hidden purpose to source gas from interstate pipelines.

The Commission had no obligation to require Saguaro to provide evidence of contracts with Connector Pipeline shippers. Opening Br. 47. In contrast to certification of interstate pipeline facilities under Section 7 (which, unlike Section 3, confers eminent domain), and consistent with Section 3's statutory presumption favoring approval of export facilities, a project developer need not provide evidence

of service contracts in seeking Section 3 authorization.  Reh'g Order P 53 & n.212,

JA__-__ (citing authorities); FERC Br. 56.  And unlike where new Section 7 pipeline

capacity is underwritten by long-term shipper agreements for firm transportation

capacity, *see Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301,

1309-10 (D.C. Cir. 2015), Saguaro bears the financial risk that its pipeline facilities

may be underutilized.

*   *   *

Sierra Club's appeal ultimately boils down to a desire to thwart the

development of the Saguaro project, and to subject more pipelines to federal "public

interest" and NEPA reviews, displacing state jurisdiction.  *See* Opening Br. 52.

Those concerns are properly addressed to Congress, not the courts.  Moreover, Sierra

Club's position ignores the statutory text and distorts the balance Congress struck

between federal and state jurisdiction.  Accepting it would improperly infringe on

areas of longstanding state primacy in the production and intrastate transportation of

natural gas.

## III.    FERC complied with NEPA.

Unable to compel federal review of the Connector Pipeline under the Act,

Sierra Club strives to find fault with the Commission's NEPA review.  Those

arguments fail.  *See* FERC Br. 59-70.

## A.    The Commission reasonably crafted its statement of purpose and need and alternatives analysis.

To guide its NEPA analysis of potential alternatives, *see* 42 U.S.C. § 4332(2)(C)(iii), (H), the Commission defined the project's purpose as "to site, construct, connect, operate, and maintain a new International Boundary crossing . . . located in Hudspeth County, Texas, to interconnect Saguaro's intrastate natural gas transmission pipeline, originating near the Waha Hub in Texas, to an interconnect with a pipeline under development in Mexico."  Environmental Assessment at 2 (Aug. 25, 2023), R.71, JA__.  Sierra Club wrongly asserts that this statement precluded a meaningful analysis of alternatives.  Opening Br. 54-55.[8]

FERC appropriately formulated its statement of purpose and need in light of both its own statutorily mandated goals, and Saguaro's objective of exporting gas to serve Mexico Pacific.  Reh'g Order P 83, JA__-__; FERC Br. 59-61.  Sierra Club identifies no case holding that a statement of purpose and need akin to the one at issue here was unduly narrow.  *See* Opening Br. 54-55.

---

[8] Sierra Club's NEPA arguments rely heavily on regulations of the Council on Environmental Quality ("CEQ"), which Sierra Club treats as binding on FERC. *See* Opening Br. 54-55, 59.  But *Marin Audubon Society v. FAA*, 121 F.4th 902 (D.C. Cir. 2024), held that CEQ's NEPA regulations were "ultra vires" because CEQ lacks statutory authority to promulgate binding regulations. Although FERC's regulations state that it "will comply" with CEQ's regulations, 18 C.F.R. § 380.1, if the latter are ultra vires, there is nothing for FERC to comply with—and CEQ's regulations provide no basis to set aside FERC's orders.  At the time this brief was filed, rehearing requests remained pending in *Marin Audubon.* Regardless, FERC fully complied with CEQ's regulations.

Instead, Sierra Club cites a Fourth Circuit decision concluding that a similar NEPA statement of purpose and need for a pipeline allowed "for a wide range of alternatives but [was] narrow enough . . . that there [were] not an infinite number of alternatives." *Sierra Club, Inc. v. U.S. Forest Serv.*, 897 F.3d 582, 599 (4th Cir. 2018). That statement, like FERC's here, identified "where the gas must come from, where it will go, [and] how much [the pipeline] would deliver." *Id.* This Court's precedent is to similar effect. *See N.J. Conservation Found. v. FERC*, 111 F.4th 42, 57-58 (D.C. Cir. 2024) (FERC satisfied NEPA by defining pipeline project's purpose as delivering a specific volume of gas from a production area to specified delivery points); *accord Citizens Action Coal. of Ind., Inc. v. FERC*, --- F.4th ---, No. 23-1046, 2025 WL 37052, at *3-4 (D.C. Cir. Jan. 7, 2025) (upholding FERC's definition of pipeline project's purpose as delivering natural gas to serve customer's combustion turbines). The Commission's statement of purpose and need here, defined in terms of delivering a specific volume of gas to a fixed delivery point, fell comfortably within the Commission's discretion.

To the extent Sierra Club properly presents any challenge to FERC's alternatives analysis, *see* Opening Br. 56-58, the Commission reasonably rejected proposed location, system, and pipeline capacity alternatives. FERC Br. 61-63. With respect to other locations, the record contradicts Sierra Club's assertion that the location of facilities in Mexico is flexible. The location of those facilities has

been "assessed and aligned by the Mexican proponent," and Saguaro does not control where they are built. *See* Permit Application, Resource Report 10 at 10-1, 10-2, JA__-__. Apart from a passing mention of system alternatives, Opening Br. at 56, Sierra Club offers no specific argument on appeal and has thus forfeited the issue. *See Consol. Edison Co. of N.Y., Inc. v. FERC*, 510 F.3d 333, 340 (D.C. Cir. 2007).

### B. NEPA did not require the Commission to consider the indirect effects of the Connector Pipeline.

Sierra Club argues that NEPA required FERC to evaluate the "reasonably foreseeable indirect effects *of the Connector Pipeline*." Opening Br. 59-65 (emphasis added). This argument fails for numerous reasons. FERC Br. 63-67. Intervenors add the following points.

Sierra Club focuses on a supposed obligation for FERC to assess the "indirect effects of the Connector Pipeline." It has not presented or preserved any other indirect-effects argument, such as whether the Connector Pipeline's impacts constitute "indirect impacts" of FERCs approval *of the Border Facility*. *See Consol. Edison*, 510 F.3d at 340; Opening Br. 59-61 (referring to "indirect impacts from the Connector Pipeline"). It doubly forfeited any such argument by not presenting it with specificity on rehearing. *See* 15 U.S.C. § 717r(b).[9]

---

[9] The NEPA indirect-effects arguments raised on rehearing focused on issues that Sierra Club abandoned in this Court—e.g., a supposed obligation to consider "life-

Even if Sierra Club had preserved a broader argument, it would fail.  *See* FERC Br. 63-67.  Indirect impacts are defined as effects (a) that are reasonably foreseeable; and (b) for which the agency action is the legally relevant cause.  42 U.S.C. § 4332(2)(C)(i); *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 763-70 (2004).  Where an action or effect falls within another agency's exclusive jurisdiction, that breaks the causal chain.  *Public Citizen*, 541 U.S. at 768; *Sierra Club v. FERC*, 827 F.3d 36, 47 (D.C. Cir. 2016) ("*Freeport*") (Commission not required to consider environmental impacts of gas exports, given Department of Energy's authority).  These cases exclude from the Commission's NEPA obligations impacts for which other agencies are the legally relevant cause.  Impacts associated with the Connector Pipeline, such as seismic risks, impacts on waterways, or environmental justice impacts, Opening Br. 60-63, do not qualify as indirect impacts of FERC's approval of the Border Facility.  The Texas Railroad Commission, not FERC, regulates the Connector Pipeline's construction and operation, and so that agency is the legally relevant cause of those impacts.  *Freeport*, 827 F.3d at 47.

Sierra Club's indirect-effects arguments have other flaws.  It invokes the Commission's Section 7 "certificate" authority, but the Commission *disclaimed*

---

cycle [greenhouse gas] emissions" or effects from upstream production.  Reh'g Request at 5, 112-15 (Mar. 18, 2024), R.110, JA__, __-__.  Passing general references to indirect effects, buried in a 120-page rehearing request and not identified as a point of error, do not suffice.

Section 7 jurisdiction here.  Opening Br. 63.  Sierra Club focuses primarily on a bare "reasonable foreseeability" standard.  *Id.* at 59.  To the extent it acknowledges the causation requirement, it (mis)cites one out-of-circuit case for an effectively limitless concept of but-for causation, under which FERC would be the "legally relevant cause" of any impacts it could "prevent . . . from occurring" by rejecting the Border Crossing facility.  *Id.* at 63.  Circuit law holds, however, that "a 'but-for' causal relationship is insufficient" for indirect effects.  *Freeport*, 827 F.3d at 46-47.

Sierra Club cannot be heard to complain that the Commission's orders should have devoted more attention to particular aspects of its indirect-effects analysis, Opening Br. 64-65, given Sierra Club's own failure to "specifically urge" those issues on rehearing.  *Intermountain Mun. Gas Agency v. FERC*, 326 F.3d 1281, 1285 (D.C. Cir. 2003).  Regardless, even where the Commission's orders do not explicitly consider "the extent to which *Public Citizen* place[s] [certain] . . . effects outside the Commission's NEPA duties," this Court can give effect to "NEPA and binding Supreme Court precedent," because doing so does not "trench[] upon a determination specifically entrusted to [the Commission's] expertise."  *Freeport*, 827 F.3d at 48-49.

## C.    The Commission reasonably applied its four-factor test.

The Commission's four-factor test did not compel evaluation of the Connector Pipeline's impacts.  *See* FERC Br. 68-70.  In addition:

Because Sierra Club offers no argument on the first and third factors, this Court has no basis to set aside the Commission's findings that those factors weigh against "federaliz[ing]" the Connector Pipeline. *Compare* Opening Br. 66-67, *with* Reh'g Order PP 76, 78, JA__-__. In a footnote, Sierra Club suggests that one factor can suffice. Opening Br. 66 n.19. But even if one factor did support Sierra Club's position, the Commission explained it would be outweighed by "the remaining three factors," which are considered in their "totality." Reh'g Order P 77 n.326, JA__.

In arguing about "Federal control and responsibility" over the *Connector Pipeline*, Sierra Club erroneously cites a table listing agencies regulating the *Border Facility*. Opening Br. 66 (citing Environmental Assessment at 7, JA__ (chart of permits required for "Project," defined as 1,000-foot border facility)). As for the Army Corps' regulation of water crossings, that limited jurisdiction does not compel expanded environmental review. FERC Br. 70; Reh'g Order P 79 & n.330, JA__.

## IV. If the Court finds merit in any of Sierra Club's arguments, it should remand without vacatur.

The Court should deny the petition. But if it finds merit in any of Sierra Club's arguments, the proper remedy would be remand without vacatur. A decision to vacate depends on (1) "the likelihood that 'deficiencies' in an order can be redressed on remand," and (2) "the 'disruptive consequences' of vacatur." *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013) (quoting *Allied-Signal v. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).

FERC could readily redress any deficiencies on remand while still authorizing the project.  This follows from the process-based nature of Sierra Club's appellate challenges, which argue that the Commission should have broadened the scope of its Natural Gas Act and NEPA review, or should have given additional consideration to certain impacts.  *See, e.g.*, Opening Br. 15-16, 52-59.  The likelihood that the Commission would reach the same substantive result on remand is heightened by the statutory presumption favoring authorization of export facilities, 15 U.S.C. § 717b(a), and Sierra Club's failure to raise any argument here that the Border Facility is inconsistent with the public interest.

*Environmental Defense Fund v. FERC*, 2 F.4th 953 (D.C. Cir. 2021) is readily distinguishable.  There, the Court criticized the Commission's reliance on one service contract with a corporate affiliate to demonstrate need for a new Section 7 pipeline, an error the Court viewed as undermining the Commission's ability to reauthorize the project on remand.  *Id.* at 973-77.  Here, Sierra Club made no effort to rebut the presumption favoring approval, and the Commission did not rely on any affiliate contracts.

This Court has repeatedly remanded without vacatur, even after finding error in an agency's decision to bypass a particular procedural step under NEPA, or other NEPA errors.  *See Food & Water Watch v. FERC*, 28 F.4th 277, 292 (D.C. Cir. 2022); *Healthy Gulf v. FERC*, 107 F.4th 1033, 1047 (D.C. Cir. 2024) ("reasonably

likely" FERC could "still authorize the Project" after correcting NEPA violations). Sierra Club does not make the kind of procedural arguments that this Court has found to support vacatur, such as where an agency prepared an environmental assessment rather than an environmental impact statement, *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032 (D.C. Cir. 2021), or bypassed formal supplementation, *City of Port Isabel v. FERC*, 111 F.4th 1198 (D.C. Cir. 2024) (reh'g petitions filed Oct. 21, 2024).

Moreover, vacatur would have severely disruptive consequences for both Saguaro and its customer, Mexico Pacific, of the kind that have been found to justify remand without vacatur.[10]  Saguaro has invested years and millions of dollars in developing, proposing, permitting, and preparing to construct the Border Facility and related infrastructure.  And Mexico Pacific is far advanced in developing facilities in Mexico that rely on Saguaro's infrastructure; vacatur here would disrupt its planning, financing, approvals, and schedule.  Vacatur would disrupt not only each company's investments, but also the commercial and contractual arrangements

---

[10] It is wrong to suggest, *see* Opening Br. 68, that the Court can ignore disruptive consequences unless it finds that the first step of *Allied-Signal* supports remand without vacatur.  The Court need not reach this issue, because the first prong is satisfied.  Regardless, under longstanding precedent, disruptive consequences, standing alone, can justify remand without vacatur.  *See North Carolina v. EPA*, 550 F.3d 1176, 1177-78 (D.C. Cir. 2008) (per curiam) (remanding without vacatur given disruptive effects, even where panel identified "more than several fatal flaws in the [agency action]").

between them.  *Healthy Gulf*, 107 F.4th at 1047 (disruption to "commercial operations," including to natural gas supply contracts, "counsel[s] against vacatur"); *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1332 (D.C. Cir. 2021) (vacatur would "needlessly disrupt completion of [] projects").

For all these reasons, if the Court grants any relief, it should remand without vacatur.

## **<u>CONCLUSION</u>**

The petition for review should be denied.

Dated: January 24, 2025

Respectfully submitted,

<u>/s/ Ashley C. Parrish</u>
(by permission)
James F. Bowe, Jr.
Ashley C. Parrish
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, D.C. 20006
Phone: 202.737.0500
Email: aparrish@kslaw.com

*Counsel for Respondent-Intervenor*
*Mexico Pacific Limited LLC*

<u>/s/ Jeremy C. Marwell</u>
Jeremy C. Marwell
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Phone: 202.639.6507
Email: jmarwell@velaw.com

Garrett T. Meisman
VINSON & ELKINS LLP
845 Texas Avenue, Suite 4700
Houston, TX 77002
Phone: 713.758.2559
Email: gmeisman@velaw.com

Ryan J. Collins
WRIGHT & TALISMAN, P.C.
1200 G Street, NW
Suite 600
Washington, DC 20005-3898
Phone: 202.349.9471
Email: collins@wrightlaw.com

*Counsel for Respondent-Intervenor*
*Saguaro Connector Pipeline, L.L.C.*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation provided in this Court's order of August 8, 2024 (Doc. 2069008) because it contains 9,075 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-point Times New Roman font.

Dated: January 24, 2025

*/s/ Jeremy C. Marwell*
Jeremy C. Marwell
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Phone: 202.639.6507
Email: jmarwell@velaw.com

*Counsel for Respondent-Intervenor*
*Saguaro Connector Pipeline, L.L.C.*

42

**<u>ADDENDUM</u>**

## TABLE OF CONTENTS FOR ADDENDUM

**Statute:**                                                                                  **Page**

Tex. Nat. Res. Code § 81.051 ............................................................................  A-1

**Regulations:**

18 C.F.R. § 157.6 ...........................................................................................  A-3

18 C.F.R. § 284.123 .......................................................................................  A-6

18 C.F.R. § 380.1 ...........................................................................................  A-11

18 C.F.R. § 388.112 .......................................................................................  A-13

Sec. 81.021.  INTELLECTUAL PROPERTY.  (a)  The commission may:

(1)  apply for, register, secure, hold, and protect under the laws of the United States or any state or nation:

(A)  a patent for the invention, discovery, or improvement of any process, machine, manufacture, or composition of matter;

(B)  a copyright for an original work of authorship fixed in any tangible medium of expression, known or later developed, from which it can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device;

(C)  a trademark, service mark, collective mark, or certification mark for a word, name, symbol, device, or slogan that the commission uses to identify and distinguish the commission's goods and services from other goods and services; or

(D)  other evidence of protection or exclusivity issued for intellectual property;

(2)  contract with a person for the sale, lease, marketing, or other distribution of the commission's intellectual property;

(3)  obtain under a contract described in Subdivision (2) a royalty, license right, or other appropriate means of securing reasonable compensation for the development or purchase of the commission's intellectual property; and

(4)  waive or reduce the amount of compensation secured by contract under Subdivision (3) if the commission determines that the waiver or reduction will:

(A)  further a goal or mission of the commission; and

(B)  result in a net benefit to the state.

(b)  Money paid to the commission under this section shall be deposited to the credit of the oil and gas regulation and cleanup fund as provided by Section 81.067.

Added by Acts 2017, 85th Leg., R.S., Ch. 72 (S.B. 1422), Sec. 1, eff. May 22, 2017.


### SUBCHAPTER C. JURISDICTION, POWERS, AND DUTIES

Sec. 81.051.  JURISDICTION OF COMMISSION.  (a)  The commission has jurisdiction over all:

(1)  common carrier pipelines defined in Section 111.002 of this code in Texas;

(2)  oil and gas wells in Texas;

(3)  persons owning or operating pipelines in Texas;

(4)  persons owning or engaged in drilling or operating oil or gas wells in Texas; and

(5)  pipeline transportation and underground storage of hydrogen.

(b)  Persons listed in Subsection (a) of this section and their pipelines and oil and gas wells are subject to the jurisdiction conferred by law on the commission.

Acts 1977, 65th Leg., p. 2510, ch. 871, art. I, Sec. 1, eff. Sept. 1, 1977.  Amended by Acts 1977, 65th Leg., p. 2694, ch. 871, art. II, Sec. 5, eff. Sept. 1, 1977.

Amended by:

Acts 2023, 88th Leg., R.S., Ch. 734 (H.B. 2847), Sec. 1, eff. September 1, 2023.


Sec. 81.052.  RULES.  The commission may adopt all necessary rules for governing and regulating persons and their operations under the jurisdiction of the commission as set forth in Section 81.051, including such rules as the commission may consider necessary and appropriate to implement state responsibility under any federal law or rules governing such persons and their operations.

Acts 1977, 65th Leg., p. 2510, ch. 871, art. I, Sec. 1, eff. Sept. 1, 1977.  Amended by Acts 1979, 66th Leg., p. 19, ch. 12, Sec. 1, eff. March 15, 1979.


Sec. 81.0521.  FEE FOR APPLICATION FOR EXCEPTION TO RAILROAD COMMISSION RULE.  (a)  With each application for an exception to any commission rule contained in Chapter 3 of Part I of Title 16 of the Texas Administrative Code, the applicant shall submit to the commission a fee of $150.

(b)  The application fee for an exception to any commission rule may not be refunded.

(c)  The proceeds from this fee, excluding any penalties collected in connection with the fee, shall be deposited to the oil and gas regulation and cleanup fund as provided by Section 81.067.



### § 157.6 Applications; general requirements.

(a) *Applicable rules*—(1) *Submission required to be furnished by applicant under this subpart.* Applications, amendments thereto, and all exhibits and other submissions required to be furnished by an applicant to the Commission under this subpart must be submitted in an original and 7 conformed copies. To the extent that data required under this subpart has been provided to the Commission, this data need not be duplicated. The applicant must, however, include a statement identifying the forms and records containing the required information and when that form or record was submitted.

(2) *Maps and diagrams.* An applicant required to submit a map or diagram under this subpart must submit one paper copy of the map or diagram.

(3) The following must be submitted in electronic format as prescribed by the Commission:

(i) Applications filed under this part 157 and all attached exhibits;

(ii) Applications covering acquisitions and all attached exhibits;

(iii) Applications for temporary certificates and all attached exhibits;

(iv) Applications to abandon facilities or services and all attached exhibits;

(v) The progress reports required under § 157.20(c) and (d);

(vi) Applications submitted under subpart E of this part and all attached exhibits;

(vii) Applications submitted under subpart F of this part and all attached exhibits;

(viii) Requests for authorization under the notice procedures established in § 157.205 and all attached exhibits;

(ix) The annual report required by § 157.207;

(x) The report required under § 157.214 when storage capacity is increased;

(xi) Amendments to any of the foregoing.

(4) All filings must be signed in compliance with the following.

(i) The signature on a filing constitutes a certification that: The signer has read the filing signed and knows the contents of the paper copies and electronic filing; the paper copies contain the same information as contained in the electronic filing; the contents as stated in the copies and in the electronic filing are true to the best knowledge and belief of the signer; and the signer possesses full power and authority to sign the filing.

(ii) A filing must be signed by one of the following:

(A) The person on behalf of whom the filing is made;

(B) An officer, agent, or employee of the governmental authority, agency, or instrumentality on behalf of which the filing is made; or,

(C) A representative qualified to practice before the Commission under § 385.2101 of this chapter who possesses authority to sign.

(5) *Other requirements.* Applications under section 7 of the Natural Gas Act must conform to the requirements of §§ 157.5 through 157.14. Amendments to or withdrawals of applications must conform to the requirements of §§ 385.215 and 385.216 of this chapter. If the application involves an acquisition of facilities, it must conform to the additional requirements prescribed in §§ 157.15 and 157.16. If the application involves an abandonment of facilities or service, it must conform to the additional requirements prescribed in § 157.18.

(b) *General content of application.* Each application filed other than an application for permission and approval to abandon pursuant to section 7(b) shall set forth the following information:

(1) The exact legal name of applicant; its principal place of business; whether an individual, partnership, corporation, or otherwise; State under the laws of which organized or authorized; and the name, title, and mailing address of the person or persons to whom communications concerning the application are to be addressed.

(2) The facts relied upon by applicant to show that the proposed service, sale, operation, construction, extension, or acquisition is or will be required by the present or future public convenience and necessity.

(3) A concise description of applicant's existing operations.

(4) A concise description of the proposed service, sale, operation, construction, extension, or acquisition, including the proposed dates for the beginning and completion of construction, the commencement of operations and of acquisition, where involved.

(5) A full statement as to whether any other application to supplement or effectuate applicant's proposals must be or is to be filed by applicant, any of applicant's customers, or any other person, with any other Federal, State, or other regulatory body; and if so, the nature and status of each such application.

(6) A table of contents which shall list all exhibits and documents filed in compliance with §§ 157.5 through 157.18, as well as all other documents and exhibits otherwise filed, identifying them by their appropriate titles and alphabetical letter designations. The alphabetical letter designations specified in §§ 157.14, 157.16, and 157.18 must be strictly adhered to and extra exhibits submitted at the volition of applicant shall be designated in sequence under the letter Z (Z1, Z2, Z3, etc.).

(7) A form of notice of the application suitable for publication in the FEDERAL REGISTER in accordance with the specifications in § 385.203(d) of this chapter.

(8) For applications to construct new facilities, detailed cost-of-service data supporting the cost of the expansion project, a detailed study showing the revenue responsibility for each firm rate schedule under the pipeline's currently effective rate design and under the pipeline's proposed rates, a detailed rate impact analysis by rate schedule (including by zone, if applicable), and an analysis reflecting the impact of the fuel usage resulting from the proposed expansion project (including by zone, if applicable).

(c) *Requests for shortened procedure.* If shortened procedure is desired a request therefor shall be made in conformity with § 385.802 of this chapter and may be included in the application or filed separately.

(d) *Landowner notification.* (1) For all applications filed under this subpart which include construction of facilities or abandonment of facilities (except for abandonment by sale or transfer where the easement will continue to be used

for transportation of natural gas), the applicant shall make a good faith effort to notify all affected landowners and towns, communities, and local, state and federal governments and agencies involved in the project:

(i) By certified or first class mail, sent within 3 business days following the date the Commission issues a notice of the application; or

(ii) By hand, within the same time period; and

(iii) By publishing notice twice of the filing of the application, no later than 14 days after the date that a docket number is assigned to the application, in a daily or weekly newspaper of general circulation in each county in which the project is located.

(2) All affected landowners includes owners of property interests, as noted in the most recent county/city tax records as receiving the tax notice, whose property:

(i) Is directly affected (*i.e.*, crossed or used) by the proposed activity, including all facility sites (including compressor stations, well sites, and all above-ground facilities), rights of way, access roads, pipe and contractor yards, and temporary workspace;

(ii) Abuts either side of an existing right-of-way or facility site owned in fee by any utility company, or abuts the edge of a proposed facility site or right-of-way which runs along a property line in the area in which the facilities would be constructed, or contains a residence within 50 feet of the proposed construction work area;

(iii) Is within one-half mile of proposed compressors or their enclosures or LNG facilities; or

(iv) Is within the area of proposed new storage fields or proposed expansions of storage fields, including any applicable buffer zone.

(3) The notice shall include:

(i) The docket number of the filing;

(ii) The most recent edition of the Commission's pamphlet that explains the Commission's certificate process and addresses the basic concerns of landowners. Except: pipelines are not required to include the pamphlet in notifications of abandonments or in the published newspaper notice. Instead, they should provide the title of the

**Federal Energy Regulatory Commission**                                        **§ 157.8**

pamphlet and indicate its availability at the Commission's Internet address;

(iii) A description of the applicant and the proposed project, its location (including a general location map), its purpose, and the timing of the project;

(iv) A general description of what the applicant will need from the landowner if the project is approved, and how the landowner may contact the applicant, including a local or toll-free phone number and a name of a specific person to contact who is knowledgeable about the project;

(v) A brief summary of what rights the landowner has at the Commission and in proceedings under the eminent domain rules of the relevant state. Except: pipelines are not required to include this information in the published newspaper notice. Instead, the newspaper notice should provide the Commission's Internet address and the telephone number for the Commission's Office of External Affairs; and

(vi) Information on how the landowner can get a copy of the application from the company or the location(s) where a copy of the application may be found as specified in §157.10.

(vii) A copy of the Commission's notice of application, specifically stating the date by which timely motions to intervene are due, together with the Commission's information sheet on how to intervene in Commission proceedings. Except: pipelines are not required to include the notice of application and information sheet in the published newspaper notice. Instead, the newspaper notice should indicate that a separate notice is to be mailed to affected landowners and governmental entities.

(4) If the notice is returned as undeliverable, the applicant will make a reasonable attempt to find the correct address and notify the landowner.

(5) Within 30 days of the date the application was filed, applicant shall file an updated list of affected landowners, including information concerning notices that were returned as undeliverable.

(6) If paragraph (d)(3) of this section requires an applicant to reveal Critical Energy Infrastructure Information (CEII), as defined by §388.113(c) of this chapter, to any person, the applicant

shall follow the procedures set out in §157.10(d).

[17 FR 7386, Aug. 14, 1952]

EDITORIAL NOTE: For FEDERAL REGISTER citations affecting §157.6, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at *www.govinfo.gov*.

**§ 157.7   Abbreviated applications.**

(a) *General.* When the operations sales, service, construction, extensions, acquisitions or abandonment proposed by an application do not require all the data and information specified by this part to disclose fully the nature and extent of the proposed undertaking, an abbreviated application may be filed in the manner prescribed in §385.2011 of this chapter, provided it contains all information and supporting data necessary to explain fully the proposed project, its economic justification, its effect upon applicant's present and future operations and upon the public proposed to be served, and is otherwise in conformity with the applicable requirements of this part regarding form, manner of presentation, and filing. Such an application shall (1) state that it is an abbreviated application; (2) specify which of the data and information required by this part are omitted; and (3) relate the facts relied upon to justify separately each such omission.

[Order 280, 29 FR 4876, Apr. 7, 1964]

EDITORIAL NOTE: For FEDERAL REGISTER citations affecting §157.7, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at *www.govinfo.gov*.

**§ 157.8   Acceptance for filing or rejection of applications.**

Applications will be docketed when received and the applicant so advised.

(a) If an application patently fails to comply with applicable statutory requirements or with applicable Commission rules, regulations, and orders for which a waiver has not been granted, the Director of the Office of Energy Projects or the Director of the Office of Energy Market Regulation may reject the application within 10 business days of filing as provided by §385.2001(b) of this chapter. This rejection is without prejudice to an applicant's refiling a


**Federal Energy Regulatory Commission**                    **§ 284.123**

(e) An interstate pipeline must obtain from its shippers certifications including sufficient information to verify that their services qualify under this section. Prior to commencing transportation service described in paragraph (d)(3) of this section, an interstate pipeline must receive the certification required from a local distribution company or an intrastate pipeline pursuant to paragraph (d)(3) of this section.

[Order 436, 50 FR 42495, Oct. 18, 1985, as amended by Order 526, 55 FR 33011, Aug. 13, 1990; Order 537, 56 FR 50245, Oct. 4, 1991; Order 581, 60 FR 53072, Oct. 11, 1995; Order 637, 65 FR 10222, Feb. 25, 2000; Order 756, 77 FR 4894, Feb. 1, 2012]

**§§ 284.103–284.106   [Reserved]**

## Subpart C—Certain Transportation by Intrastate Pipelines

**§ 284.121   Applicability.**

This subpart implements section 311(a)(2) of the NGPA and applies to the transportation of natural gas by any intrastate pipeline on behalf of:

(a) Any interstate pipeline, or

(b) Any local distribution company served by any interstate pipeline.

**§ 284.122   Transportation by intrastate pipelines.**

(a) Subject to paragraph (d) of this section, other provisions of this subpart, and the applicable conditions of Subpart A of this part, any intrastate pipeline may, without prior Commission approval, transport natural gas on behalf of:

(1) Any interstate pipeline; or

(2) Any local distribution company served by an interstate pipeline.

(b) No rate charged for transportation authorized under this subpart may exceed a fair and equitable rate under § 284.123.

(c) Any intrastate pipeline engaged in transportation arrangements authorized under this section must file reports as required by § 284.126.

(d) Transportation of natural gas is not on behalf of an interstate pipeline or local distribution company served by an interstate pipeline or authorized under this section unless:

(1) The interstate pipeline or local distribution company has physical custody of and transports the natural gas at some point; or

(2) The interstate pipeline or local distribution company holds title to the natural gas at some point, which may occur prior to, during, or after the time that the gas is being transported by the intrastate pipeline, for a purpose related to its status and functions as an interstate pipeline or its status and functions as a local distribution company.

[Order 436, 50 FR 42495, Oct. 18, 1985, as amended by Order 537, 56 FR 50245, Oct. 4, 1991; Order 537–A, 57 FR 46501, Oct. 9, 1992; Order 581, 60 FR 53073, Oct. 11, 1995; Order 756, 77 FR 4894, Feb. 1, 2012]

**§ 284.123   Rates and charges.**

(a) *General rule.* Rates and charges for transportation of natural gas authorized under § 284.122(a) shall be fair and equitable as determined in accordance with paragraph (b) of this section.

(b) *Election of rates.* (1) Subject to the conditions in §§ 284.7 and 284.9 of this chapter, an intrastate pipeline may elect to:

(i) Base its rates upon the methodology used:

(A) In designing rates to recover the cost of gathering, treatment, processing, transportation, delivery or similar service (including storage service) included in one of its then effective firm sales rate schedules for city-gate service on file with the appropriate state regulatory agency; or

(B) In determining the allowance permitted by the appropriate state regulatory agency to be included in a natural gas distributor's rates for city-gate natural gas service; or

(ii) To use the rates contained in one of its then effective transportation rate schedules for intrastate service on file with the appropriate state regulatory agency which the intrastate pipeline determines covers service comparable to service under this subpart.

(2)(i) If an intrastate pipeline does not choose to make any election under paragraph (b)(1) of this section, it shall apply for Commission approval, by order, of the proposed rates and charges by filing with the Commission the proposed rates and charges, and information showing the proposed rates and charges are fair and equitable.

Each petition for approval filed under this paragraph must be accompanied by the fee set forth in § 381.403 or by a petition for waiver pursuant to § 384.106 of this chapter. Upon filing the petition for approval, the intrastate pipeline may commence the transportation service and charge and collect the proposed rate, subject to refund.

(ii) 150 days after the date on which the Commission received an application filed pursuant to paragraph (b)(2)(i) of this section, the rate proposed in the application will be deemed to be fair and equitable and not in excess of an amount which interstate pipelines would be permitted to charge for providing similar transportation service, unless within the 150 day period, the Commission either extends the time for action, or institutes a proceeding in which all interested parties will be afforded an opportunity for written comments and for the oral presentation of views, data and arguments. In such proceeding, the Commission either will approve the rate or disapprove the rate and order refund, with interest, of any amount which has been determined to be in excess of those shown to be fair and equitable or in excess of the rates and charges which interstate pipelines would be permitted to charge for providing similar transportation service.

(iii) A Commission order approving or disapproving a transportation rate under this paragraph supersedes a rate determined in accordance with paragraph (b)(1) of this section.

(c) *Treatment of revenues.* The Commission presumes that all revenues received by an intrastate pipeline in connection with transportation authorized under § 284.122(a) and computed in accordance with paragraph (b)(1) of this section have been or will be taken into account by the appropriate state regulatory agency for purposes of establishing transportation charges by the intrastate pipeline for service to intrastate customers.

(d) *Presumptions.* If the intrastate pipeline is charging a rate computed pursuant to § 284.123(b)(1), the rate charged is presumed to be:

(1) Fair and equitable; and

(2) Not in excess of the rates and charges which interstate pipelines would be permitted to charge for providing similar transportation service.

(e) *Filing requirements.* Within 30 days of commencement of new service, any intrastate pipeline that engages in transportation arrangements under this subpart must file with the Commission a statement that includes the pipeline's interstate rates, the rate election made pursuant to paragraph (b) of this section, and a description of how the pipeline will engage in these transportation arrangements, including operating conditions, such as quality standards and financial viability of the shipper. If the pipeline changes its operations, rates, or rate election under this subpart, it must amend the statement and file such amendments not later than 30 days after commencement of the change in operations or the change in rate election.

(f) *Electronic filing of statements, and related materials*—(1) *General rule.* All filings made in proceedings initiated under this part must be made electronically, including rates and charges, or parts thereof, and material related thereto, statements, and all workpapers.

(2) *Requirements for signature.* All filings must be signed in compliance with the following:

(i) The signature on a filing constitutes a certification that the contents are true to the best knowledge and belief of the signer, and that the signer possesses full power and authority to sign the filing.

(ii) A filing must be signed by one of the following:

(A) The person on behalf of whom the filing is made;

(B) An officer, agent, or employee of the company, governmental authority, agency, or instrumentality on behalf of which the filing is made; or,

(C) A representative qualified to practice before the Commission under § 385.2101 of this chapter who possesses authority to sign.

(iii) All signatures on the filing or any document included in the filing must comply, where applicable, with the requirements in § 385.2005 of this chapter with respect to sworn declarations or statements and electronic signatures.

**Federal Energy Regulatory Commission**    **§ 284.123**

(3) *Format requirements for electronic filing.* The requirements and formats for electronic filing are listed in instructions for electronic filing and for each form. These formats are available through the Commission's website, *https://www.ferc.gov.*

(g) *Election of Notice Procedures*—(1) *Applicability.* An intrastate pipeline filing for approval of rates, a statement of operating conditions, and any amendments or modifications thereto pursuant to this section may use the notice procedures in this paragraph. Any intrastate pipeline electing to use these notice procedures for a filing must clearly state its election to use these procedures in the filing. Such filing is approved and the rates deemed fair and equitable and not in excess of the amount that an interstate pipeline would be permitted to charge for similar transportation service if the requirements in paragraph (g)(8) of this section have been fulfilled.

(2) *Rejection of filing.* The Director of the Office of Energy Market Regulation or his designee shall reject within 7 days of the date of filing a request which patently fails to comply with the provisions of paragraph (e) or (f) of this section, without prejudice to the intrastate pipeline refiling a complete application. If such filing was required by this section, that filing must be refiled within 14 days of the date of the rejection.

(3) *Publication of notice of filing.* The Secretary of the Commission shall issue a notice of the filing within 10 days of the date of the filing, which will then be published in the FEDERAL REGISTER. The notice shall designate a deadline for filing interventions, initial comments, final comments, and protests to the filing. The deadline for interventions and initial comments shall be 21 days after the date of the filing or such other date established by the Secretary of the Commission. The deadline for final comments and protests shall be 60 days after the date of the filing or such other date established by the Secretary of the Commission.

(4) *Protests.* (i) Any person or the Commission's staff may file a protest prior to the deadline for protests.

(ii) Protests shall be filed with the Commission in the form required by Part 385 of this chapter including a detailed statement of the protestor's interest in the filing and the specific reasons and rationale for the objection and whether the protestor seeks to be an intervenor.

(5) *Effect of protest.* If a protest is filed in accordance with paragraph (g)(4) of this section, then the intrastate pipeline, the person who filed the protest, any intervenors and Commission staff shall have 30 days from the deadline for filing protests established by the Secretary of the Commission in accordance with paragraph (g)(3) of this section, to resolve the protest, and to file a withdrawal of the protest pursuant to paragraph (g)(6) of this section. Informal settlement conferences may be convened by the Director of the Office of Energy Market Regulation or his designee during this 30 day period. If a protest is not withdrawn or dismissed by end of that 30 day period, the filing shall not be deemed approved pursuant to this paragraph. Within 60 days from the deadline for filing protests established by the Secretary of the Commission in accordance with paragraph (g)(3) of this section the Commission will establish procedures to resolve the proceeding.

(6) *Withdrawal of protests.* The protestor may withdraw a protest by submitting written notice of withdrawal to the Secretary of the Commission pursuant to § 385.216 of this chapter and serving a copy on the intrastate pipeline, any intervenors, and any person who has filed a motion to intervene in the proceeding.

(7) *Amendments or modifications to tariff records prior to approval.* An intrastate pipeline may file to amend or modify a tariff record contained in the initial filing pursuant to the procedures under this paragraph (g) which has not yet been approved pursuant to paragraph (g)(8) of this section. Such filing will toll the notice period established in paragraph (g)(3) of this section and the Secretary of the Commission will issue a notice establishing new deadlines for comments and protests for the entire filing pursuant to paragraph (g)(3).

855

(8) *Final approval.* (i) If no protest is filed within the time allowed by the Secretary of the Commission under paragraph (g)(3) of this section, the filing by the intrastate pipeline is approved, effective on the date proposed in the filing requesting approval unless the intrastate pipeline withdraws, amends, or modifies its filing or the filing is rejected pursuant to paragraph (g)(2) of this section.

(ii) If any protest is filed within the time allowed by the Secretary of the Commission under paragraph (g)(3) of this section and is subsequently withdrawn before the end of the 30-day reconciliation period provided by paragraph (g)(5) of this section, the filing by the intrastate pipeline is approved effective on the date proposed in the filing requesting approval unless the intrastate pipeline withdraws, amends, or modifies its filing or the filing is rejected pursuant to paragraph (g)(2) of this section.

(9) *Periodic rate review.* Rates of pipelines approved by the Commission pursuant to this paragraph are required to be periodically reviewed.

(i) Any intrastate pipeline with rates so approved must file an application for rate approval under this section on or before the date five years following the date it filed the application for authorization of rates pursuant to this paragraph. Any Hinshaw pipeline that has been a granted a blanket certificate under § 284.224 of this chapter and with rates approved pursuant to this paragraph must on or before the date five years following the date it filed the application for authorization of the rates pursuant to this paragraph either file under this section cost, throughput, revenue and other data, in the form specified in § 154.313 of this chapter, to allow the Commission to determine whether any change in rates is required pursuant to section 5 of the Natural Gas Act or an application for rate authorization pursuant to this section.

(ii) An intrastate pipeline with rates approved pursuant to the rate election in paragraph (b)(1) of this section that

remain unchanged during the five-year review period which were approved based on then effective state rates may file a certification with the Commission pursuant to this paragraph (g) that the rates continue to comply on the same basis with the requirements set forth in paragraph (b)(1) of this section. Such certification of rates will meet the periodic rate review requirement set forth in this paragraph (g)(9) unless the Commission determines that further proceedings concerning the rates are appropriate.

(iii) If the state rate used pursuant to paragraph (b)(1) of this section for approval of a rate pursuant to this paragraph (g) is changed, not later than 30 days after that changed rate becomes effective, the intrastate pipeline must file a new rate election pursuant to paragraph (b) of this section.

(10) *Withdrawal of filing prior to approval.* A pipeline may, pursuant to paragraph (h) of this section, withdraw in its entirety a filing made pursuant to paragraph (g) that has not been approved by filing a withdrawal motion with the Commission. A filing that is withdrawn will not fulfill the requirements under paragraph (g)(8) of this section.

(h) *Withdrawal of filing.* A pipeline may withdraw in its entirety a filing pursuant to this section that has not been approved by filing a withdrawal motion with the Commission.

(1) The withdrawal motion must state that any amounts collected subject to refund in excess of the rates authorized the Commission will be refunded with interest calculated and a refund report filed with the Commission in accordance with § 154.501 of this chapter. The refunds must be made within 60 days of the date the withdrawal motion becomes effective.

(2) The withdrawal motion will become effective, and the filing will be deemed withdrawn at the end of 15 days from the date of filing of the withdrawal motion, if no order disallowing the motion is issued within that period. If an answer in opposition is filed

**Federal Energy Regulatory Commission**                                **§ 284.126**

within the 15-day period, the withdrawal is not effective until an order accepting the withdrawal is issued.

[44 FR 52184, Sept. 7, 1979, as amended at 44 FR 66791, Nov. 21, 1979; Order 394, 49 FR 35364, Sept. 7, 1984; Order 436, 50 FR 42496, Oct. 18, 1985; 50 FR 52276, Dec. 23, 1985; Order 581, 60 FR 53073, Oct. 11, 1995; Order 714, 73 FR 57535, Oct. 3, 2008; Order 781, 78 FR 45862, July 30, 2013; Order 849, 83 FR 36715, July 30, 2018; Order 849–B, 86 FR 29506, June 2, 2021; Order 899, 88 FR 74031, Oct. 30, 2023]

**§ 284.124  Terms and conditions.**

Contracts for the transportation of natural gas authorized under this subpart shall provide that the transportation arrangement is subject to the provisions of this subpart.

**§ 284.125  [Reserved]**

**§ 284.126  Reporting requirements.**

(a) *Notice of bypass.* An intrastate pipeline that provides transportation (except storage) under § 284.122 to a customer that is located in the service area of a local distribution company and will not be delivering the customer's gas to that local distribution company, must file with the Commission within thirty days after commencing such transportation, a statement that the interstate pipeline has notified the local distribution and the local distribution company's appropriate state regulatory agency in writing of the proposed transportation prior to commencement.

(b) Form No. 549D, *Quarterly Transportation and Storage Report of Intrastate Natural Gas and Hinshaw Pipelines.*

(1) Each intrastate pipeline must use Form No. 549D to file a quarterly report with the Commission and the appropriate state regulatory agency that contains, for each transportation and storage service provided during the preceding calendar quarter under § 284.122, the following information on each transaction, aggregated by contract:

(i) The full legal name, and identification number, of the shipper receiving the service, including whether there is an affiliate relationship between the pipeline and the shipper;

(ii) The type of service performed (*i.e.,* firm or interruptible transportation, storage, or other service);

(iii) The rate charged under each contract, specifying the rate schedule/name of service and docket where the rates were approved. The report should separately state each rate component set forth in the contract (*i.e.,* reservation, usage, and any other charges);

(iv) The primary receipt and delivery points covered by the contract, identified by the list of points that the pipeline has published with the Commission;

(v) The quantity of natural gas the shipper is entitled to transport, store, or deliver under each contract;

(vi) The duration of the contract, specifying the beginning and (for firm contracts only) ending month and year of the current agreement;

(vii) Total volumes transported, stored, injected or withdrawn for the shipper; and

(viii) Annual revenues received for each shipper, excluding revenues from storage services. The report should separately state revenues received under each component, and need only be reported every fourth quarter.

(2) The quarterly Form No. 549D report for the period January 1 through March 31 must be filed on or before June 1. The quarterly report for the period April 1 through June 30 must be filed on or before September 1. The quarterly report for the period July 1 through September 30 must be filed on or before December 1. The quarterly report for the period October 1 through December 31 must be filed on or before March 1.

(3) Each Form No. 549D report must be filed as prescribed in § 385.2011 of this chapter as indicated in the General Instructions and Data Dictionary set out in the quarterly reporting form. Each report must be prepared and filed in conformance with the Commission's software or XML Schema, eTariff filing structure, and reporting guidance, so as to be posted and available for downloading from the FERC Web site (*http://www.ferc.gov*). One copy of the report must be retained by the respondent in its files.

(4) Intrastate pipelines filing Form No. 549D are no longer required to file

857

hearings, prehearing conferences, settlement conferences, and other meetings before presiding officers are suspended, and any requirement that a presiding officer act on motions (including motions to permit interlocutory appeals and to certify questions) is also suspended. Service of data requests and other discovery, and responses thereto, by and to the Commission's Trial Staff is similarly suspended. Upon resumption of Commission operations in whole or in relevant part, such hearings, conferences and other meetings will be rescheduled, action on motions also will be rescheduled, and service of data requests and other discovery, and responses thereto, by and to the Commission's Trial Staff, will similarly be rescheduled, by the presiding officer or the Commission, as appropriate.

(i) *Enforcement Actions under the Public Utility Regulatory Policies Act of 1978.* Unless otherwise directed, if the date by which the Commission is required to act on a petition for enforcement action under section 210(h)(2) of the Public Utility Regulatory Policies Act of 1978 falls during a period when the Continuity of Operations Plan is activated and, following such activation, when Commission operations are suspended in whole or in relevant part, and also during the 14 days thereafter, the Commission will not initiate such an enforcement action under section 210(h)(2) of the Public Utility Regulatory Policies Act of 1978 and the petitioner may itself bring its own enforcement action in the appropriate court.

(j) *Chairman's and Commission's authority to modify deadlines and timeframes.* During periods when the Continuity of Operations Plan is activated and, following such activation, when Commission operations are suspended in whole or in part and also during the 14 days thereafter, the Chairman (or the Chairman's delegate pursuant to § 376.205, as appropriate), may shorten, and the Commission (or the Commission's delegate pursuant to § 376.204, as appropriate) may extend, with respect to the matters addressed in this section, as appropriate:

(1) The time periods and dates for filings with the Commission, a decisional employee, or a presiding officer;

(2) The time periods and dates for reports, submissions and notifications to the Commission, a decisional employee, or a presiding officer; and

(3) The time periods and dates for actions by the Commission, a decisional employee, or a presiding officer.

[Order 765, 77 FR 43490, July 25, 2012]

## PART 380—REGULATIONS IMPLEMENTING THE NATIONAL ENVIRONMENTAL POLICY ACT

Sec.
380.1   Purpose.
380.2   Definitions and terminology.
380.3   Environmental information to be supplied by an applicant.
380.4   Projects or actions categorically excluded.
380.5   Actions that require an environmental assessment.
380.6   Actions that require an environmental impact statement.
380.7   Format of an environmental impact statement.
380.8   Preparation of environmental documents.
380.9   Public availability of NEPA documents and public notice of NEPA related hearings and public meetings.
380.10   Participation in Commission proceedings.
380.11   Environmental decisionmaking.
380.12   Environmental reports for Natural Gas Act applications.
380.13   Compliance with the Endangered Species Act.
380.14   Compliance with the National Historic Preservation Act.
380.15   Siting and maintenance requirements.
380.16   Environmental reports for section 216 Federal Power Act Permits.
APPENDIX A TO PART 380—MINIMUM FILING REQUIREMENTS FOR ENVIRONMENTAL REPORTS UNDER THE NATURAL GAS ACT

AUTHORITY: 42 U.S.C. 4321–4370h, 7101–7352; E.O. 12009, 3 CFR 1978 Comp., p. 142.

SOURCE: Order 486, 52 FR 47910, Dec. 17, 1987, unless otherwise noted.

## § 380.1  Purpose.

The regulations in this part implement the Federal Energy Regulatory Commission's procedures under the National Environmental Policy Act of 1969 (NEPA). These regulations supplement the regulations of the Council on Environmental Quality, 40 CFR parts 1500 through 1508. The Commission will

**Federal Energy Regulatory Commission**                      **§ 380.3**

comply with the regulations of the Council on Environmental Quality except where those regulations are inconsistent with the statutory requirements of the Commission.

[Order 486, 52 FR 47910, Dec. 17, 1987, as amended by Order 756, 77 FR 4895, Feb. 1, 2012]

### § 380.2 Definitions and terminology.

For purposes of this part—

(a) *Categorical exclusion* means a category of actions described in § 380.4, which do not individually or cumulatively have a significant effect on the human environment and which the Commission has found to have no such effect and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. The Commission may decide to prepare environmental assessments for the reasons stated in § 380.4(b).

(b) *Commission* means the Federal Energy Regulatory Commission.

(c) *Council* means the Council on Environmental Quality.

(d) *Environmental assessment* means a concise public document for which the Commission is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2) Aid the Commission's compliance with NEPA when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is necessary. Environmental assessments must include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E) of NEPA, of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

(e) *Environmental impact statement* (EIS) means a detailed written statement as required by section 102(2)(C) of NEPA. DEIS means a draft EIS and FEIS means a final EIS.

(f) *Environmental report* or ER means that part of an application submitted to the Commission by an applicant for authorization of a proposed action which includes information concerning the environment, the applicant's analysis of the environmental impact of the action, or alternatives to the action required by this or other applicable statutes or regulations.

(g) *Finding of no significant impact* (FONSI) means a document by the Commission briefly presenting the reason why an action, not otherwise excluded by § 380.4, will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. It must include the environmental assessment or a summary of it and must note other environmental documents related to it. If the assessment is included, the FONSI need not repeat any of the discussion in the assessment but may incorporate it by reference.

### § 380.3 Environmental information to be supplied by an applicant.

(a) An applicant must submit information as follows:

(1) For any proposed action identified in §§ 380.5 and 380.6, an environmental report with the proposal as prescribed in paragraph (c) of this section.

(2) For any proposal not identified in paragraph (a)(1) of this section, any environmental information that the Commission may determine is necessary for compliance with these regulations, the regulations of the Council, NEPA and other Federal laws such as the Endangered Species Act, the National Historic Preservation Act or the Coastal Zone Management Act.

(b) An applicant must also:

(1) Provide all necessary or relevant information to the Commission;

(2) Conduct any studies that the Commission staff considers necessary or relevant to determine the impact of the proposal on the human environment and natural resources;

(3) Consult with appropriate Federal, regional, State, and local agencies during the planning stages of the proposed action to ensure that all potential environmental impacts are identified. (The specific requirements for consultation on hydropower projects are contained in § 4.38 and § 16.8 of this chapter and in section 4(a) of the Electric Consumers Protection Act, Pub. L. No. 99–495, 100 Stat. 1243, 1246 (1986));


the relevance of the desired testimony or documents, and a discussion of whether the desired testimony or documents are reasonably available from other sources. If testimony is desired, the statement must also contain a general summary of the testimony and a discussion of whether Commission records could be produced and used in lieu of testimony. Any authorization for testimony will be limited to the scope of the demand as summarized in such statement.

(d) Commission records or information which are not part of the public record will be produced only upon authorization by the Commission.

(e) The Commission or its designee will consider and act upon subpoenas under this section with due regard for statutory restrictions, the Commission's Rules of Practice and Procedure, and the public interest, taking into account factors such as applicable privileges including the deliberative process privilege; the need to conserve the time of employees for conducting official business; the need to avoid spending the time and money of the United States for private purposes; the need to maintain impartiality between private litigants in cases where a substantial government interest is not involved; and the established legal standards for determining whether justification exists for the disclosure of confidential information and records.

(f) The Commission authorizes the General Counsel or the General Counsel's designee to make determinations under this section.

### § 388.112 Requests for privileged treatment for documents submitted to the Commission.

(a) *Scope.* By following the procedures specified in this section, any person submitting a document to the Commission may request privileged treatment for some or all of the information contained in a particular document that it claims is exempt from the mandatory public disclosure requirements of the Freedom of Information Act, 5 U.S.C. 552 (FOIA), and should be withheld from public disclosure. For the purposes of the Commission's filing requirements, non-CEII subject to an outstanding claim of exemption from

disclosure under FOIA will be referred to as privileged material. The rules governing CEII are contained in § 388.113.

(b) *Procedures for filing and obtaining privileged material.* (1) General Procedures. A person requesting that material be treated as privileged information must include in its filing a justification for such treatment in accordance with the filing procedures posted on the Commission's Web site at *http://www.ferc.gov*. A person requesting that a document filed with the Commission be treated as privileged in whole or in part must designate the document as privileged in making an electronic filing or clearly indicate a request for such treatment on a paper filing. The cover page and pages or portions of the document containing material for which privileged treatment is claimed should be clearly labeled in bold, capital lettering, indicating that it contains privileged or confidential information, as appropriate, and marked ''DO NOT RELEASE.'' The filer also must submit to the Commission a public version with the information that is claimed to be privileged material redacted, to the extent practicable.

(2) Procedures for Proceedings with a Right to Intervene. The following procedures set forth the methods for filing and obtaining access to material that is filed as privileged in complaint proceedings and in any proceeding to which a right to intervention exists:

(i) If a person files material as privileged material in a complaint proceeding or other proceeding to which a right to intervention exists, that person must include a proposed form of protective agreement with the filing, or identify a protective agreement that has already been filed in the proceeding that applies to the filed material. This requirement does not apply to material submitted in hearing or settlement proceedings, or if the only material for which privileged treatment is claimed consists of landowner lists or privileged information filed under §§ 380.12(f) and 380.16(f) of this chapter.

(ii) The filer must provide the public version of the document and its proposed form of protective agreement to

1268

**Federal Energy Regulatory Commission**     **§ 388.112**

each entity that is required to be served with the filing.

(iii) Any person who is a participant in the proceeding or has filed a motion to intervene or notice of intervention in the proceeding may make a written request to the filer for a copy of the complete, non-public version of the document. The request must include an executed copy of the protective agreement and a statement of the person's right to party or participant status or a copy of their motion to intervene or notice of intervention. Any person may file an objection to the proposed form of protective agreement. A filer, or any other person, may file an objection to disclosure, generally or to a particular person or persons who have sought intervention.

(iv) If no objection to disclosure is filed, the filer must provide a copy of the complete, non-public document to the requesting person within 5 days after receipt of the written request that is accompanied by an executed copy of the protective agreement. If an objection to disclosure is filed, the filer shall not provide the non-public document to the person or class of persons identified in the objection until ordered by the Commission or a decisional authority.

(v) For material filed in proceedings set for trial-type hearing or settlement judge proceedings, a participant's access to material for which privileged treatment is claimed is governed by the presiding official's protective order.

(vi) For landowner lists, information filed as privileged under §§ 380.12(f) and 380.16(f) of this chapter, forms filed with the Commission, and other documents not covered above, access to this material can be sought pursuant to a FOIA request under § 388.108. Applicants are not required under paragraph (b)(2)(iv) of this section to provide intervenors with landowner lists and the other materials identified in the previous sentence.

(c) *Effect of privilege or CEII claim.* (1) For documents filed with the Commission:

(i) The documents for which privileged treatment is claimed will be maintained in the Commission's document repositories as non-public until

such time as the Commission may determine that the document is not entitled to the treatment sought and is subject to disclosure consistent with § 388.108. By treating the documents as nonpublic, the Commission is not making a determination on any claim of privilege status. The Commission retains the right to make determinations with regard to any claim of privilege status, and the discretion to release information as necessary to carry out its jurisdictional responsibilities.

(ii) The request for privileged treatment and the public version of the document will be made available while the request is pending.

(2) For documents submitted to Commission staff. The notification procedures of paragraphs (d), (e), and (f) of this section will be followed before making a document public.

(d) *Notification of request and opportunity to comment.* When a FOIA requester seeks a document for which privilege status has been claimed, or when the Commission itself is considering release of such information, the Commission official who will decide whether to release the information or any other appropriate Commission official will notify the person who submitted the document and give the person an opportunity (at least five calendar days) in which to comment in writing on the request. A copy of this notice will be sent to the requester.

(e) *Notification before release.* Notice of a decision by the Commission, the Chairman of the Commission, the Director, Office of External Affairs, the General Counsel or General Counsel's designee, a presiding officer in a proceeding under part 385 of this chapter, or any other appropriate official to deny a claim of privilege, in whole or in part, will be given to any person claiming that the information is privileged no less than 5 calendar days before disclosure. The notice will briefly explain why the person's objections to disclosure are not sustained by the Commission. A copy of this notice will be sent to the FOIA requester.

(f) Notification of suit in Federal courts. When a FOIA requester brings suit to compel disclosure of information for which a person has claimed privileged treatment, the Commission

1269

will notify the person who submitted the documents of the suit.

[Order 769, 77 FR 65476, Oct. 29, 2012, as amended by Order 833, 81 FR 93748, Dec. 21, 2016]

### § 388.113 Critical Energy/Electric Infrastructure Information (CEII).

(a) *Scope.* This section governs the procedures for submitting, designating, handling, sharing, and disseminating Critical Energy/Electric Infrastructure Information (CEII) submitted to or generated by the Commission. The Commission reserves the right to restrict access to previously filed information as well as Commission-generated information containing CEII. Nothing in this section limits the ability of any other Federal agency to take all necessary steps to protect information within its custody or control that is necessary to ensure the safety and security of the electric grid. To the extent necessary, such agency may consult with the CEII Coordinator regarding the treatment or designation of such information.

(b) *Purpose.* The procedures in this section implement section 215A of the Federal Power Act, and provide a comprehensive overview of the manner in which the Commission will implement the CEII program.

(c) *Definitions.* For purposes of this section:

(1) *Critical electric infrastructure information* means information related to critical electric infrastructure, or proposed critical electrical infrastructure, generated by or provided to the Commission or other Federal agency other than classified national security information, that is designated as critical electric infrastructure information by the Commission or the Secretary of the Department of Energy pursuant to section 215A(d) of the Federal Power Act. Such term includes information that qualifies as critical energy infrastructure information under the Commission's regulations. Critical Electric Infrastructure Information is exempt from mandatory disclosure under the Freedom of Information Act, 5 U.S.C. 552(b)(3) and shall not be made available by any Federal, State, political subdivision or tribal authority pursuant to any Federal, State, political subdivision or tribal law requiring public disclosure of information or records pursuant to section 215A(d)(1)(A) and (B) of the Federal Power Act.

(2) *Critical energy infrastructure information* means specific engineering, vulnerability, or detailed design information about proposed or existing critical infrastructure that:

(i) Relates details about the production, generation, transportation, transmission, or distribution of energy;

(ii) Could be useful to a person in planning an attack on critical infrastructure;

(iii) Is exempt from mandatory disclosure under the Freedom of Information Act, 5 U.S.C. 552; and

(iv) Does not simply give the general location of the critical infrastructure.

(3) *Critical electric infrastructure* means a system or asset of the bulk-power system, whether physical or virtual, the incapacity or destruction of which would negatively affect national security, economic security, public health or safety, or any combination of such matters.

(4) *Critical infrastructure* means existing and proposed systems and assets, whether physical or virtual, the incapacity or destruction of which would negatively affect security, economic security, public health or safety, or any combination of those matters.

(d) *Criteria and procedures for determining what constitutes CEII.* The following criteria and procedures apply to information labeled as CEII:

(1) For information submitted to the Commission:

(i) A person requesting that information submitted to the Commission be treated as CEII must include with its submission a justification for such treatment in accordance with the filing procedures posted on the Commission's Web site at *http://www.ferc.gov.* The justification must provide how the information, or any portion of the information, qualifies as CEII, as the terms are defined in paragraphs (c)(1) and (2) of this section. The submission must also include a clear statement of the date the information was submitted to the

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2025, I electronically filed the foregoing document, together with its addendum, with the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system, and served copies of the foregoing via the Court's CM/ECF system on all ECF-registered counsel.

Dated: January 24, 2025

Respectfully submitted,

*/s/ Jeremy C. Marwell*
Jeremy C. Marwell
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Phone: 202.639.6507
Email: jmarwell@velaw.com

*Counsel for Respondent-Intervenor Saguaro Connector Pipeline, L.L.C.*